**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>NOBLE HOUSE HOME FURNISHINGS LLC, et al.,<br><br>       Debtors. [1] | Chapter 11<br><br>Case No. 23-90773 (CML)<br><br>(Joint Administration Pending) |

**DEBTORS' <u>EMERGENCY</u> MOTION FOR ENTRY OF INTERIM AND FINAL
ORDERS (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION
FINANCING AND (B) USE CASH COLLATERAL, (II) GRANTING LIENS AND
PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS,
(III) GRANTING ADEQUATE PROTECTION TO PREPETITION ABL PARTIES, (IV)
MODIFYING THE AUTOMATIC STAY, (V) SCHEDULING
A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF**

> **Emergency relief has been requested. Relief is requested not later than September 12, 2023.**
>
> **If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**
>
> **A hearing will be conducted on this matter on September 12, 2023, at 4:00 p.m. (prevailing Central Time). Participation at the hearing will only be permitted by an audio and video connection.**
>
> **Audio communication will be by use of the Court's dial-in facility. You may access the facility at (832) 917-1510. Once connected, you will be asked to enter the conference room number. Judge Lopez's conference room number is 590153. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Lopez's homepage. The meeting code is "JudgeLopez". Click the settings icon in the upper right corner and enter your name under the personal information setting.**
>
> **Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance" link on Judge Lopez's homepage. Select the case name, complete the required fields and click "Submit" to complete your appearance.**

  The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") state

the following in support of this financing motion (this "<u>Motion</u>"):

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification numbers, are: Noble House Home Furnishings LLC (1671); Best Selling Home Decor Furniture, LLC (5580), Le Pouf, LLC (8197), NH Services LLC (9626), and Heavy Metal, Inc. (3124). The Debtors' service address in these Chapter 11 cases is 700 Milam Street, Suite 1300, Houston, TX 77002.

## JURISDICTION AND VENUE

1.      The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b). The Debtors confirm their consent, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court.

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The bases for the relief requested herein are sections 105, 361, 362, 363, 364, 503, and 507 of Title 11 of the United States Code (the "Bankruptcy Code"), Bankruptcy Rules 2002 and 4001, and rules 4002-1 and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Local Rules").

## RELIEF REQUESTED

4.      The Debtors seek the entry of an interim order, substantially in the form attached hereto (the "Interim Order"),[2] and a final order (the "Final Order,"[3] respectively, and together, the "DIP Orders"):

> a.   authorizing the Debtors to obtain senior secured, superpriority postpetition financing on a superpriority basis consisting of a senior secured superpriority revolving credit facility in the aggregate principal amount of up to **$12,200,000** in new money advances plus the DIP Roll-Up Obligations (the "DIP Facility," and all amounts extended thereunder, the "DIP Loans"), pursuant to the terms and conditions of that certain *Senior Secured Super-Priority Debtor-In-Possession Credit Agreement* (as the same may be amended, restated, supplemented, waived or otherwise modified from time to time, the "DIP Agreement"), by and among the Debtors and Wells Fargo Bank, National Association, as administrative agent (in such capacity, the "DIP Agent") for and on behalf of itself and the other lenders, letter of credit issuers and bank

---

[2]    Capitalized terms used herein but not otherwise defined have the meanings ascribed to them in the DIP Documents (defined below) or the Interim Order, as applicable.

[3]    The Debtors will file the form of Final Order prior to the Final Hearing (as defined herein).

product providers party thereto (collectively with the DIP Agent, the "DIP Lenders"), substantially in the form of Exhibit B to the Interim Order;

b.  authorizing the Debtors to apply all collections and proceeds of DIP Collateral to reduce, on a dollar for dollar basis, the Prepetition ABL Obligations (the "Creeping Roll-Up") and, upon entry of the Final Order, converting all remaining outstanding Prepetition ABL Obligations into DIP Obligations (collectively, the "DIP Roll-Up Obligations");

c.  authorizing the Debtors to execute and deliver the DIP Agreement and any other agreements, instruments, pledge agreements, guarantees, control agreements and other Loan Documents and documents related thereto (including any security agreements, intellectual property security agreements, control agreements, or notes) (as amended, restated, supplemented, waived, and/or modified from time to time, and collectively, with the DIP Agreement, the "DIP Documents") and to perform such other acts as may be necessary or desirable in connection with the DIP Documents;

d.  granting to the DIP Agent, for the benefit of itself and the DIP Lenders on account of the DIP Facility and all obligations owing thereunder and under, or secured by, the DIP Documents (collectively, and including all "Obligations" as described in the DIP Agreement, the "DIP Obligations") allowed superpriority administrative expense claim status in each of the Cases and any Successor Cases (as defined herein);

e.  granting to the DIP Agent, for the benefit of itself and the DIP Lenders (as defined in the DIP Agreement) under the DIP Documents, automatically perfected security interests in and liens on all of the DIP Collateral, including all property constituting "cash collateral" as defined in section 363(a) of the Bankruptcy Code ("Cash Collateral"), which liens shall be subject to the priorities set forth herein;

f.  authorizing and directing the Debtors to pay the principal, interest, fees, expenses and other amounts payable under the DIP Documents as such become due, including, without limitation, letter of credit fees (including issuance and other related charges), continuing commitment fees, closing fees, audit fees, appraisal fees, valuation fees, liquidator fees, structuring fees, arrangement fees, upfront fees, administrative agent's fees, the reasonable fees and disbursements of the DIP Agent's attorneys, advisors, accountants and other consultants, all to the extent provided in, and in accordance with, the DIP Documents;

g.  authorizing the Debtors to use, on the terms described in the Interim Order, the DIP Loans and the Prepetition Collateral (as defined herein), including the Cash Collateral of the Prepetition ABL Parties under the Prepetition ABL Documents;

3

h.  providing adequate protection to the Prepetition ABL Parties for any diminution in value of their interests in the Prepetition Collateral, including Cash Collateral, for any reason provided for under the Bankruptcy Code, including the imposition of the automatic stay, the Debtors' use, sale, or lease of the Prepetition Collateral, including Cash Collateral, and the priming of their respective interests in the Prepetition Collateral (including by the Carve Out) pursuant to the terms and conditions set forth herein ;

i.  vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and this Interim Order;

j.  scheduling a final hearing (the "Final Hearing"); and

k.  granting related relief.

