**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| NOBLE HOUSE HOME FURNISHINGS LLC, et al., | Case No. 23-90773 (CML) |
| Debtors. [1] | (Joint Administration Pending) |

**DEBTORS' <u>EMERGENCY</u> MOTION FOR ENTRY OF ORDERS (A)(I) AUTHORIZING ASSET PURCHASE AGREEMENT FOR SALE OF SUBSTANTIALLY ALL OF DEBTORS' ASSETS (II) APPROVING BIDDING PROCEDURES FOR SALE OF DEBTORS' ASSETS, (III) APPROVING BID PROTECTIONS, (IV) SCHEDULING CERTAIN DATES WITH RESPECT THERETO, (V) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, AND (VI) APPROVING CONTRACT ASSUMPTION AND ASSIGNMENT PROCEDURES; (B) APPROVING (I) SALE OF CERTAIN ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, AND (II) ASSUMPTION AND ASSIGNMENT OF CERTAIN CONTRACTS AND LEASES; AND (C) GRANTING RELATED RELIEF**

---

**Emergency relief has been requested. Relief is requested not later than September 20, 2023.**

**If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

---

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") state as follows in support of this motion (this "<u>Motion</u>"):

## <u>INTRODUCTION</u>

1. As described in the First Day Declaration, the Debtors filed these chapter 11 cases to effectuate a sale of substantially all their assets to a going-concern buyer through a transaction that will preserve the Debtors' business operations, jobs, and vendor relationships. Before the

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification numbers, are:  Noble House Home Furnishings LLC (1671); Best Selling Home Decor Furniture, LLC (5580); Le Pouf, LLC (8197), NH Services LLC (9626), and Heavy Metal, Inc. (3124).  The Debtors' service address in these Chapter 11 cases is 700 Milam Street, Suite 1300, Houston, TX 77002.

1

Petition Date, the Debtors engaged Lincoln Partners Advisors LLC ("Lincoln") as their investment banker in connection with the Debtors' efforts to identify such a going-concern buyer.  These efforts culminated in the Asset Purchase Agreement dated as of September 11, 2023 (the "Stalking Horse Purchase Agreement") by and between the Debtors and GigaCloud Technology Inc. (the "Stalking Horse Purchaser"). The marketing process remains ongoing. The Debtors anticipate that disclosure of the Stalking Horse Purchase Agreement and approval of the procedures provided for herein will facilitate the continuation of the marketing process.  The Debtors submit that the marketing process and proposed bidding procedures will enable the Debtors to achieve a value-maximizing transaction in the best interests of their stakeholders.

## **RELIEF REQUESTED**

2.      The Debtors seek entry of an order, substantially in the form attached hereto (the "Bidding Procedures Order"):

      a.    authorizing and approving bidding procedures, attached to the Bidding Procedures Order as Exhibit 1 (the "Bidding Procedures"), by which the Debtors will solicit and select the highest or otherwise best offer for the sale (or sales) of some or all of the Debtors' assets (the "Property"), potentially at an auction, if needed (the "Auction");

      b.    establishing the following dates and deadlines in connection with the Bidding Procedures, including:

- Bid Deadline: October 18, 2023, at 5:00 p.m., prevailing Central Time, as the deadline by which all binding bids must be actually received by the Debtors pursuant to the Bidding Procedures (the "Bid Deadline");

- Auction: October 23, 2023, at 10:00 a.m., prevailing Central Time, as the time and date on which the Debtors will conduct the Auction, if one is needed; and

- Sale Hearing: October 25, 2023, or as soon prior to that date as the Court's calendar permits, as the date for a hearing to approve one or more sales of the Property (the "Sale Hearing").

2

c.    authorizing the Debtors to (i) enter into the Stalking Horse Purchase Agreement with the Stalking Horse Purchaser, attached as <u>Exhibit 2</u> to the Bidding Procedures Order, and (ii) in connection with the Stalking Horse Purchase Agreement, authorization to pay (A) a breakup fee in the amount of $3,400,000 (the "<u>Breakup Fee</u>"), and (B) reimbursement of the actual and reasonable documented expenses incurred by the Stalking Horse Purchaser in connection with the Stalking Horse Purchase Agreement of up to $550,000 (the "<u>Expense Reimbursement</u>" and, together with the Breakup Fee, the "<u>Bid Protections</u>"), if and to the extent that such Bid Protections come due under the Stalking Horse Purchase Agreement;

d.    approving the form and manner of notice of the Auction and Sale Hearing with respect to the sale or sales of some or all of the Property free and clear of liens, claims, encumbrances, and other interests (any such sale, a "<u>Sale</u>"), attached as <u>Exhibit 3</u> to the Bidding Procedures Order (the "<u>Sale Notice</u>");

e.    approving procedures for the assumption and assignment of certain executory contracts and unexpired leases (collectively, the "<u>Contracts</u>") in connection with any Sale (the "<u>Assumption and Assignment Procedures</u>"), and approving the form and manner of the notice thereof, attached as <u>Exhibit 4</u> to the Bidding Procedures Order (the "<u>Cure Notice</u>"); and

f.    granting related relief.

3.    The Debtors also seek entry of an order (the "<u>Sale Order</u>"), among other things, (a) approving the sale of the Debtors' assets to the Stalking Horse Purchaser or other successful bidder at the Auction free and clear of liens, claims and interests pursuant to Bankruptcy Code section 363(f), (b) approving the assumption and assignment of the Contracts pursuant to Bankruptcy Code section 365(a), (c) determining that the Stalking Horse Purchaser or other successful bidder is a good faith purchaser pursuant to Bankruptcy Code section 363(f) and (m), and is entitled to the protections of Bankruptcy Code section 363(m), and (d) granting related relief.

3

## JURISDICTION AND VENUE

4.      The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court.

5.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

6.      The bases for the relief requested herein are sections 105(a), 363, 365, 503, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Bankruptcy Rules 2002, 6004, 6006(a), 9007, and 9014 and rule 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules").

## BACKGROUND

### A.      General Case Background

7.      On September 11, 2023 (the "Petition Date"), the Debtors each commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these chapter 11 cases.

8.      The Company is a distributor, manufacturer and retailer of indoor and outdoor home furnishings with distribution throughout e-commerce channels including partners such as Amazon, WalMart, Costco, Wayfair, Overstock, Target and Home Depot, fulfilling direct to consumer orders from its distribution centers. Family-owned since its founding in 1992, the Company designs, markets and sells products under several brands including Christopher Knight

Home, NobleHouse, LePouf, OkiOki, Best Selling, and GDFStudio, and it leases offices, warehouses, and other sites in Texas, California, and Georgia.  Including indoor and outdoor furnishings, the Company has a wide and diverse range of products, including over 100 categories of products and 8,000 core SKUs.   The Company also sells through wholesale channels, primarily to the Big Box retailers – TJMaxx, Home Goods, Marshalls, Ross Stores and others.