**GENERAL BACKGROUND**

5.     On September 11, 2023 (the "Petition Date"), the Debtors each commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code. The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or statutory committee of creditors has been appointed in these Chapter 11 Cases. The Debtors have filed a motion requesting joint administration of their Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1.

6.     The Debtors are a distributor, manufacturer and retailer of indoor and outdoor home furnishings with distribution throughout e-commerce channels including partners such as Amazon, WalMart, Costco, Wayfair, Overstock, Target and Home Depot, fulfilling direct to consumer orders from the Debtors' distribution centers. Family-owned since their founding in 1992, the Debtors design, market and sell their products under several brands including Christopher Knight Home, NobleHouse, LePouf, OkiOki, Best Selling, and GDFStudio, and they lease offices, warehouses, and other sites in Texas, California, and Georgia.  Including indoor and outdoor

4

furnishings, the Debtors have a wide and diverse range of products, including over 100 categories of products and 8,000 core SKUs.  The Debtors also sell through wholesale channels, primarily to the Big Box retailers – TJMaxx, Home Goods, Marshalls, Ross Stores and others.

7.     Information regarding the Debtors' business and capital structure and the circumstances leading to the commencement of these Chapter 11 Cases is set forth in the *Declaration of Gayla Bella in Support of the Debtors' Chapter 11 Petitions and First Day Relief* (the "First Day Declaration"), which has been filed with the Court contemporaneously herewith and is incorporated by reference herein.

**Concise Statement of the Material Terms of the Material Terms of the Interim Order Pursuant to Bankruptcy Rule 4001 and the Procedures for Complex Chapter 11 Cases in the United States Bankruptcy Court for the Southern District of Texas**

8.     The following chart contains a concise summary of the material terms of the proposed Interim Order, together with references to the applicable sections of the Interim Order and other relevant source documents, including the DIP Agreement, as required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and the *Procedures for Complex Chapter 11 Cases in the Southern District of Texas*, effective January 1, 2023 (the "Complex Case Procedures").

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| **DIP Borrowers**<br>Bankruptcy Rule 4001(c)(1)(B) | Noble House Home Furnishings LLC, Best Selling Home Décor Furniture, LLC, Le Pouf, LLC, and NH Services LLC |
| **DIP Lenders**<br>Bankruptcy Rule 4001(c)(1)(B) | Wells Fargo Bank, N.A. ("Wells") |
| **DIP Agent**<br>Bankruptcy Rule 4001(c)(1)(B) | Wells |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| **Term**<br>Bankruptcy Rule 4001(b)(l)(B)(iii), 4001(c)(1)(B) | Definition of "Maturity Date" in the DIP Agreement means the earlier of (a) October 31, 2023 (b) the date of termination of all of the Commitments pursuant to Section 9.1, (c) the date on which the Obligations become due and payable pursuant to this Agreement, whether by acceleration or otherwise, (d) the effective date of a Plan of Reorganization for the Debtors, (e) the date of a sale of all or substantially all of the Debtors' assets (including, without limitation, under Section 363 and/or 365 of the Bankruptcy Code), (f) the first Business Day on which the Interim Order expires by its terms or is terminated, unless the Final Order has been entered and become effective prior thereto, (g) the date the Final Order is vacated, terminated, rescinded, revoked, declared null and void or otherwise ceases to be in full force and effect, (h) the date of a conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code or any Loan Party shall file a motion or other pleading seeking the conversion of the Chapter 11 Cases to Chapter 7 of the Bankruptcy Code, unless otherwise consented to in writing by the Agent, and (i) the date of dismissal of any of the Chapter 11 Cases, unless otherwise consented to in writing by the Agent. |
| **DIP Commitments**<br>Bankruptcy Rule 4001(c)(1)(B) | A revolving credit facility in the aggregate principal amount of up to **$12,200,000** plus the DIP Roll-Up Obligations. |
| **Conditions of Borrowing**<br>Bankruptcy Rule 4001(c)(1)(B) | As specified in Article 3 of the DIP Agreement. |
| **Interest Rate**<br>Bankruptcy Rule 4001(c)(1)(B) | Interest will accrue at a *per annum* rate equal to the Base Rate (approx. 5.50% to 6.00% per annum) *plus* the Applicable Margin (4.50% per annum). |
| **Use of DIP Facility and Cash Collateral**<br>Bankruptcy Rule 4001(b)(1)(B)(ii) | To provide working capital and for other general corporate purposes of the Debtors, and to fund the administrative expenses of the Chapter 11 Cases, pursuant to an approved Budget. |
| **Entities with Interests in Cash Collateral**<br>Bankruptcy Rule 4001(b)(l)(B)(i) | Wells, as administrative agent, and other lenders under the *Credit Agreement*, dated as of December 3, 2021, and related documents, the obligations of which are the "Prepetition ABL Obligations" and the liens granted to the lenders thereto are the "Prepetition ABL Liens." |
| **Fees**<br>Bankruptcy Rule 4001(c)(1)(B) | A closing fee in an amount equal to 0.25% of the Maximum Revolver Amount which will be due at closing.<br><br>A transaction fee equal to 1.50% of the Maximum Revolver amount, which will be due upon consummation of the Sale Transaction.<br><br>A collateral management fee of $3,333.33 per month payable in arrears.<br><br>An unused facility fee equal to 0.25% if the Average Revolver Usage is greater than 50% of the Maximum Revolver Amount and 0.375% if the Average Revolver Usage is less than or equal to 50% of the Maximum Revolver Amount. |
| **Budget**<br>Bankruptcy Rule 4001(c)(1)(B) | The initial Budget is attached as Exhibit A to the Interim Order. |
| **Reporting Information**<br>Bankruptcy Rule 4001(c)(l)(B) | Sections 5.1, 5.2, and 5.18 of the DIP Agreement provide for reporting and budgeting information. |