9.     Additional information regarding the Debtors' business and capital structure and the circumstances leading to the commencement of these Chapter 11 Cases is set forth in the *Declaration of Gayla Bella in Support of Debtors' Chapter 11 Petitions and First Day Relief* (the "First Day Declaration"),[2] which has been filed with the Court contemporaneously herewith and is incorporated by reference herein.

**B.     The Marketing Process**

10.     The Debtors' sale process for a going-concern sale of substantially all the Debtors' assets has been managed by their investment banker, Lincoln, which was initially hired by the Debtors in February 2023 to run a refinancing process for the Debtors.  In July 2023, Lincoln commenced a robust marketing process, assisting the Debtors with the identification parties interested in consummating a sale transaction.  Lincoln contacted parties it believed were most likely to be interested in the Debtors' business and assets.

11.      Lincoln has worked closely with the Debtors' management to analyze the Debtors' financial position and outlook, prepare marketing and diligence materials (including a Confidential Information Presentation), and populate an electronic data  room (the "Data Room") for prospective purchasers interested in purchasing all or any portion of the Debtors' assets.

---

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration.

Commencing in July 2023, Lincoln contacted approximately 60 potential buyers, composed of 47 financial firms and 13 strategics, including some with private equity backing.  To date, 23 of these parties have signed non-disclosure agreements and have received access to the comprehensive Data Room.  Five of those parties held meetings with the Debtors' management, and four conducted site visits.  Ultimately, three parties submitted preliminary, non-binding Indications of Interest (IOIs) for substantially all assets.

12.     The Debtors determined the Stalking Horse Purchaser's proposal represented the best proposal they received.  On September 11, 2023, the Debtors entered into the Stalking Horse Purchase Agreement with the Stalking Horse Purchaser.

## THE STALKING HORSE PURCHASE AGREEMENT

13.     The following are the material terms of the proposed Stalking Horse Purchase Agreement:[3]

| | |
|---|---|
| Purchase Price | $85,000,000, subject to adjustment or holdback as set forth in Section 2.6 of Stalking Horse Purchase Agreement, plus an additional $4,100,000 to be allocated to Banc of America Leasing & Capital, LLC for the Non Automated Equipment |

---

[3]     The following is only a summary of certain of the terms and provisions of the Stalking Horse Purchase Agreement. In the event of any conflict between the summary set forth in this Motion and the Stalking Horse Purchase Agreement, the terms and provisions of the Stalking Horse Purchase Agreement control.  All capitalized terms that are used in this summary but not otherwise defined here have the meanings given to them in the Stalking Horse Purchase Agreement.

| | |
|---|---|
| Purchased Assets | Substantially all of the Debtors' assets relating to the operation of their Business (as defined in the Stalking Horse Purchase Agreement), including without limitation, personal property, supplies and inventory, intangible property, including intellectual property rights and customer information, accounts and notes receivable, rights under contracts, permits, warranties with respect to any purchased assets, books and records, and claims and causes of action, including preference and avoidance claims, provided that the Stalking Horse Purchaser agrees to waive and not to pursue any preference and avoidance claims, equity interests in Noble Home Furnishings Canada, Inc., Noble House Home Furnishings UK Limited, Noble House Home Furnishings, S. De R.L. De C.V., Noble House Home Furnishings (HK) Limited, Noble House Home Furnishings Vietnam Company Limited, Noble House Home Furnishings (MY) Sdn. Bhd, Fujian Baimei Electronic Commerce Co., Ltd. and Baimei (Fujian) Network Information Technology Co., Ltd. |
| Excluded Assets | (i) all cash and cash equivalents and marketable and other securities; (ii) all rights under the Stalking Horse Purchase Agreement and any Ancillary Agreement; (iii) all cash deposits and prepaid items other than those described in Section 2.1(e) of the Stalking Horse Purchase Agreement; (iv) the equity interests in Debtors and in any subsidiaries of Debtors that are not Purchased Subsidiaries; (v) all Benefit Plans, and all assets in respect of any Benefit Plan; (vi) any intercompany Accounts Receivable; (vii) Excluded Contracts (as defined in the Stalking Horse Purchase Agreement); (viii) certain organizational documents, minute books, member ledger, books of account or other records; (ix) all Tax assets and Tax Returns of Debtors or any of its Affiliates, with respect to the Purchased Assets or the Business, for taxable periods ending on or prior to the Closing Date; (x) any Books and Records which Debtors are required by applicable Law to retain; (xi) all insurance policies of Debtors, and all benefits, rights and claims and proceeds thereunder; (xii) all refunds for prepaid insurance premiums or insurance prepayments; (xiii) except as provided in Sections 2.1(d), (e), (g) and (l) of the Stalking Horse Purchase Agreement, all claims or causes of action of Debtors, including all preference or avoidance claims and actions of Debtors; (xiv) any Tangible Personal Property held by Debtors pursuant to a Contract where Stalking Horse Purchaser does not assume the underlying Contract relating to such Tangible Personal Property at the Closing; (xv) any software or other item of intangible property (including Intellectual Property) held by Debtors pursuant to a license or other Contract where Stalking Horse Purchaser does not assume the underlying Contract relating to such intangible personal property at the Closing; (xvi) any assets specifically set forth or described on Schedule 2.2(p) of the Stalking Horse Purchase Agreement; and (xvii) any equipment, fixture, vehicle or item of personal property secured by the Banc of America Loan which does not constitute Non-Automated Equipment. |

| Assumed Liabilities | (i) all Liabilities of Debtors under the Assigned Contracts; (ii) all Liabilities arising after the Closing Date with respect to the Purchased Assets or Stalking Horse Purchaser's operation of the Business; (iii) all cure obligations required to be paid pursuant to the Approval Order as a condition to Stalking Horse Purchaser's assumption of the Assigned Contracts (other than any cure obligations related to the New Jersey Warehouse Lease, which will be addressed separately with Stalking Horse Purchaser with the landlord thereunder or rejected by Debtors); (iv) obligations to customers of Debtors for refunds, rebates, returns, discounts and the like existing as of the Closing Date; (v) any product liability or warranty claims, but only with respect to Products sold by Stalking Horse Purchaser following Closing; and (vi) all accounts payable, accrued expenses and other working capital liabilities of the Business that were incurred in the Ordinary Course of Business since the filing of the Bankruptcy Case and remained unpaid in the Ordinary Course of Business and which are outstanding as of the Closing. |
|---|---|
| Breakup Fee and Expense Reimbursement | Breakup Fee: $3,400,000.00<br><br>Expense Reimbursement: The actual and reasonable documented expenses incurred by Stalking Horse Purchaser in connection with the Stalking Horse Purchase Agreement up to $550,000 |
| Closing Deadline | Outside Date: October 31, 2023 |
| Representations and Warranties / Covenants | Customary for a transaction of this type. |
| Employees | Buyer may offer employment, on terms of employment generally consistent with those provided by Seller as of just prior to the Closing, to the employees of Seller or any subsidiary of Seller not being purchased pursuant to this Agreement. |