DOCS_NY:48208.6

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| **Chapter 11 Milestones** Bankruptcy Rule 4001(c)(1)(B) | Exhibit C to the Interim Order lists the Chapter 11 Milestones for events such as the entry of the order approving bid procedures for the sale of substantially all the Debtors' assets, and closing of such sale. |
| **Liens and Priorities** Bankruptcy Rule 4001(c)(l)(B)(i) | Paragraphs 6 and 7 of the Interim Order specify the DIP Liens and the Superpriority Claims granted for the benefit of the DIP Lenders. |
| **Carve Out** Bankruptcy Rule 4001(c)(1)(B) | Paragraph 33(a) of the Interim Order defines the Carve-Out. |
| **Challenge Period** Bankruptcy Rule 4001(c)(l)(B) | Paragraph 36 of the Interim Order sets forth a customary challenge period for any objection that seeks to challenge: (a) the existence, validity, non-avoidability, priority, or amount of Prepetition Liens and Claim Matters or (b) the extent, legality, validity, priority, perfection, non-avoidability, or enforceability of Prepetition Liens. |
| **Adequate Protection** Bankruptcy Rules 4001(b)(l)(B)(iv), 4001(c)(1)(B)(ii) | Paragraph 12 of the Interim Order sets forth the Adequate Protection Liens and the Adequate Protection Superpriority Claims granted as adequate protection to the Prepetition ABL Parties. |
| **Events of Default** Bankruptcy Rule 4001(c)(l)(B) | Article 8 of the DIP Agreement defines and lists "Events of Default." |
| **Waiver/Modification of the Automatic Stay** Bankruptcy Rule 4001(c)(1)(B)(iv) | Paragraph 17 of the Interim Order contemplates that the automatic stay imposed by Bankruptcy Code § 362(a) will be modified, to the extent necessary, to implement and effectuate the terms and conditions of the Interim Order. |
| **Indemnification** Bankruptcy Rule 4001(c)(1)(B)(ix) | Paragraph 31 of the Interim Order contemplates that the Debtors pay and hold harmless the DIP Agent and the Prepetition ABL Agent. |

## STATEMENT REGARDING SIGNIFICANT PROVISIONS

9.      In accordance with paragraph 8 of the Complex Case Procedures, the Debtors disclose as follows:

a.   ***Plan Confirmation Milestone.*** The DIP Facility does not contemplate any deadlines for the confirmation of a plan, but does contain milestones related to the commencement of a competitive bidding, auction, and sale process.

b.   ***DIP Roll-Up Obligations***. Pending entry of the Final Order, the Debtors are seeking approval of a gradual roll-up of the Prepetition ABL Obligations by a reduction of such amounts on a dollar for dollar basis by all collections and proceeds of the DIP Collateral. All Bank Products Obligations and issued and outstanding Letters of Credit shall be deemed issued under the DIP Agreement. Upon entry of a Final Order,

DOCS_NY:48208.6

all remaining outstanding Prepetition ABL Obligations shall be converted into and constitute DIP Obligations.

c. ***No-Cross Collateralization.*** The DIP Facility does not contemplate the cross-collateralization of the Prepetition ABL Obligations except insofar as, subject to entry of the Final Order, the DIP Roll-Up Obligations will be converted to DIP Loans (*i.e.,* "rolled up" into the DIP Loan).

d. ***Requirement that Postpetition Loans Be Used to Repay Prepetition Debt.*** The DIP Facility does not contemplate that DIP Loans will be used to repay any of the Prepetition ABL Obligations except insofar as collections and proceeds on the DIP Collateral will reduce on a dollar for dollar basis the Prepetition ABL Obligations and, subject to entry of the Final Order, the DIP Roll-Up Obligations will be converted to DIP Loans (*i.e.,* "rolled up" into the DIP Loan).

e. ***Liens on Proceeds of Avoidance Actions.*** The DIP Collateral includes proceeds of avoidance actions provided that an appropriate Final Order is entered.

f. ***Default Provisions and Remedies.*** Upon the occurrence and during the continuance of any Event of Default or the Interim Order, subject to five business days' notice to the Debtors and the filing of an appropriate motion and obtaining an order of this Court, the DIP Agent may be permitted to exercise any of the following actions, among others: (i) exercising of all rights and remedies under the DIP Documents and Interim Order; (ii) exercising all rights and remedies under the Prepetition ABL Documents; and (iii) taking any other action or exercise any other right or remedy under applicable law.

g. ***Limitations on the Use of Cash Collateral.*** None of the proceeds of the DIP Loans or Cash Collateral may be used in connection with: (a) preventing, hindering, or delaying any of the DIP Agent's, the DIP Lenders', or the Prepetition ABL Parties' permitted enforcement or realization upon any of the DIP Collateral or Prepetition Collateral; (b) using or seeking to use Cash Collateral or selling or otherwise disposing of DIP Collateral without the consent of the DIP Agent or as permitted by the DIP Documents; (c) using or seeking to use any insurance proceeds constituting DIP Collateral without the consent of the DIP Agent; (d) incurring Indebtedness without the prior consent of the DIP Agent, except to the extent permitted under the DIP Agreement; (e) seeking to amend or modify any of the rights granted to the DIP Agent, the DIP Lenders, or the Prepetition ABL Parties under this Interim Order, the DIP Documents, or the Prepetition ABL Documents, including seeking to use Cash Collateral and/or DIP Collateral on a contested basis; (f) objecting to or challenging in any way the DIP Liens,