**PROPOSED SALE PROCESS**

14.     The Debtors are seeking approval of the Bidding Procedures to establish a clear and open process for the solicitation, receipt, and evaluation of overbids on a timeline that allows the Debtors to consummate a Sale of substantially all of the Debtors' Property that the Debtors believe is reasonable and will provide parties with sufficient time and information to submit a competitive bid. In formulating the Bidding Procedures and time periods set forth therein, the Debtors balanced the need to provide adequate notice to parties in interest and potential bidders with the need to run a fulsome, expeditious, and efficient marketing process. The Bidding Procedures are designed to

generate the highest or otherwise best available recoveries to the Debtors' stakeholders by encouraging prospective bidders to submit competitive, value-maximizing bids. The Bidding Procedures are designed to allow the Debtors sufficient time to conduct a Sale and potentially an Auction while simultaneously ensuring that the Debtors maintain sufficient runway in these chapter 11 cases.

15.     Specifically, the Debtors propose the following timeline for the Sale:

| Event or Deadline | Date and Time |
|---|---|
| Qualified Bid Deadline | October 18, 2023, at 5:00 p.m. (prevailing Central Time) |
| Auction (if applicable) | The Auction will be held on October 23, 2023, at 10:00 a.m (prevailing Central Time) via remote video[4] |
| Cure Objection Deadline | 14 days after service of cure notice |
| Sale Objection Deadline | October 24, 2023, at 4:00 p.m. (prevailing Central Time) |
| Sale Hearing | October 25, 2023, at a time to be determined or as soon prior to this date as the Court's calendar permits[5] |
| Outside Closing Date | October 31, 2023 |

16.     The Debtors also request authority, as set forth in the Bidding Procedures, Bidding Procedures Order, and Stalking Horse Purchase Agreement with the Stalking Horse Purchaser to provide the Breakup Fee and Expense Reimbursement. Such Bid Protections would be an actual and necessary cost of preserving the value of the Debtors' estates.

---

[4]     If the Debtors decide to hold a live, in-person Auction, Qualified Bidders shall still have the ability to submit Bids remotely.

[5]     The Debtors cannot modify the date of the Sale Hearing or the Outside Closing Date without the consent of the Stalking Horse Purchaser, as set forth in the Stalking Horse Purchase Agreement.  The Debtors shall consult with the Stalking Horse Purchaser prior to modifying the date of the Auction, the Cure Objection Deadline, or the Sale Objection Deadline.

DOCS_NY:48317.8 61051/002
\v

## THE BIDDING PROCEDURES

17.     To optimally and expeditiously solicit, receive and evaluate bids in a fair and accessible manner, the Debtors have developed and proposed the Bidding Procedures.

18.     Because the Bidding Procedures are attached to the proposed Bidding Procedures Order, they are not restated fully below. The Bidding Procedures establish, among other things:[6]

- the process by which the Debtors will provide the Bidding Procedures Order, the Bidding Procedures, the Sale Notice, and the Cure Notice to interested parties as soon as practicable after entry of the Bidding Procedures Order;

- the requirements that Potential Bidders must satisfy to participate in the bidding process and become Qualified Bidders;

- the availability of and access to due diligence by Potential Bidders;

- the deadlines and requirements for submitting bids and the method and criteria by which such bids are deemed to be Qualified Bids sufficient to trigger the Auction and participate in the Auction, including the minimum consideration that must be provided, the terms and conditions that must be satisfied, and the deadline that must be met, for any bidder (other than the Stalking Horse Purchaser) to be considered a Qualified Bidder, which shall be determined by the Debtors;

- the manner in which Qualified Bids will be evaluated by the Debtors to determine the starting bid (or starting bids) for the Auction;

- the conditions for having an Auction and procedures for conducting the Auction, if any;

- the criteria by which the Successful Bidder will be selected by the Debtors; and

- various other matters relating to the sale process generally, including the designation of the Backup Bid, return of any good faith deposits, and certain reservations of rights.

---

[6]     This summary is qualified in its entirety by the Bidding Procedures. All capitalized terms that are used in this summary but not otherwise defined here have the meanings given to them in the Bidding Procedures. If there are any conflicts between this summary and the Bidding Procedures, the terms of the Bidding Procedures govern.

19.     Importantly, the Bidding Procedures do not impair the Debtors' ability to consider all Qualified Bid proposals, and, as noted, they preserve the Debtors' right to modify the Bidding Procedures as necessary or appropriate to maximize value for the Debtors' estates. As such, the Bidding Procedures uphold and comply with the Debtors' fiduciary obligations to maximize value.

20.     Following conclusion of the Auction, if any, and the selection of a Successful Bidder, and Backup Bidder (if any) the Debtors intend to present the results of the Auction at the Sale Hearing and seek entry of the Sale Order. The Sale Order would authorize the Debtors to enter into and perform under the asset purchase agreement with the Successful Bidder (or the Backup Bidder) and deem the Debtors' selection of the applicable Successful Bid final.

**I.     Form and Manner of Sale Notice.**

21.     The Auction, if any, will take place at 10:00 a.m. (prevailing Central Time) on October 23, 2023, via remote video,[7] or such later date and time as selected by the Debtors.

22.     Within three business days after entry of the Bidding Procedures Order, the Debtors will cause the Sale Notice, substantially in the form attached as <u>Exhibit 3</u> to the Bidding Procedures Order, to be served on the following parties or their respective counsel, if known (collectively, the "<u>Notice Parties</u>"): (a) the United States Trustee for the Southern District of Texas; (b) counsel to any official committee of unsecured creditors; (c) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (d) Moore & Van Allen LLP, as counsel to the Stalking Horse Purchaser; (e) Morgan Lewis & Bockius LLP, as counsel to the DIP Lenders; (f) the Office of the United States Attorney for the Southern District of Texas; (g) the state attorneys general for states in which the Debtors conduct business; (h) the Internal Revenue Service; (i) the

---

[7]     If the Debtors decide to hold a live, in-person Auction, Qualified Bidders will still have the ability to submit Bids and otherwise participate in the Auction remotely.