DIP Obligations, Prepetition Liens, Prepetition ABL Obligations, DIP Collateral (including Cash Collateral) or, as the case may be, Prepetition Collateral, or any other claims or liens, held by or on behalf of any of the DIP Agent, the DIP Lenders, or the Prepetition ABL Parties, respectively; (g) asserting, commencing or prosecuting any claims or causes of action whatsoever, including, without limitation, any actions under Chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions to recover or disgorge payments, against any of the DIP Agent, the DIP Lenders, the Prepetition ABL Parties, or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors and employees; (h) litigating, objecting to, challenging, or contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the DIP Obligations, the DIP Liens, the Prepetition ABL Liens, Prepetition ABL Obligations or any other rights or interests of any of the DIP Agent, the DIP Lenders, the Prepetition ABL Parties; or (i) seeking to subordinate, recharacterize, disallow or avoid the DIP Obligations or the Prepetition ABL Obligations; *provided, however*, that the Carve Out and such collateral proceeds and loans under the DIP Documents may be used for allowed fees and expenses, in an amount not to exceed **$50,000** in the aggregate (the "Investigation Budget Amount"), incurred solely by a Committee (if appointed), in investigating (but not prosecuting or challenging) the validity, enforceability, perfection, priority or extent of the Prepetition ABL Obligations within the Challenge Period.

h. ***Priming Liens.*** The DIP Loan contemplates that the liens in favor of the DIP Facility prime the Prepetition ABL Liens.

i. ***No Limitation on the Ability of Estate Fiduciaries to Fulfill their Duties.*** Except insofar as the Interim Order contains restrictions on the use of the Carve-Out, proceeds from the DIP Facility and Cash Collateral as described above, there is no further limitation on the ability of estate fiduciaries to fulfill their duties.

## THE PROPOSED DIP FACILITY

**I.     The Debtors' Need for Immediate Access to the DIP Facility and Cash Collateral**

10.     As described in the First Day Declaration, the Debtors require immediate access to the DIP Loans, and continued use of Cash Collateral, to fund operations, capital expenditures, and the administrative costs of these Chapter 11 Cases. As of the Petition Date, the Debtors' cash on hand is insufficient to operate their enterprise and continue paying their obligations as they come

9

due. The Debtors' business is cash-intensive, with significant daily costs required to satisfy obligations to the Debtors' customers, landlords, vendors, and employees.  Access to the DIP Loans and Cash Collateral also will allow the Debtors to consummate a value-maximizing, going concern sale, either with the stalking horse buyer or an alternative overbidder.

11.     The Debtors rely on the liquidity generated from their operations to, among other things, procure home furnishings to sell to their customers. Because the Debtors operate in a competitive industry, a seamless transition into chapter 11 and the ability to continue uninterrupted operations is imperative to preserve relationships with the Debtors' suppliers and the loyalty and goodwill of their customers, vendors, and employees, and the going-concern value of the Debtors.

12.     As described in the First Day Declaration, the Debtors and their advisors have carefully reviewed and analyzed the Debtors' projected cash receipts and disbursements and prepared a budget outlining the Debtors' postpetition cash needs over the course of the Chapter 11 Cases, a copy of which is attached as Exhibit A to the Interim Order. The Debtors relied on these forecasts to determine the minimum amount of postpetition financing required to fund operations and administer these Chapter 11 Cases. More specifically, the Debtors determined that they require immediate access to DIP financing to fund the costs of these Chapter 11 Cases and ongoing business operations.

13.     The Debtors believe that the DIP Facility provides the Debtors with sufficient liquidity to maintain their operations, fund the administration of these Chapter 11 Cases, and provide sufficient runway to market and consummate a going-concern sale of substantially all the Debtors' assets. The DIP Facility will allow the Debtors to: (a) continue satisfying obligations to the Debtors' contract counterparties; (b) reassure other stakeholders, including the Debtors' customers and employees, that the Debtors have sufficient funds to continue operating in the

ordinary course; (c) fund the Debtors' payroll obligations; (d) fund the administrative costs of these Chapter 11 Cases; and (e) consummate a value-maximizing, going concern sale transaction.

14.     During the pendency of these Chapter 11 Cases, the Debtors intend to use a portion of the proceeds from the DIP Facility to honor their postpetition obligations to their vendors, employees, and customers. Accordingly, the proposed DIP Facility will provide much needed stabilization to the Debtors' business operations. The DIP Facility will also provide the funding means to implement the pending sale, while ensuring the Debtors' ability to operate as a going-concern and maximizing the value of the Debtors' estates for the benefit of all stakeholders.

15.     Absent funds available from the DIP Loans and access to Cash Collateral, the Debtors could face a value-destructive interruption to their business and lose support from important stakeholders on which the Debtors' business depends. This result, in turn, would hinder the Debtors' ability to close a sale and maximize the value of their estates, and the Debtors would be forced to curtail their operations significantly, or even cease operations, to the severe detriment of all stakeholders.

**II.     The Debtors' Proposed Adequate Protection Is Fair and Reasonable.**

16.     The adequate protection provided in the Interim Order (the "Adequate Protection") is fair and reasonable under the circumstances. The Adequate Protection package proposed for the Prepetition Lenders includes the liens and superpriority claims described in the Interim Order. Taken together, the cumulative effect of all of these provisions is to provide reasonable and appropriate adequate protection for the Prepetition ABL Parties. The proposed Adequate Protection is sufficient to protect the Prepetition ABL Parties from any diminution in value to the Prepetition Collateral, including Cash Collateral. In light of the foregoing, the proposed Adequate Protection to be provided for the benefit of the Prepetition ABL Parties is appropriate.