DOCS_NY:48317.8 61051/002
\v

United States Securities and Exchange Commission; (j) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtors conduct business; (k) all known holders of liens, encumbrances, and other claims secured by the Property; (l) all known creditors of the Debtors; (m) each governmental agency that is an interested party with respect to the Sale and transactions proposed thereunder; (n) any party that has requested notice pursuant to Bankruptcy Rule 2002; and (o) any other party entitled to notice pursuant to Bankruptcy Local Rule 9013-1(d).

23.     In addition, the Debtors will publish the Sale Notice, with any modifications necessary for ease of publication, on the Google-searchable website maintained for these cases by the Debtors' claims and noticing agent, Epiq.

24.     The Sale Notice is reasonably calculated to provide all interested parties with timely and proper notice of any proposed Sales, including the date, time, and place of the Auction (if one is held) and the Bidding Procedures and the dates and deadlines related thereto. The Debtors request that the form and manner of the Sale Notice be approved and no other or further notice of the Sales or the Auction (in each case, if any) be required.

## II.    **Summary of the Assumption and Assignment Procedures.**

25.     The Debtors are also seeking approval of the Assumption and Assignment Procedures set forth below to facilitate the fair and orderly assumption, assumption and assignment, or rejection of certain of the Debtors' Contracts in connection with any Sale(s). The proposed Assumption and Assignment Procedures are as follows:

> a.     **Cure Notice**. Within three (3) business days after entry of the Bidding Procedures Order, the Debtors shall file with the Court and serve via first class mail, electronic mail, or overnight delivery, the Cure Notice, attached as Exhibit 4 to the proposed Bidding Procedures Order, on certain non-Debtor contract counterparties (collectively, the "Contract Counterparties"), and post the Cure Notice to the case website

12

(https://dm.epiq11.com/NobleHouseHomeFurnishings).

b.   **Content of Cure Notice**. The Cure Notice shall notify the applicable Contract Counterparties that the Contracts may be subject to assumption and assignment in connection with the Sale, and contain the following information: (i) a list of the applicable Contracts that may be assumed and assigned in connection with the Sale (the "Assigned Contracts," and each individually, an "Assigned Contract"); (ii) the applicable Contract Counterparties; (iii) the Debtors' good faith estimate of the proposed amount necessary to cure all monetary defaults, if any, under each Assigned Contract (the "Cure Costs"); and (iv) the deadline by which any Contract Counterparty to an Assigned Contract must file an objection to the proposed assumption, assignment, cure, and/or adequate assurance and the procedures relating thereto (the "Cure Objection"); *provided* that service of a Cure Notice does not constitute an admission that such Assigned Contract is an executory contract or unexpired lease or that such Assigned Contract will be assumed at any point by the Debtors or assumed and assigned pursuant to any Successful Bid.

c.   **Cure Objections**. Cure Objections, if any, to a Cure Notice must: (i) be in writing; (ii) comply with the applicable provisions of the Bankruptcy Rules, the Bankruptcy Local Rules, and any order governing the administration of these chapter 11 cases; (iii) state with specificity the nature of the objection and, if the Cure Objection pertains to the proposed Cure Costs, state the cure amount alleged to be owed to the objecting Contract Counterparty, together with any applicable and appropriate documentation in support thereof; and (iv) be filed with the Court within 14 days of service of the Cure Notice (the "Cure Objection Deadline"); *provided* that the Debtors may modify the Cure Objection Deadline upon consultation with the Stalking Horse Purchaser or the Successful Bidder, as applicable, by email confirmation.

d.   **Effects of Filing a Cure Objection**. A properly filed Cure Objection will reserve such objecting party's rights against the Debtors only with respect to the assumption and assignment of the Assigned Contract at issue, and/or objection to the accompanying Cure Costs, as set forth in the Cure Objection, but will not constitute an objection to the remaining relief requested in the Motion.

e.   **Dispute Resolution**. Any Cure Objection to the proposed assumption and assignment of an Assigned Contract or Cure Costs that remains unresolved after the Sale Hearing shall be heard at such later date as may be agreed upon by the parties (including the Successful Bidder) or fixed by the Court. To the extent that any Cure Objection cannot be resolved by the parties, such Contract shall be assumed and assigned only upon satisfactory resolution of the Cure Objection, to be determined in the Successful

DOCS_NY:48317.8 61051/002
\v

Bidder's reasonable discretion. To the extent a Cure Objection remains unresolved, the Contract may be conditionally assumed and assigned, subject to the consent of the Successful Bidder, pending a resolution of the Cure Objection after notice and a hearing. If a Cure Objection is not satisfactorily resolved, the Successful Bidder may determine that such Contract should be rejected and not assigned, in which case the Successful Bidder will not be responsible for any Cure Costs in respect of such contract. Notwithstanding the foregoing, if a Cure Objection relates solely to the Cure Costs (any such objection, a "<u>Cure Dispute</u>"), the applicable Assigned Contract may be assumed by the Debtors and assigned to the Successful Bidder provided that the cure amount the Contract Counterparty asserts is required to be paid under section 365(b)(1)(A) and (B) of the Bankruptcy Code (or such lower amount as agreed to by the Contract Counterparty) is deposited in a segregated account by the Debtors pending the Court's adjudication of the Cure Dispute or the parties' consensual resolution of the Cure Dispute.

f.  **Supplemental Cure Notice**. If the Debtors discover Contracts inadvertently omitted from the Cure Notice or the Stalking Horse Purchaser or Successful Bidder, as applicable, identifies other Contracts that it desires to assume or assume and assign in connection with the Sale, the Debtors may, after consultation with the Stalking Horse Purchaser or the Successful Bidder, as applicable, at any time before the closing of the Sale supplement the Cure Notice with previously omitted Contracts or modify a previously filed Cure Notice, including by modifying the previously stated Cure Costs associated with any Contracts (the "<u>Supplemental Cure Notice</u>"); *provided* that the Stalking Horse Purchaser shall not be required to assume such contract or be responsible for any additional obligation relating to a Supplemental Cure Notice absent its express written consent.