17.     Access to the Prepetition ABL Parties' Cash Collateral will provide liquidity vital for the Debtors to maintain operations, pay employees, and fund these Chapter 11 Cases. Thus, the Debtors' provision of the Adequate Protection is not only necessary to protect against any diminution in value but is fair and appropriate under the circumstances of these Chapter 11 Cases to ensure the Debtors are able to continue using Cash Collateral for the benefit of all parties in interest and their estates.

**III.     Alternative Sources of Financing Are Not Available on Better Terms**

18.     In evaluating possible financing sources for the Debtors' postpetition financing, the Debtors' advisors determined that no third-party lender is willing to provide DIP financing to the Debtors on terms or timing more favorable than the DIP Facility.

19.     First, the Debtors' advisors reached out to eighteen potential DIP lenders.  Thirteen signed non-disclosure agreements and conducted diligence.  Notwithstanding the Debtors' efforts, no third-party provided an actionable proposal to lend.

20.     Second, the Debtors do not reasonably believe there are strong grounds to support a third-party priming facility under section 364 of the Bankruptcy Code. Additionally, the Debtors believe that the delays, costs, and futility of continuing to shop for such third-party financing from every possible source, as well as the attendant delay in stabilizing the Debtors' operations, more than justify proceeding with the DIP Facility instead.

21.     Accordingly, it was clear to the Debtors and their advisors that their best path to financing these Chapter 11 Cases was through financing from the Prepetition ABL Parties. Following extensive arm's-length and good faith negotiations with the Prepetition ABL Parties, the Debtors reached agreement on the proposed DIP Facility, the terms of which are fair and reasonable.

**IV.    The DIP Facility is Necessary to Preserve the Value of the Debtors' Estates**

22.    Absent the liquidity infusion to be provided by the DIP Facility, the Debtors would need to curtail their operations significantly and their very existence as a going concern would be threatened. Even with the ability to access Cash Collateral, cash-on-hand and expected inflows would not be sufficient to fund their operations as a going concern in the near term nor meet the administrative expenses incurred in these cases. Without a new source of liquidity, the Debtors would not be able to consummate a sale and their business would be irreparably harmed. Consequently, the DIP Facility is necessary to preserve the going-concern value of the Debtors' estates.

## BASIS FOR RELIEF

**I.    The Debtors Should Be Authorized to Obtain Postpetition Financing Through the DIP Documents**

**A.    Entry into the DIP Documents Is an Exercise of the Debtors' Sound Business Judgment**

23.    The Court should authorize the Debtors, in exercising their sound business judgment, to enter into the DIP Documents, obtain access to the DIP Facility, and continue using the Cash Collateral. Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances discussed in detail below. Courts grant a debtor-in-possession considerable deference in acting in accordance with its business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code. *See, e.g., In re N Bay Gen. Hosp., Inc.,* No. 08-20368 (Bankr. S.D. Tex. July 11, 2008) (order approving postpetition financing on an interim basis as exercise of debtors' business judgment); *In re Trans World*

*Airlines, Inc.,* 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflected] sound and prudent business judgment"); *In re L.A. Dodgers LLC,* 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.,* 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party in interest").

24.     To determine whether the business judgment standard is met, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.,* 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.,* 14 B.R. 506, 513-14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of the debtor's authority under the [Bankruptcy] Code").

25.     In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *See In re Farmland Indus., Inc.,* 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003) (while many of the terms favored the DIP lenders, "taken in context, and considering the relative circumstances of the parties," the court found them to be reasonable); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'I Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.),* 65 B.R.

358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).

26.     The Debtors' determination to move forward with the DIP Facility is a sound exercise of their business judgment following an arm's-length process and careful evaluation of available alternatives. The Debtors require significant postpetition financing to support their working capital needs and to continue their operations. As discussed herein, in the First Day Declaration, the Debtors and their advisors determined that the DIP Facility is the best way to stabilize the business and is on fair and reasonable terms. The Debtors and their advisors also determined that the DIP Facility provides certainty with respect to the capital necessary for the administration of these Chapter 11 Cases during the ongoing sale process. The fees, interest rate, and other borrowing availability provided for in the DIP Facility, taken as a whole, are fair and in the Debtors' best interests and the DIP Facility is the best financing option currently available to the Debtors under the circumstances.

27.     The Debtors negotiated the DIP Documents in good faith, at arm's length, and with the assistance of their advisors, and they have obtained the best financing available under the circumstances. After extensive negotiations with the DIP Lenders and careful consideration of the alternatives, the Debtors determined that the proposed DIP Facility was preferable to engaging in a costly and uncertain priming fight. Accordingly, the Court should authorize the Debtors' entry into the DIP Documents as a reasonable exercise of the Debtors' business judgment.

### B.    The Creeping Roll Up Should Be Approved

28.     In addition, the Court should approve the DIP Roll-Up Obligations as an exercise of the Debtors' sound business judgment. Bankruptcy Code section 363(b) permits a debtor to use, sell, or lease property, other than in the ordinary course of business, with court approval. Courts in the Fifth Circuit have recognized that it is appropriate to authorize the payment of prepetition

15

obligations where necessary to protect and preserve the estate, including an operating business's going-concern value. *See, e.g., In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (authorizing payment of certain prepetition claims pursuant to "doctrine of necessity"); *In re Equalnet Commc'ns Corp.*, 258 B.R. 368, 369-70 (Bankr. S.D. Tex. 2000) (business transactions critical to the survival of the business of the debtor are exceptions to the general rule of nonpayment of prepetition claims prior to plan confirmation).