g.  **Objection to the Supplemental Cure Notice**. Any Contract Counterparty listed on the Supplemental Cure Notice may file an objection (a "<u>Supplemental Cure Objection</u>") only if such objection is to the proposed assumption or assumption and assignment of the applicable Contracts or the proposed Cure Costs, if any. All Supplemental Cure Objections must: (i) state, with specificity, the legal and factual basis for the objection as well as what Cure Costs are required, if any; (ii) include appropriate documentation in support thereof; and (iii) be filed no later than 4:00 p.m. (prevailing Central Time) on the date that is fourteen (14) days following the date of service of such Supplemental Cure Notice, which date will be set forth in the Supplemental Cure Notice.

h.  **Dispute Resolution of Supplemental Cure Objection**. If a Contract Counterparty files a Supplemental Cure Objection in a manner that is consistent with the requirements set forth above, and the parties are unable

to consensually resolve the dispute, the Debtors shall seek an expedited hearing before the Court to determine the Cure Costs, if any, and approve the assumption of the relevant Contracts. If there is no such objection, then the Debtors shall obtain an order of this Court fixing the Cure Costs and approving the assumption of any Contract listed on a Supplemental Cure Notice. Notwithstanding the foregoing, if a Supplemental Cure Objection relates solely to a Cure Dispute, the applicable Assigned Contract may be assumed by the Debtors and assigned to the Successful Bidder provided that the cure amount the Contract Counterparty asserts is required to be paid under section 365(b)(1)(A) and (B) of the Bankruptcy Code (or such lower amount as agreed to by the Contract Counterparty) is deposited in a segregated account by the Debtors pending the Court's adjudication of the Cure Dispute or the parties' consensual resolution of the Cure Dispute.

i.     **No Cure Objections**. If there are no Cure Objections or Supplemental Cure Objections, or if a Contract Counterparty does not file and serve a Cure Objection or a Supplemental Cure Notice in a manner that is consistent with the requirements set forth above, and absent a subsequent order of the Court establishing an alternative Cure Cost, (i) the Cure Costs, if any, set forth in the Cure Notice (or Supplemental Cure Notice) shall be controlling, notwithstanding anything to the contrary in any Contract or any other document, and (ii) the Contract Counterparty will be deemed to have consented to the assumption or assumption and assignment of the Contract and the Cure Costs, if any, and will be forever barred from objecting to the assumption or assumption and assignment of such Contract and rights thereunder, including the Cure Costs, if any, and from asserting any other claims related to such Contract against the Debtors or the Successful Bidder, or the property of any of them.

## BASIS FOR RELIEF

**I.     The Bidding Procedures Are Fair, Designed to Maximize the Value Received for the Property, and Consistent with the Debtors' Reasonable Business Judgment**

26.     A debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling an estate's assets. *See, e.g.*, *In re Institutional Creditors of Continental Air Lines, Inc. v. Continental Air Lines, Inc., et al. (In re Continental Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or a debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business.");

*In re Crutcher Resources Corp.*, 72 B.R. 628, 631 (Bankr. N.D. Tex. 1987) ("A Bankruptcy Judge has considerable discretion in approving a § 363(b) sale of property of the estate other than in the ordinary course of business but the movant must articulate some business justification for the sale.").

27.     The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. *See In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate."); *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *In re Integrated Res., Inc.*, 147 B.R. 650, 659 (S.D.N.Y. 1992) ("[I]t is a well-established principle of bankruptcy law that the objective of the bankruptcy rules and the trustee's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (internal citations omitted).

28.     To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and, therefore, are appropriate in the context of bankruptcy transactions. *See, e.g.*, *In re Integrated Res., Inc.*, 147 B.R. at 659 (bidding procedures "are important tools to encourage bidding and to maximize the value of the debtor's assets"); *In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").

29.     Here, the Bidding Procedures will promote active bidding from interested parties and will elicit the highest or otherwise best offers available for some or all of the Property. The

Bidding Procedures are designed to facilitate orderly yet competitive bidding to maximize the value realized by the Debtors' estates from any eventual transactions. In particular, the Bidding Procedures contemplate an open auction process and provide potential bidding parties with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid.

30.     It is well-settled that where there is a court-approved auction process, a full and fair price is presumed for the assets sold because the best way to determine value is exposure to the market. *See Bank of Am. Nat'l Trust & Sav. Ass'n. v. LaSalle St. P'ship*, 526 U.S. 434, 457 (1999); *see also In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, at *4 (Bankr. D. Del. 2001) (while a "sale transaction does not require an auction procedure," "the auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction"). This is true here, where the Sale has been subjected to a marketing process and intensively scrutinized by the Debtors and their retained advisors. The proposed Bidding Procedures will encourage competitive bidding and are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings. The Court should enter the Bidding Procedures Order.

## II.     The Breakup Fee and Expense Reimbursement Have a Sound Business Purpose and Should Be Approved

31.     The Debtors are also seeking authority to provide the Breakup Fee and Expense Reimbursement to the Stalking Horse Purchaser. The use of a stalking horse in a public auction process for sales is a customary practice in chapter 11 cases, as the use of a stalking horse bid is, in many circumstances, the best way to maximize value in an auction process by "establish[ing] a framework for competitive bidding and facilitat[ing] a realization of that value." *Interforum Holding LLC*, 2011 WL 2671254 at *1 n. 1. As a result, stalking horse bidders virtually always

DOCS_NY:48317.8 61051/002
\v

require break-up fees and, in many cases, other forms of bidding protections as an inducement for "setting the floor at auction, exposing [their] bid[s] to competing bidders, and providing other bidders with access to the due diligence necessary to enter into an asset purchase agreement." *Id*. (citation omitted). The use of bidding protections has become an established practice in chapter 11 cases.

32.    Break-up fees and other forms of bidding protections are a normal and, in many cases, necessary component of significant sales conducted in chapter 11: "Break-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets . . . In fact, because the directors of a corporation have a duty to encourage bidding, break-up fees can be *necessary* to discharge the directors' duties to maximize value." *Integrated Res.*, 147 B.R. at 659-60 (emphasis in original). Specifically, bid protections "may be legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking." *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (citation and quotations omitted); *see also Integrated Res.*, 147 B.R. at 660–61 (noting bid protections can prompt bidders to commence negotiations and "ensure that a bidder does not retract its bid").

33.    As a result, courts routinely approve such bidding protections in connection with proposed bankruptcy sales where a proposed fee or reimbursement provides a benefit to the estate. *See In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 535 (3d Cir. 1999) ("In other words, the allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate."). The allowance of Bid Protections is in the best interests of the Debtors' estates and their creditors, as the Stalking Horse Purchase Agreement will establish a floor for further bidding that

may increase the consideration given in exchange for the Property, which will inure to the benefit of the Debtors' estates.