29.     Subject to entry of the Interim Order, the Debtors are requesting that, without any further action by the Debtors or any other party, (1) all Bank Product Obligations and issued and outstanding Letters of Credit be deemed issued under and subject to the DIP Agreement and constitute DIP Obligations, and (2) all collections and proceeds of DIP Collateral be applied to reduce, on a dollar-for-dollar basis, the Prepetition ABL Obligations. The Debtors are further requesting that, upon entry of the Final Order, all remaining outstanding Prepetition ABL Obligations be converted into and constitute DIP Obligations. The DIP Roll-Up Obligations are subject to Challenge pursuant to paragraph 36 of the Interim Order.

30.     Repayment of prepetition secured claims are routinely paid outside of a plan of reorganization, including through a "roll-up" where the proceeds of the debtor in possession financing are used to pay off or replace the prepetition debt. Refinancing prepetition debt is a common feature in debtor in possession financing arrangements, particularly when accomplished pursuant to a final order.

31.     Here, agreeing to the Creeping Roll-Up is a reasonable exercise of the Debtors' business judgment for multiple reasons. Inclusion of the DIP Roll-Up Obligations was a topic of extensive negotiation between the Debtors and the DIP Lenders and was a necessary condition to

securing the DIP Lenders' commitment to fund the new money portion of the DIP Facility and the Prepetition ABL Parties' consent to the use of their Cash Collateral.

32.     Further, because the DIP Roll-Up Obligations are subject to Challenge as set forth in paragraph 36 of the Interim Order, they will not prejudice the right of any other party in interest. The Debtors believe that this protection adequately preserves the rights of all parties while ensuring their continued access to Cash Collateral and the new money loans to be advanced under the DIP Facility.

### C.     The Debtors Should Be Authorized to Grant Liens and Superpriority Claims to the DIP Lenders

33.     The Debtors propose to obtain financing under the DIP Facility by providing security interests and liens as set forth in the DIP Documents pursuant to section 364(c) of the Bankruptcy Code. Specifically, the Debtors propose to provide to the DIP Lenders postpetition security interest in and liens on the DIP Collateral (as defined in the Interim Order) and Prepetition Collateral that are valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination immediately upon entry of the Interim Order.

34.     The statutory requirement for obtaining postpetition credit under section 364(c) of the Bankruptcy Code is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under Section 503(b)(1) of [the Bankruptcy Code]." 11 U.S.C. § 364(c). *See In re Crouse Grp., Inc.,* 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained). Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

a.    the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, *i.e.*, by allowing a lender only an administrative claim;

b.    the credit transaction is necessary to preserve the assets of the estate; and

c.    the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*See In re Ames Dep't Stores*, 115 B.R. 34, 37–40 (Bankr. S.D.N.Y. 1990); *see also In re St. Mary Hosp.*, 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988); *Crouse Group*, 71 B.R. at 549.

35.      The Debtors meet each part of this test. As described above, no lenders were willing to provide sufficient postpetition financing on a junior lien or an unsecured or administrative priority basis. The DIP Lenders will not fund the DIP Facility on any other terms, and no other existing stakeholder or third party has presented a higher or otherwise better debtor-in-possession financing proposal. Absent the DIP Facility, which will provide certainty that the Debtors will have sufficient liquidity to administer these Chapter 11 Cases, and comfort to their employees, customers, and vendor constituencies that business will continue in the ordinary course, the value of the Debtors' estates would be impaired to the detriment of all stakeholders. Further, access to the DIP Loans and Cash Collateral will allow the Debtors to consummate a going concern sale, either with the stalking horse buyer or an alternative overbidder.  Given these circumstances, the Debtors believe that the terms of the DIP Facility, as set forth in the DIP Documents are fair, reasonable, and meet the standard for approval.

36.      When a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) of the Bankruptcy Code provides that a court "may authorize the obtaining of credit or the incurring of debt (a) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b); (b)

secured by a lien on property of the estate that is not otherwise subject to a lien; or (c) secured by a junior lien on property of the estate that is subject to a lien." As described above, the Debtors are unable to obtain unsecured postpetition financing credit. Therefore, approving (a) a superpriority claim in favor of the DIP Lenders, (b) liens in favor of the DIP Lenders on unencumbered property of the estate, and (c) junior liens in favor of the DIP Lenders on encumbered property of the estate is reasonable and appropriate.

37.     Section 364(d) of the Bankruptcy Code provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1). The Debtors may incur "priming" liens under the DIP Facility if either (a) the prepetition secured lenders have consented or (b) the prepetition secured lenders' interest in collateral are adequately protected. *See Anchor Savs. Bank FSB v. Sky Valley, Inc.,* 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").

38.     Further, section 364(d) provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1). Accordingly, the Debtors may incur "priming" liens under the DIP Facility if they are unable to obtain unsecured or junior secured credit and either (a) the prepetition secured lenders

19

have consented or (b) the prepetition secured lenders' interests in collateral are adequately protected.

39.     Here, the Prepetition ABL Parties have consented to the DIP Facility and the priming of their liens in favor of the DIP Lenders. As set forth more fully herein and in the Interim Order, the Debtors propose to provide a variety of adequate protection to protect the interests of the Prepetition ABL Parties. Therefore, the relief requested pursuant to section 364(d)(1) of the Bankruptcy Code is appropriate.

**D.     No Comparable Alternative to the DIP Facility Is Reasonably Available On More Favorable Overall Terms**

40.     A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code. *In re Snowshoe Co., Inc.,* 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods., Inc.,* 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992). In circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.,* 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.,* 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Snowshoe Co.,* 789 F.2d 1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.,* 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *In re Ames Dep't Stores,* 115 B.R. at 37-39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

20

41.     As noted above, the cost, uncertainty and delays associated with a potential priming fight would have been highly risky and likely would have threatened the Debtor's viability as a going concern. Simply put, the DIP Facility provides the Debtors with sufficient liquidity to pursue a successful sale process.