34.     Courts in the Fifth Circuit analyze the appropriateness of bidding incentives under the "business judgment rule" standard, and the law is well established in this district that courts consider whether (a) the incentive hampers, rather than encourages, bidding, and (b) the amount of the incentive is unreasonable relative to the proposed purchase price. *See In re ASARCO, L.L.C.*, 650 F.3d 593 (5th Cir. 2011) (affirming bankruptcy court's decision to apply the business judgment rule to evaluate whether an expense reimbursement bid protection was permissible); *see also In re ASARCO LLC*, 441 B.R. 813, 826 (S.D. Tex. 2010) (explaining three-part test used to determine whether expense reimbursement was permissible under business judgment rule).

35.     The Breakup Fee and Expense Reimbursement are a critical component of the proposed transaction. The Stalking Horse Purchaser has expended and will continue to expend time and resources negotiating, drafting, and performing due diligence activities necessitated by the Sale transaction, despite the fact that its bid will be subject not only to Court approval, but also to overbidding by third parties. The Breakup Fee and Expense Reimbursement have been negotiated in good faith and at arm's length and with significant give-and-take with respect to such Breakup Fee and Expense Reimbursement. As a result, by the Breakup Fee and Expense Reimbursement, the Debtors ensure that their estates can realize the benefit of a transaction with the Stalking Horse Purchaser without sacrificing the potential for interested parties to submit overbids at the Auction.

36.     The Breakup Fee and Expense Reimbursement (a) are an actual and necessary cost and expense of preserving the Debtors' estates within the meaning of sections 503(b) and 507(a)(2) of the Bankruptcy Code, (b) are commensurate to the real and material benefits conferred upon the

Debtors' estates by the Stalking Horse Purchaser, and (c) are fair, reasonable, and appropriate, including in light of the size and nature of the proposed transaction, the commitments that have been made, and the efforts that have been and will be expended by the Stalking Horse Purchaser. The Breakup Fee and Expense Reimbursement are necessary to induce the Stalking Horse Purchaser to pursue a Sale and enter into the Stalking Horse Purchase Agreement.

37.     If the Court does not approve Breakup Fee and Expense Reimbursement, the Debtors may not be able to induce the Stalking Horse Purchaser to serve as a stalking horse, to the detriment of the Debtors' estates. Further, if the Bid Protections were ultimately to be paid, it will necessarily be because the Debtors have received higher or otherwise superior offers for the Property. In short, the proposed Breakup Fee and Expense Reimbursement are fair and reasonable under the circumstances because they constitute a "fair and reasonable percentage of the proposed purchase price" and are "reasonably related to the risk, effort, and expenses of the prospective purchaser." *Integrated Res.*, 147 B.R. at 662.

38.     The Breakup Fee and Expense Reimbursement are a sound exercise of the Debtors' business judgment and are in the best interests of the Debtors, their estates, and all stakeholders. The Court should approve Breakup Fee and Expense Reimbursement.

## III.    The Court Should Approve the Debtors' Entry into the Stalking Horse Purchase Agreement as a Sound Exercise of Business Judgment

39.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Although section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale, or lease of property of the estate, bankruptcy courts routinely authorize sales of a debtor's assets if such sale is based upon "some articulated business justification for using, selling, or leasing the property

outside the ordinary course of business." *In re Continental Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986); *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996).

40.     As noted above, the business judgment rule shields a debtor's management's decisions from judicial second-guessing. *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) (a "presumption of reasonableness attaches to a debtor's management decisions" and courts generally will not entertain objections to the debtor's conduct after a reasonable basis is set forth). Once a debtor articulates a valid business justification, the court should review that request under the business judgment rule. *See In re Gulf Coast Oil Corp.*, 404 B.R. 407, 415 (Bankr. S.D. Tex. 2009) (noting that a debtor in possession has the discretionary authority to exercise business judgment given to an officer or director of a corporation). The business judgment rule protects certain debtor decisions—such as the Debtors' entry into one or more definitive purchase agreements-from reevaluation by a court with the benefit of hindsight. *See Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F. 2d 1303, 1311 (5th Cir. 1985) ("More exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially."). If a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1) of the Bankruptcy Code.

41.     Based on this rationale, courts have authorized a debtor's sale of assets as a sound exercise of business judgment under section 363 of the Bankruptcy Code.

DOCS_NY:48317.8 61051/002
\v

A.      **A Sound Business Purpose Exists for the Sale**

42.     The Debtors have a sound business justification for selling the Property. As is set forth more fully in the First Day Declaration, the Debtors entered into these chapter 11 cases in the presence of a severe liquidity crisis with the goal of completing a going-concern sale of substantially all their assets. The Debtors and their advisors believe that exploring a marketing process to ensure that the terms offered by the Stalking Horse Purchase Agreement currently represents the highest possible value for the Debtors' assets is in the best interest of the Debtors' estates. In light of the Debtors' duty to maximize value for their estates, the Debtors have a sound business purpose for the Sale.

43.     Additionally, the Stalking Horse Purchase Agreement will be subject to competing bids, enhancing the Debtors' ability to receive the highest or otherwise best value for the Property. Consequently, the ultimate successful bid, after being subject to a further "market check" in the form of the Auction (if any), will constitute, in the Debtors' reasonable business judgment, the highest or otherwise best offer for the Property and will provide a greater recovery for their estates than any known or practicably available alternative. *See, e.g.*, *In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, at *4 (Bankr. D. Del. 2001) (while a "section 363(b) sale transaction does not require an auction procedure … the auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction.").

44.     The asset purchase agreement of the Successful Bidder will constitute the highest or otherwise best offer for the applicable Property, which will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative. The Debtors' determination to sell the Property through an Auction process and to enter into an asset purchase agreement with the Successful Bidder (and any Backup Bidder) will be a valid and sound exercise

22

of the Debtors' business judgment. The Debtors request that the Court authorize the proposed Sale as a proper exercise of the Debtors' business judgment.

**B.      The Sale Should Be Approved "Free and Clear" Under Section 363(f) of the Bankruptcy Code**

45.      Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and clear of another party's interest in the property if: (a) applicable nonbankruptcy law permits such a free and clear sale; (b) the holder of the interest consents; (c) the interest is a lien and the sale price of the property exceeds the value of all liens on the property; (d) the interest is the subject of a bona fide dispute; or (e) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest. *See* 11 U.S.C. § 363(f).

46.      Section 363(f) of the Bankruptcy Code is drafted the disjunctive. Thus, satisfaction of any of the requirements enumerated therein will suffice to warrant the sale of the Property free and clear of all liens, security interests, pledges, charges, defects, or similar encumbrances (collectively, "Encumbrances"), except with respect to any Encumbrances that may be assumed by the Successful Bidder. *See In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("[I]f any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens.").