## II.     The Debtors Should Be Authorized to Use Cash Collateral

42.     Section 363 of the Bankruptcy Code generally governs the use of estate property. Section 363(c)(2)(A) of the Bankruptcy Code permits a debtor in possession to use cash collateral with the consent of the secured party. Here, the DIP Lenders and the Prepetition ABL Parties consent or are deemed to consent to the Debtors' use of the Cash Collateral, subject to the terms and limitations set forth in the Interim Order. As described above and in the DIP Declaration, access to Cash Collateral on an interim basis is essential to the continued operation of the Debtors' businesses and smooth entry into the Chapter 11 Cases. Use of Cash Collateral is in the best interests of the Debtors' estates and all of their stakeholders, including the Prepetition ABL Parties, and should be approved.

## III.    Adequate Protection Provided to the Prepetition ABL Parties Is Appropriate

43.     Section 363(e) of the Bankruptcy Code provides for adequate protection of interests in property when a debtor uses cash collateral. Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay. *See In re Cont'l Airlines,* 91 F.3d 553, 556 (3d Cir. 1996) (en banc). While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis. *See, e.g., In re Swedeland Dev. Grp., Inc.,* 16 F.3d 552, 564 (3d Cir. 1994) (explaining that the "determination of whether there is adequate protection is made on a case by case basis"); *In re Satcon Tech. Corp.,* No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D.

21

Del. Dec. 7, 2012) (same); *In re N.J. Affordable Homes Corp.,* No. 05-60442 (DHS), 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006) ("the circumstances of the case will dictate the necessary relief to be given"); *In re Columbia Gas Sys., Inc.,* Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992) ("what interest is entitled to adequate protection and what constitutes adequate protection must be decided on a case-by-case basis"); *see also In re Dynaco Corp.,* 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy 361.01[1] at 361-66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding")).

44.     As described more fully in this motion, and as set forth in the Interim Order, the Debtors propose to provide the Prepetition ABL Parties with a variety of adequate protection to protect against the post-petition diminution in value of the Cash Collateral resulting from the use, sale, or lease of the Cash Collateral by the Debtors and the imposition of the automatic stay. The Adequate Protection package includes the Adequate Protection Liens and the Adequate Protection Super-Priority Claims (collectively, the "Adequate Protection").

45.     The proposed Adequate Protection to be provided for the benefit of the Prepetition ABL Parties is appropriate. The Adequate Protection Liens are not only necessary to protect against any diminution in value but is fair and appropriate under the circumstances of these Chapter 11 Cases to ensure the Debtors are able to continue using the Cash Collateral, subject to the terms and limitations set forth in the Interim Order, for the benefit of all parties in interest and their estates.

## IV.     The Scope of the Carve Out Is Appropriate

46.     Without the Carve Out, the Debtors and other parties in interest may be deprived of certain rights and powers because the services for which professionals may be paid in these

Chapter 11 Cases would be restricted. *See In re Ames Dep't Stores*, 115 B.R. at 40 (observing that courts insist on carve outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced.") The Carve Out does not directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers. Additionally, the Carve Out protects against administrative insolvency during the course of the Chapter 11 Cases by ensuring that assets remain for the payment of accrued but unpaid payroll obligations and related taxes, the Clerk of the Court, U.S. Trustee fees, and professional fees of the Debtors and any statutory committee appointed under section 1102 of the Bankruptcy Code in these Chapter 11 Cases and independent director fees.

**V.     The Debtors Should Be Authorized to Pay the Fees Required by the DIP Agent and the DIP Lenders under the DIP Documents**

47.     As set forth in the First Day Declaration, the interest and fees to be paid under the proposed DIP Facility are consistent with the market and appropriate, particularly in light of the circumstances of these Chapter 11 Cases and the protected negotiations among the parties, represent the only viable option presently available to the Debtors. In connection with negotiating the DIP Facility, the Debtors have agreed, subject to Court approval, to pay (i) a closing fee in an amount of 0.25% of the Maximum Revolver Amount at closing, (ii) a transaction fee equal to 1.50% of the Maximum Revolver Amount upon consummation of the Sale Transaction, (iii) a collateral management fee of $3,333.33 per month payable in arrears, and (iv) an unused facility fee equal to 0.25% if the Average Revolver Usage is greater than 50% of the Maximum Revolver Amount and 0.375% if the Average Revolver Usage is less than or equal to 50% of the Maximum Revolver Amount, which would be earned at closing, its payment would be deferred until the Maturity Date.

48.     The fees and rates to be paid under the proposed DIP Facility (a) were the subject of arm's-length negotiation between the Debtors and the DIP Lenders, and (b) are an integral component of the overall terms of the proposed DIP Facility. The Debtors considered the fees described above when determining in their sound business judgment that the DIP Facility is reasonable and constitutes the best terms on which the Debtors can obtain the postpetition financing necessary to continue their operations and benefit the Debtors' estates. Accordingly, the Court should authorize the Debtors to pay the interest and fees provided under the DIP Documents in connection with the DIP Facility.

## VI.     The DIP Agent and the DIP Lenders Should Be Afforded Good-Faith Protection under Section 364(e)

49.     Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

50.     As explained in this Motion and in the First Day Declaration, the DIP Documents are the result of: (a) the Debtors' reasonable and informed determination that the DIP Lenders provided the best postpetition financing alternative available under the circumstances and (b) extended arm's-length, good-faith negotiations between the Debtors and the DIP Lenders. The terms and conditions of the DIP Documents are reasonable under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the

Bankruptcy Code. Further, the Debtors market-tested the terms of the DIP Facility before determining that the DIP Facility provided the best terms available. Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded thereunder.