47.      Any Encumbrance that will not be an assumed liability satisfies or will satisfy at least one of the five conditions of section 363(f) of the Bankruptcy Code, and any such Encumbrance will be adequately protected by either being paid in full at the time of closing, or by having it attach to the net proceeds of the Sale, subject to any claims and defenses the Debtors may possess with respect thereto. The Debtors request authority to convey the Property to the Successful Bidder free and clear of all Encumbrances including liens, claims, rights, interests,

23

charges, and encumbrances, with any such liens, claims, rights, interests, charges, and encumbrances to attach to the proceeds of the Sale.

**IV.    The Successful Bidder Should be Entitled to the Protections of Section 363(m) of the Bankruptcy Code**

48.    Section 363(m) of the Bankruptcy Code protects a good faith purchaser's interest in property purchased from a debtor notwithstanding that the sale conducted under section 363(b) is later reversed or modified on appeal.  Specifically, Section 363(m) of the Bankruptcy Code states the following:

> The reversal or modification on appeal of an authorization under [section 363(b) of the Bankruptcy Code] … does not affect the validity of a sale … to an entity that purchased … such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale … were stayed pending appeal.

11 U.S.C. § 363(m).  Section 363(m) of the Bankruptcy Code fosters the "'policy of not only affording finality to the judgment of the [B]anrkuptcy [C]ourt but particularly to give finality to those orders and judgments upon which third parties rely.'" *In re Abbotts Dairies*, 788 F.2d 143, 147 (3d Cir. 1986) (citation omitted); *see also Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal.").

49.    While the Bankruptcy Code does not define "good faith," the Fifth Circuit has defined the term in two ways:

> (1) a notice-based definition, wherein a "good faith purchaser" is "'one who purchases the assets for value, in good faith, and without notice of adverse claims'"; and (2) a conduct-based definition, meaning one who does not engage in "misconduct" including, *inter alia*, "'fraud, collusion between the purchaser and other bidders, or an attempt to take grossly unfair advantage of other bidders.'"

*SR Constr., Inc. v. Hall Palm Springs, L.L.C.*, 65 F.4th 752, 759 (5th Cir. 2023) (citations omitted). The Fifth Circuit has further defined the first prong of that definition to state that "under the notice-definition of a good faith purchaser, the threshold for an 'adverse claim' is a dispute in ownership interest." *Id.* at 761. With respect to the Fifth Circuit's second prong, a party would have to show misconduct, such as "'fraud, collusion between the purchaser and other bidders, or an attempt to take grossly unfair advantage of other bidders'" in order to destroy a purchaser's good faith status. *Id.* at 762.

50.     The Debtors submit that the Stalking Horse Purchaser is a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code. The Debtors and the Stalking Horse Purchaser have entered into the Stalking Horse Purchase Agreement without notice of adverse claims or misconduct such as fraud or collusion. Rather, the Debtors and Stalking Horse Purchaser have entered into the Stalking Horse Purchase Agreement in good faith and through extensive arm's-length negotiations. Indeed, the Stalking Horse Purchaser and the Debtors have engaged separate counsel and other professional advisors to represent their respective interests in the negotiation of the Stalking Horse Purchase Agreement and in the sale process generally. In addition, Lincoln was an independent investment bank retained by the Debtors for the purpose of exploring strategic alternatives, marketing the Debtors' businesses and soliciting bids since July 2023. To the best of the Debtors' knowledge, information and belief, no party has engaged in any conduct that would cause or permit the Stalking Horse Purchase Agreement to be set aside under Section 363(m) of the Bankruptcy Code.

51.     As further detailed in this Motion, the Bidding Procedures are designed to produce a fair and transparent competitive bidding process. Each Qualified Bidder participating in the Auction must confirm that it has not engaged in any collusion with respect to the bidding or the

sale of any of the Property.  Any asset purchase agreement with a Successful Bidder executed by the Debtors will be negotiated at arm's length and in good faith.  The Debtors seek a finding that any Successful Bidder (including the Stalking Horse Bidder) is a good faith purchaser and is entitled to the full protections afforded by section 363(m) of the Bankruptcy Code.  The Debtors also submit that the proposed Sale should be approved as a good faith transaction.

**V.      The Form and Manner of the Sale Notice Should Be Approved**

52.      Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide creditors with 21-days' notice of a hearing where the Debtors will seek to use, lease, or sell property of the estate outside the ordinary course of business. Bankruptcy Rule 2002(c) requires any such notice to include the time and place of the auction and the hearing and the deadline for filing any objections to the relief requested therein. As required under Bankruptcy Rule 2002(b), the Debtors seek approval of the Sale Notice as proper notice of the Auction. Notice of this Motion and the related hearing to consider entry of the Bidding Procedures Order, coupled with service of the Sale Notice, as provided for herein, constitutes good and adequate notice of the Auction and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002. The Debtors request that this Court approve the form and manner of the Sale Notice.

**VI.    The Assumption and Assignment Procedures Are Appropriate and
         Should Be Approved**

**A.      The Assumption and Assignment of the Assigned Contracts Reflects the
          Debtors' Reasonable Business Judgment**

53.      To facilitate and effectuate the Sale, the Debtors are seeking authority to assign or transfer the Assigned Contracts to a Successful Bidder to the extent required by such bidder. Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign its executory

26

contracts and unexpired leases, subject to the approval of the court, *provided* that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided. The Debtors' decision to assume or reject an executory contract or unexpired lease must only satisfy the "business judgment rule" and will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment. *See, e.g.*, *Richmond Leasing*, 762 F.2d at 1309 (applying a business judgment standard to debtor's determination to assume unexpired lease).

54.     As set forth in the Bidding Procedures Order, the Debtors also request that any party that fails to object to the proposed assumption and assignment of any Assigned Contract be deemed to consent to the assumption and assignment of the applicable Assigned Contract pursuant to section 365 of the Bankruptcy Code on the terms set forth in the Sale Order, along with the cure amounts identified in the Cure Notice. *See, e.g.*, *In re Tabone, Inc.*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to sale motion, creditor deemed to consent); *Pelican Homestead v. Wooten (In re Gabel)*, 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same).

55.     Here, the Court should approve the decision to assume and assign the Assigned Contracts in connection with the Sale as a sound exercise of the Debtors' business judgment. *First*, the Assigned Contracts are essential to the value of the Property and, as such, they are essential to inducing the highest or otherwise best offer for the Property. *Second*, it is unlikely that any purchaser would want to acquire certain of the Property unless certain of the contracts needed to conduct business and manage day-to-day operations of those Property were included in the transaction. *Third,* the Assigned Contracts will be assumed and assigned through the process approved by the Court pursuant to the Bidding Procedures Order and, thus, will be reviewed by key constituents in these chapter 11 cases.