## VII.   The Automatic Stay Should Be Modified on a Limited Basis

51.    The proposed Interim Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to allow the DIP Lenders, among other things, to file any financing statements, security agreements, notices of liens, and other similar instruments and documents in order to validate and perfect the liens and security interests granted to them under the Interim Order. The proposed Interim Order further provides that the automatic stay is modified as necessary to permit the Debtors to grant liens to the DIP Lenders and the Prepetition ABL Parties and to incur all liabilities and obligations set forth in the Interim Order. The automatic stay should be modified to allow the Debtors and the DIP Lenders to effectuate the terms of the Interim Order.

## VIII.  Failure to Obtain Immediate Interim Access to the DIP Facility and Cash Collateral Would Cause Immediate and Irreparable Harm

52.    Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code or to use Cash Collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion. Upon request, however, the Court may conduct a preliminary, expedited hearing on the motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate. *See* Bankruptcy Rule 4001(b)(2). Section 363(c)(3) of the Bankruptcy Code authorizes the court to conduct a preliminary hearing and to authorize the use of cash collateral "if there is a reasonable likelihood that the [debtor] will

prevail at the final hearing under [section 363(e) of the Bankruptcy Code]." 11 U.S.C. § 363(c)(3). Furthermore, the Complex Case Procedures provide that "on motion by the debtors . . . a hearing will routinely be conducted as a first day hearing to consider either cash collateral and/or interim debtor-in-possession financing." Complex Case Procedures, ¶ 5.

53.    As set forth in First Day Declaration, the Debtors have an immediate postpetition need to use Cash Collateral, and access the liquidity provided by the DIP Facility. The Debtors cannot maintain the value of their estates during the pendency of these Chapter 11 Cases without access to a significant infusion of cash. Without immediate financing, the Debtors project that they will be unable to pay essential costs required to continue operating as a going concern, resulting in immediate and irreparable harm to the Debtors' business. Absent funds available from the DIP Facility and access to cash collateral, the Debtors could face a value-destructive interruption to their business and lose support from important stakeholders, including the Debtors' employees, vendors, and customers, on which the Debtors' business depends.  Further, access to the DIP Loans and Cash Collateral also will allow the Debtors to consummate a going concern sale, either with the stalking horse buyer or an alternative overbidder.

54.    In short, the Debtors' ability to administer these Chapter 11 Cases through the use of Cash Collateral and the liquidity provided by the DIP Facility is vital to preserving and maximizing the value of the Debtors' estates.

55.    The Debtors request that the Court hold and conduct a hearing to consider entry of the Interim Order authorizing the Debtors, from and after entry of the Interim Order until the Final Hearing, to receive immediate interim funding under the DIP Facility and to utilize Cash Collateral. The Debtors require immediate funding under the DIP Facility prior to the Final Hearing and entry of the Final Order to continue operating, pay their administrative expenses, and

to implement the relief requested in the Debtors' other "first day" motions. This emergency relief will enable the Debtors to preserve and maximize value and, therefore, avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing.

## REQUEST FOR FINAL HEARING

56.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, and fix the time and date prior to the Final Hearing for parties to file objections to this motion.

## EMERGENCY CONSIDERATION

57.     The Debtors request emergency consideration of the Motion pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm." An immediate and orderly transition into chapter 11 is critical to the viability of the Debtors' operations and that any delay in granting the relief requested could hinder such operations and cause irreparable harm. The failure to receive the requested relief during the first 21 days of these chapter 11 cases will cause serious disruption to the Debtors' operations. The Debtors have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and request that the Court approve the relief requested herein on an emergency basis.

## WAIVER OF BANKRUPTCY RULES 6004(a) AND 6004(h)

58.     The Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## **<u>NOTICE</u>**

59.     Notice of the hearing on the relief requested in this Motion will be provided by the Debtors in accordance and compliance with Bankruptcy Rules and Local Rules. The Debtors will provide notice of this motion to the following: (a) the U.S. Trustee for the Southern District of Texas; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) Wells Fargo Bank; (d) the parties holding secured claims against the Debtors; (e) the United States Attorney's Office for the Southern District of Texas; (f) the Internal Revenue Service; (g) the United States Securities and Exchange Commission; (h) the state attorneys general for states in which the Debtors conduct business; (i) governmental agencies having a regulatory or statutory interest in these cases; and (j) any party that has requested notice pursuant to Bankruptcy Rule 2002 and Bankruptcy Local Rule 9013-1(d). No other or further notice is needed in light of the nature of the relief requested.

*[Remainder of Page Intentionally Left Blank]*

DOCS_NY:48208.6

## <u>CONCLUSION</u>

**WHEREFORE**, the Debtors request that the Court enter the Orders granting the relief requested herein and such other and further relief as may be just and proper under the circumstances.

Dated: September 12, 2023

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ Michael D. Warner*

Michael D. Warner (SBT 00792304)
Maxim B. Litvak (SBT 24002482)
Benjamin L. Wallen (SBT 24102623)
440 Louisiana Street, Suite 900
Houston, TX 77002
Telephone: (713) 691-9385
Facsimile:  (713) 691-9407
mwarner@pszjlaw.com
mlitvak@pszjlaw.com
bwallen@pszjlaw.com

-and-

Richard M. Pachulski (pending *pro hac vice*)
Teddy M. Kapur (pending *pro hac vice*)
Gregory V. Demo (pending *pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
rpachulski@pszjlaw.com
tkapur@pszjlaw.com
gdemo@pszjlaw.com

*Proposed Counsel to the Debtors and Debtors in Possession*

29

<u>**CERTIFICATE OF SERVICE**</u>

I certify that on September 12, 2023, a true and correct copy of the foregoing document was caused to be served via the Court's CM/ECF noticing filing system for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Michael D. Warner*
Michael D. Warner

30