56.     The assumption and assignment of the Assigned Contracts by way of the Assumption and Assignment Procedures should be approved as an exercise of the Debtors' business judgment.

**B.     Defaults Under the Assumed Contracts Will Be Cured in Connection with the Sale**

57.     To facilitate and effectuate the Sale, the Debtors are seeking authority to assign or transfer the Assigned Contracts to a Successful Bidder to the extent required by such bidder. Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign its executory contracts and unexpired leases, subject to the approval of the court, *provided* that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided. The Debtors' decision to assume or reject an executory contract or unexpired lease must only satisfy the "business judgment rule" and will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment. *See, e.g.*, *Richmond Leasing*, 762 F.2d at 1309 (applying a business judgment standard to debtor's determination to assume unexpired lease).

58.     Once finding that a debtor has exercised its business judgment in determining that assuming an executory contract is in the best interest of its estate, courts must then evaluate whether the assumption meets the requirements of section 365(b) of the Bankruptcy Code, specifically that a debtor (a) cure, or provide adequate assurance of promptly curing, prepetition defaults in the executory contract, (b) compensate parties for pecuniary losses arising therefrom, and (c) provide adequate assurance of future performance thereunder. This section "attempts to strike a balance between two sometimes competing interests, the right of the contracting non-debtor to get the performance it bargained for and the right of the debtor's creditors to get the benefit of the debtor's bargain." *In re Luce Indus., Inc.*, 8 B.R. 100, 107 (Bankr. S.D.N.Y. 1980).

59.     The statutory requirements of section 365(b)(1)(A) of the Bankruptcy Code will be satisfied because the Assumption and Assignment Procedures provide a clear process by which to resolve disputes over cure amounts or other defaults. The Debtors are confident that if defaults exist that must be cured, such cure will be achieved fairly, efficiently, and properly, consistent with the Bankruptcy Code and with due respect to the rights of non-Debtor parties.

### C.     Non-Debtor Parties Will Be Adequately Assured of Future Performance

60.     Similarly, the third requirement of section 365(b) of the Bankruptcy Code— adequate assurance of future performance—is also satisfied given the facts and circumstances present here. "The phrase 'adequate assurance of future performance' adopted from section 2-609(1) of the Uniform Commercial Code, is to be given a practical, pragmatic construction based upon the facts and circumstances of each case." *In re U.L. Radio Corp.*, 19 B.R. 537, 542 (Bankr. S.D.N.Y. 1982). Although no single solution will satisfy every case, "the required assurance will fall considerably short of an absolute guarantee of performance." *In re Prime Motor Inns, Inc.*, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance present where a prospective assignee has financial resources and has expressed a willingness to devote sufficient funding to a business to give it a strong likelihood of succeeding).

61.     The Debtors will demonstrate that the requirements for assumption and assignment of the Assigned Contracts to the Successful Bidder (and any Backup Bidder) will be satisfied. As required by the Bidding Procedures, the Debtors will evaluate the financial wherewithal of Potential Bidders before designating such party a Qualified Bidder or Successful

Bidder (e.g., financial credibility, willingness, and ability of the interested party to perform under the Assigned Contracts), including as it relates to such Qualified Bidder's willingness and ability to perform under the Assigned Contracts assigned to the Successful Bidder (or any Backup Bidder). Further, the Assumption and Assignment Procedures provide the Court and other interested parties' ample opportunity to evaluate and, if necessary, challenge the ability of the Successful Bidder (or Backup Bidder) to provide adequate assurance of future performance and object to the assumption of the Assigned Contracts or proposed cure amounts. The Court therefore will have a sufficient basis to authorize the Debtors to reject or assume and assign the Assigned Contracts as set forth in the definitive purchase agreement.

## EMERGENCY RELIEF

62.     The Debtors request emergency consideration of the relief requested herein no later than September 20, 2023. The DIP milestones require entry of an order approving these Bidding Procedures no later than fourteen (14) days of the Petition Date, and further require a Bid Deadline of October 18, 2023.  In order to achieve a transaction in the best interests of their stakeholders, the Debtors believe a hearing no later than September 20, 2023 balances notice considerations while maximizing the fulsome and robust marketing process.

## WAIVER OF BANKRUPTCY RULE 6004(A) AND 6004(H)

63.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## **NOTICE**

64.     Notice of the hearing on the relief requested in this Motion will be provided by the Debtors in accordance and compliance with Bankruptcy Rules and Local Rules.  The Debtors will provide notice of this motion to the following: (a) the U.S. Trustee for the Southern District of Texas; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) Wells Fargo Bank; (d) the parties holding secured claims against the Debtors; (e) the United States Attorney's Office for the Southern District of Texas; (f) the Internal Revenue Service; (g) the United States Securities and Exchange Commission; (h) the state attorneys general for states in which the Debtors conduct business; (i) governmental agencies having a regulatory or statutory interest in these cases; and (j) any party that has requested notice pursuant to Bankruptcy Rule 2002 and Bankruptcy Local Rule 9013-1(d).  No other or further notice is needed in light of the nature of the relief requested.


[*Remainder of Page Intentionally Left Blank*]

## <u>CONCLUSION</u>

The Debtors request that the Court enter the Bidding Procedures Order, granting the relief requested in this Motion and granting such other and further relief as is appropriate under the circumstances.

Dated: September 12, 2023

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ Michael D. Warner*
Michael D. Warner (SBT 00792304)
Maxim B. Litvak (SBT 24002482)
Benjamin L. Wallen (SBT 24102623)
440 Louisiana Street, Suite 900
Houston, TX 77002
Telephone: (713) 691-9385
Facsimile:  (713) 691-9407
mwarner@pszjlaw.com
mlitvak@pszjlaw.com
bwallen@pszjlaw.com

-and-

Richard M. Pachulski (pending *pro hac vice*)
Teddy M. Kapur (pending *pro hac vice*)
Gregory V. Demo (pending *pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
rpachulski@pszjlaw.com
tkapur@pszjlaw.com
gdemo@pszjlaw.com

*Proposed Counsel to the Debtors and Debtors in Possession*

## <u>Certificate of Service</u>

I certify that on September 12, 2023, a true and correct copy of the foregoing document was caused to be served via the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Michael D. Warner*
Michael D. Warner

DOCS_NY:48317.8 61051/002
\v