**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>NOBLE HOUSE HOME FURNISHINGS LLC, et al.,<br><br>Debtors. [1] | Chapter 11<br><br>Case No. 23-90773 (CML)<br><br>(Jointly Administered) |

**ORDER (I) APPROVING BIDDING PROCEDURES FOR
SALE OF THE DEBTORS' ASSETS, (II) APPROVING BID PROTECTIONS, (III)
SCHEDULING CERTAIN DATES WITH RESPECT THERETO, (IV) APPROVING
THE FORM AND MANNER OF NOTICE THEREOF, AND (V) APPROVING
CONTRACT ASSUMPTION AND ASSIGNMENT PROCEDURES**
(Related Docket No. ___)

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order (this "Order"), (a) authorizing and approving the Bidding Procedures, substantially in the form attached hereto as **Exhibit 1** (the "Bidding Procedures"), (b) establishing certain dates and deadlines in connection with the Bidding Procedures, (c) approving the Bid Protections set forth in the Stalking Horse Purchase Agreement attached hereto as **Exhibit 2**, (d) approving procedures for assuming and assigning certain executory contracts and unexpired leases, and certain related notices, approving the Sale Notice, substantially in the form attached hereto as **Exhibit 3**, and approving the Cure Notice, substantially in the form attached hereto as **Exhibit 4**, all as more fully set forth in the Motion; and the Court

---

[1]  The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification numbers, are:  Noble House Home Furnishings LLC (1671); Best Selling Home Decor Furniture, LLC (5580); Le Pouf, LLC (8197), NH Services LLC (9626), and Heavy Metal, Inc. (3124).  The Debtors' service address in these Chapter 11 cases is 700 Milam Street, Suite 1300, Houston, TX 77002.

[2]  Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion or the Bidding Procedures, as applicable.

having reviewed any evidence in support of the Motion; and the Court having reviewed the Motion

and having heard the statements in support of the relief requested therein at a hearing before the

Court (the "Hearing"); and the Court having determined that the legal and factual bases set forth

in the Motion and at the Hearing establish just cause for the relief granted herein; and any

objections to the Motion having been withdrawn with prejudice or overruled on the merits at the

Hearing; and upon all of the proceedings had before the Court; and after due deliberation and

sufficient cause appearing therefor,

**THE COURT FINDS**:[3]

A.      Jurisdiction and Venue. The Court has jurisdiction to consider the Motion and the

relief requested therein pursuant to 28 U.S.C. § 1334, and venue is proper before this Court

pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

B.      Bases for Relief. The bases for the relief requested in the Motion are sections 105,

363, 365, 503, and 507 of the Bankruptcy Code and Bankruptcy Rules 2002(a)(2), 6004, 6006,

9007, and 9014 and Bankruptcy Local Rule 9013-1.

C.      Notice of the Bidding Procedures Motion. Good and sufficient notice of the

Motion, the Bidding Procedures, and the relief sought in the Motion has been given under the

circumstances, and no other or further notice is required except as set forth herein and in the

Bidding Procedures. The notice of the Motion and of the Hearing is reasonable and sufficient in

light of the circumstances and nature of the relief requested in the Motion, and no other or further

notice of the Motion or the Hearing is necessary. A reasonable and fair opportunity to object to

the Motion and the relief granted in this Order has been afforded under the circumstances.

---

[3]     The findings of fact and conclusions of law herein constitute the Court's findings of fact and conclusions of law
for the purposes of Bankruptcy Rule 7052 made applicable pursuant to Bankruptcy Rule 9014. To the extent any
findings of facts are conclusions of law, they are adopted as such.

D.      Bidding Procedures. The Debtors have articulated good and sufficient reasons for authorizing and approving the Bidding Procedures, which are fair, reasonable, and appropriate under the circumstances and designed to maximize value for the benefit of the Debtors' estates, their creditors, and other parties in interest. The Debtors, with the assistance of their advisors, are engaged in a fulsome marketing and sale process to solicit and develop the highest or otherwise best offer for the Property. The Bidding Procedures are designed to build on that robust and extensive marketing and sale process following entry of this Order.

E.      Bid Protections. Subject to the noticing requirements and objection procedures set forth in this Order, the Bid Protections, (i) are an actual and necessary cost and expense of preserving the Debtors' estates within the meaning of sections 503(b) and 507(a)(2) of the Bankruptcy Code, (ii) are reasonably tailored to encourage, rather than hamper, bidding for the Property, by providing a baseline of value, increasing the likelihood of competitive bidding at the Auction, and facilitating participation of other bidders in the sale process, thereby increasing the likelihood that the Debtors will receive the best possible price and terms for the Property, (iii) are commensurate to the real and material benefits conferred upon the Debtors' estates by the Stalking Horse Purchaser, and (iv) are fair, reasonable, and appropriate, including in light of the commitments that have been made and the efforts that have been and will be expended by the Stalking Horse Purchaser. The Bid Protections are necessary to induce the Stalking Horse Purchaser to pursue the Sale and to be bound by the Stalking Horse Purchase Agreement, and are also reasonable in relation to the Stalking Horse Purchaser's lost opportunities resulting from the time and money spent pursuing the Sale.

F.      Assumption and Assignment Procedures. The Cure Notice is reasonably calculated to provide counterparties to the Contracts to be assumed or assumed and assigned with

proper notice of the intended assumption or assumption and assignment of their Contracts, any

cure amounts, and the Assumption and Assignment Procedures, and no other or further notice of

such intention, the cure amounts, or the Assumption and Assignment Procedures shall be

required.

   G. <u>Sale Notice</u>. The Sale Notice is reasonably calculated to provide all interested

parties with timely and proper notice of the Auction, including the date, time, and place of the

Auction (if one is held) and the Bidding Procedures and certain dates and deadlines related thereto,

and no other or further notice of the Auction shall be required.

   H. <u>Good Faith Negotiation of Bidding Procedures and Stalking Horse Purchase
Agreement</u>.  The Bidding Procedures and the Stalking Horse Purchase Agreement were each

negotiated in good faith and at arm's-length among the Debtors and the Stalking Horse Purchaser.

The Stalking Horse Purchase Agreement represents the highest or otherwise best offer that the

Debtors have received to date for the Property.  The process for selecting the Stalking Horse

Purchaser was fair and appropriate under the circumstances and in the best interests of the Debtors'

estates.

   I. <u>Business Justification</u>.  The Debtors have demonstrated a compelling and sound

business justification for the Bankruptcy Court to enter this Order and, thereby: (i) approve the

Bidding Procedures as contemplated by the Motion and the Stalking Horse Purchase Agreement;

(ii) authorize the Bid Protections under the terms and conditions set forth in the Stalking Horse

Purchase Agreement and the Bidding Procedures; (iii) set the dates of the Bid Deadline, Auction

(if needed), Sale Hearing and other deadlines set forth in the Motion and the Bidding Procedures;

(iv) approve the noticing procedures and the forms of notice; and (v) approve the Assumption and

Assignment Procedures and the form of relevant notice.  Such compelling and sound business

justification, as set forth in the Motion and on the record at the Hearing, are incorporated herein by reference and, among other things, form the basis for the findings of fact and conclusions of law set forth herein.

**NOW, THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED**:

       1.     All objections, statements, and reservations of rights to the relief granted herein that have not been withdrawn with prejudice, waived, or settled are overruled and denied on the merits with prejudice.

**I.    Important Dates and Deadlines.**

       2.     The following dates and deadlines regarding the Sale are hereby established, subject to the right of the Debtors, to modify the following dates (in consultation with the Consultation Parties (as defined in the Bidding Procedures) and with the prior written consent of the Stalking Horse Purchaser), provided notice is given in accordance with the terms of this Order:

| Event or Deadline | Date and Time |
| --- | --- |
| Qualified Bid Deadline | October 18, 2023, at 5:00 p.m. (prevailing Central Time) |
| Auction (if applicable) | The Auction will be held on October 23, 2023, at 10:00 a.m. (prevailing Central Time) via remote video[4] |
| Cure Objection Deadline | 14 days after service of cure notice |
| Sale Objection Deadline | October 24, 2023, at 4:00 p.m. (prevailing Central Time) |
| Sale Hearing | October ___, 2023, at ___:___ _.m.[5] |

---

[4]   If the Debtors decide to hold a live, in-person Auction, Qualified Bidders shall still have the ability to submit Bids remotely.

[5]   The Debtors cannot modify the date of the Sale Hearing or the Outside Closing Date without the consent of the Stalking Horse Purchaser, as set forth in the Stalking Horse Purchase Agreement. The Debtors shall consult with the Stalking Horse Purchaser prior to modifying the date of the Auction, the Cure Objection Deadline, or the Sale Objection Deadline.

| Event or Deadline | Date and Time |
|---|---|
| Outside Closing Date | October 31, 2023 |

3.      ***Successful Bidder***. The Debtors shall present the results of the Auction (if any) or otherwise present any Successful Bidders (as defined in the Bidding Procedures) to the Court at the Sale Hearing.

**II.      The Bidding Procedures.**

4.      The Bidding Procedures, which are incorporated by reference as though fully set forth herein, are hereby approved, and the Debtors are authorized to solicit bids and conduct an Auction, if necessary, on the terms set forth in the Bidding Procedures. The Bidding Procedures shall govern the submission, receipt, and analysis of all bids, and any party desiring to submit a bid on the Property must do so strictly in accordance with the terms of the Bidding Procedures and this Order. The Debtors are authorized to take all actions as are reasonably necessary or appropriate to implement the Bidding Procedures.

5.      Each bidder participating at an Auction (if any) shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale, as set forth in the Bidding Procedures, and an Auction (if any) shall be transcribed or recorded.

6.      Pursuant to the Bidding Procedures, including any applicable consultation or consent rights therein, the Debtors may (a) determine which Qualified Bid is the highest or otherwise best offer for the Property, (b) at any time prior to entry of an Order of the Court approving the applicable Successful Bid, reject any Bid (other than the Stalking Horse Purchase Agreement) that the Debtors determine, after consultation with the Consultation Parties, is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code or the Bidding Procedures, or (iii) contrary to the best interests of the Debtors' estates and their

creditors, and (c) prior to conclusion of an Auction (if any) and after consultation with the Consultation Parties, impose such other terms and conditions upon Qualified Bidders as the Debtors determine to be in the best interests of the Debtors' estates in these chapter 11 cases. Notwithstanding the foregoing, the Debtors shall not impose any terms and conditions upon the Stalking Horse Purchaser that are inconsistent with, or in addition to those contained in, the Stalking Horse Purchase Agreement (except as required at the Auction (if any) for the Stalking Horse Purchaser to become the Successful Bidder).

7.      If the Auction is cancelled, then the Debtors shall file a notice with the Court of such election within two (2) business days of the determination of such election by the Debtors. The deadline to object to the Sale shall be October 24, 2023, at 4:00 p.m. (prevailing Central Time).

8.      Other than any Bid Protections approved for the Stalking Horse Purchaser as provided herein, no person or entity shall be entitled to any expense reimbursement, break-up fees, "topping," termination, or other similar fee or payment, and by submitting a bid, such person or entity is deemed to have waived their right to request or to file with this Court any request for expense reimbursement or any fee of any nature in connection with such bid, whether by virtue of section 503(b) of the Bankruptcy Code or otherwise.

**III.     The Bid Protections.**

9.      The Breakup Fee and Expense Reimbursement as set forth in the Stalking Horse Purchase Agreement are hereby approved. The Debtors are authorized without further Court action to pay any Breakup Fee and Expense Reimbursement solely to the extent such amounts become due and payable to the Stalking Horse Purchaser, pursuant to the Stalking Horse Purchase Agreement, the Bidding Procedures and this Order.

10.     The obligation of the Debtors to pay the Breakup Fee and Expense Reimbursement: (i) shall be entitled to superpriority administrative expense status under sections 503 and 507(b) of the Bankruptcy Code, *provided*, *however*, that, for the avoidance of doubt, such claims shall be senior to all other administrative expense claims other than any carve-out and any administrative claims or debtor-in-possession financing obligations arising under any cash collateral or financing order entered by the Bankruptcy Court pursuant to Section 9.2(b) of the Stalking Horse Purchase Agreement, and *provided further* that the Breakup Fee and Expense Reimbursement shall be payable solely in accordance with the terms set forth in the Stalking Horse Purchase Agreement; *provided further*, that any such Breakup Fee and Expense Reimbursement in connection with a termination pursuant to Section 9.1(d) of the Stalking Horse Purchase Agreement shall be junior to the DIP Obligations and the Prepetition ABL Obligations and no such fee shall be payable if the Outside Date is extended by order of the Court (or with the consent of the DIP Agent).

**IV.     The Assumption and Assignment Procedures.**

11.     The following Assumption and Assignment Procedures regarding the assumption and assignment of the Contracts proposed to be assumed by the Debtors and assigned to a Successful Bidder are approved:

    (a)     **Cure Notice**. Within three (3) business days after entry of this Order, the Debtors shall file with the Court and serve via first class mail, electronic mail, or overnight delivery, the Cure Notice on certain non-Debtor contract counterparties (collectively, the "Contract Counterparties"), and post the Cure Notice to the case website (https://dm.epiq11.com/NobleHouseHomeFurnishings).

    (b)     **Content of Cure Notice**. The Cure Notice shall notify the applicable Contract Counterparties that the Contracts may be subject to assumption and assignment in connection with the Sale, and contain the following information: (i) a list of the applicable Contracts that may be assumed and assigned in connection with the Sale (the "Assigned Contracts," and each

individually, an "<u>Assigned Contract</u>"); (ii) the applicable Contract Counterparties; (iii) the Debtors' good faith estimate of the proposed amount necessary to cure all monetary defaults, if any, under each Assigned Contract (the "<u>Cure Costs</u>"); and (iv) the deadline by which any Contract Counterparty to an Assigned Contract must file an objection to the proposed assumption, assignment, cure, and/or adequate assurance and the procedures relating thereto (the "<u>Cure Objection</u>"); *provided* that service of a Cure Notice does not constitute an admission that such Assigned Contract is an executory contract or unexpired lease or that such Assigned Contract will be assumed at any point by the Debtors or assumed and assigned pursuant to any Successful Bid.

(c)     **Cure Objections**. Cure Objections, if any, to a Cure Notice must: (i) be in writing; (ii) comply with the applicable provisions of the Bankruptcy Rules, the Bankruptcy Local Rules, and any order governing the administration of these chapter 11 cases; (iii) state with specificity the nature of the objection and, if the Cure Objection pertains to the proposed Cure Costs, state the cure amount alleged to be owed to the objecting Contract Counterparty, together with any applicable and appropriate documentation in support thereof; and (iv) be filed with the Court within 14 days of service of the Cure Notice (the "<u>Cure Objection Deadline</u>"); *provided* that the Debtors may modify the Cure Objection Deadline upon consultation with the Stalking Horse Purchaser or the Successful Bidder, as applicable, by email confirmation.

(d)     **Effects of Filing a Cure Objection**. A properly filed Cure Objection will reserve such objecting party's rights against the Debtors only with respect to the assumption and assignment of the Assigned Contract at issue, and/or objection to the accompanying Cure Costs, as set forth in the Cure Objection, but will not constitute an objection to the remaining relief requested in the Motion.

(e)     **Dispute Resolution**. Any Cure Objection to the proposed assumption and assignment of an Assigned Contract or Cure Costs that remains unresolved after the Sale Hearing shall be heard at such later date as may be agreed upon by the parties (including the Successful Bidder) or fixed by the Court. To the extent that any Cure Objection cannot be resolved by the parties, such Contract shall be assumed and assigned only upon satisfactory resolution of the Cure Objection, to be determined in the Successful Bidder's reasonable discretion. To the extent a Cure Objection remains unresolved, the Contract may be conditionally assumed and assigned, subject to the consent of the Successful Bidder, pending a resolution of the Cure Objection after notice and a hearing. If a Cure Objection is not satisfactorily resolved, the Successful Bidder may determine that such Contract should be rejected and not assigned, in which case the Successful Bidder will not be responsible for any Cure Costs in respect of such

9

contract. Notwithstanding the foregoing, if a Cure Objection relates solely to the Cure Costs (any such objection, a "Cure Dispute"), the applicable Assigned Contract may be assumed by the Debtors and assigned to the Successful Bidder provided that the cure amount the Contract Counterparty asserts is required to be paid under section 365(b)(1)(A) and (B) of the Bankruptcy Code (or such lower amount as agreed to by the Contract Counterparty) is deposited in a segregated account by the Debtors pending the Court's adjudication of the Cure Dispute or the parties' consensual resolution of the Cure Dispute.

(f)     **Supplemental Cure Notice**. If the Debtors discover Contracts inadvertently omitted from the Cure Notice or the Stalking Horse Purchaser or Successful Bidder, as applicable, identifies other Contracts that it desires to assume or assume and assign in connection with the Sale, the Debtors may, after consultation with the Stalking Horse Purchaser or the Successful Bidder, as applicable, at any time before the closing of the Sale, supplement the Cure Notice with previously omitted Contracts or modify a previously filed Cure Notice, including by modifying the previously stated Cure Costs associated with any Contracts (the "Supplemental Cure Notice"); *provided* that the Stalking Horse Purchaser shall not be required to assume any such contract or be responsible for any additional obligations relating to a Supplemental Cure Notice absent its express written consent.

(g)     **Objection to the Supplemental Cure Notice**. Any Contract Counterparty listed on the Supplemental Cure Notice may file an objection (a "Supplemental Cure Objection") only if such objection is to the proposed assumption or assumption and assignment of the applicable Contracts or the proposed Cure Costs, if any. All Supplemental Cure Objections must: (i) state, with specificity, the legal and factual basis for the objection as well as what Cure Costs are required, if any; (ii) include appropriate documentation in support thereof; and (iii) be filed no later than 4:00 p.m. (prevailing Central Time) on the date that is fourteen (14) days following the date of service of such Supplemental Cure Notice, which date will be set forth in the Supplemental Cure Notice.

(h)     **Dispute Resolution of Supplemental Cure Objection**. If a Contract Counterparty files a Supplemental Cure Objection in a manner that is consistent with the requirements set forth above, and the parties are unable to consensually resolve the dispute, the Debtors shall seek an expedited hearing before the Court to determine the Cure Costs, if any, and approve the assumption of the relevant Contracts. If there is no such objection, then the Debtors shall obtain an order of this Court fixing the Cure Costs and approving the assumption of any Contract listed on a Supplemental Cure Notice. Notwithstanding the foregoing, if a Supplemental Cure Objection relates solely to a Cure Dispute, the applicable Assigned Contract may be

assumed by the Debtors and assigned to the Successful Bidder provided that the cure amount the Contract Counterparty asserts is required to be paid under section 365(b)(1)(A) and (B) of the Bankruptcy Code (or such lower amount as agreed to by the Contract Counterparty) is deposited in a segregated account by the Debtors pending the Court's adjudication of the Cure Dispute or the parties' consensual resolution of the Cure Dispute.

(i)     **No Cure Objections**. If there are no Cure Objections or Supplemental Cure Objections, or if a Contract Counterparty does not file and serve a Cure Objection or a Supplemental Cure Notice in a manner that is consistent with the requirements set forth above, and absent a subsequent order of the Court establishing an alternative Cure Cost, (i) the Cure Costs, if any, set forth in the Cure Notice (or Supplemental Cure Notice) shall be controlling, notwithstanding anything to the contrary in any Contract or any other document, and (ii) the Contract Counterparty will be deemed to have consented to the assumption or assumption and assignment of the Contract and the Cure Costs, if any, and will be forever barred from objecting to the assumption or assumption and assignment of such Contract and rights thereunder, including the Cure Costs, if any, and from asserting any other claims related to such Contract against the Debtors or the Successful Bidder, or the property of any of them.

12.     Any objection to the ability of the Successful Bidder to provide adequate assurance of future performance with respect to any Assigned Contract must be filed with the Court no later than the later of (a) the Sale Objection Deadline and (b) 4:00 p.m. (prevailing Central Time) on the date that is fourteen (14) days following the date of service of any applicable Supplemental Cure Notice.

13.     The inclusion of an Assigned Contract in the Cure Notice (or Supplemental Cure Notice) will not: (a) obligate the Debtors to assume any Assigned Contract listed thereon or obligate the Successful Bidder to take assignment of such Assigned Contract; or (b) constitute any admission or agreement of the Debtors that such Assigned Contract is an executory contract or unexpired lease. Only those Assigned Contracts that are included on a schedule of assumed and assigned contracts attached to the asset purchase agreement with a Successful Bidder (including amendments or modifications to such schedules in accordance with such agreement) will be assumed and assigned to such Successful Bidder.

V.      **Sale Notice and Related Relief.**

14.     The Sale Notice, substantially in the form attached hereto as **Exhibit 3**, is hereby approved. Within three (3) business days after entry of this Order, the Debtors shall serve the Bidding Procedures and the Sale Notice upon the Notice Parties. In addition, within five (5) business days after entry of this Order, the Debtors will publish the Sale Notice, with any modifications necessary for ease of publication, on the case-specific website maintained by Epiq to provide notice to any other potential interested parties and will serve the Cure Notice upon the Notice Parties.  No publication notice shall be required under the circumstances of these cases.

15.     Nothing in this Order or the Bidding Procedures shall be deemed a waiver of any rights, remedies, or defenses that any party (including the Debtors, the Debtors' lenders, the Stalking Horse Purchaser, or any other prospective purchaser) has or may have under applicable bankruptcy and non-bankruptcy law or any rights, remedies or defenses of the Debtors with respect thereto, including seeking relief from the Court with regard to the Auction, the Bidding Procedures, the Sale, and any related items (including, if necessary, to seek an extension of the Bid Deadline).

16.     This Order permits the use of cash only to the extent authorized under this Court's applicable orders authorizing debtor-in-possession financing, including the Budget (as defined therein) (the "DIP Orders"). In the event of any inconsistency between this Order and the DIP Orders, the DIP Orders shall control. Notwithstanding the foregoing, nothing in the DIP Orders shall affect the Stalking Horse Purchaser's right to the payment from sale proceeds of the Breakup Fee and Expense Reimbursement pursuant to this Order, the Bidding Procedures, and the Stalking Horse Purchase Agreement, subject in all cases to the conditions giving rise to payment of the Breakup Fee and Expense Reimbursement under the Stalking Horse Purchase Agreement having occurred.

17.     The DIP Agent, the DIP Lenders, the Prepetition ABL Agent and Prepetition ABL Parties, or any assignee or designee of any of the foregoing, shall be authorized to credit bid, consistent with the applicable DIP Documents and/or Prepetition ABL Documents, some or all of their claims for their respective priority collateral (each a "Credit Bid") pursuant to section 363(k) of the Bankruptcy Code, subject in each case to the DIP Orders, the Bankruptcy Code, other applicable law, and to the provision of consideration sufficient to indefeasibly pay in full in cash any senior liens on the collateral that is subject to the Credit Bid except to the extent otherwise agreed by the holder of such senior lien in their sole and absolute discretion. Any Credit Bid shall be a Qualified Bid without the need to provide any deposit and the DIP Agent, the DIP Lenders, the Prepetition ABL agent and Prepetition ABL Parties shall be Qualified Bidders in connection with any such Credit Bid, and any such Credit Bid shall be a Qualified Bid.

18.     Subject to the DIP Order and the payment of the Breakup Fee and Expense Reimbursement as provided in this Order and the Stalking Horse Purchase Agreement (if applicable), unless otherwise agreed by the DIP Agent or the Prepetition ABL Agent, all Sale proceeds generated from the sale(s) of any Property shall be paid, to the DIP Agent and the DIP Lenders, the Prepetition ABL Agent and the Prepetition ABL Parties, upon the closing of such sale(s) for permanent and indefeasible application against the DIP Obligations and the Prepetition ABL Obligations until all DIP Obligations and the Prepetition ABL Obligations have been Paid in Full (as defined in the DIP Orders) in accordance with the terms and conditions of the DIP Documents, the Prepetition ABL Documents and the DIP Orders.

19.     Notwithstanding anything to the contrary contained herein or in the Bidding Procedures or otherwise: (i) the rights of the DIP Agent and the Prepetition ABL Agent to consent to the sale of any portion of their Collateral (as defined in the DIP Orders) shall be expressly

reserved and not modified, waived or impaired in any way by this Order, and (ii) nothing in this Order shall amend, modify, or impair any provision of the DIP Orders; *provided that*, for the avoidance of doubt, the DIP Agent and Prepetition ABL Agent have consented to the sale of the Purchased Assets (as defined in the Stalking Horse Purchase Agreement) to the Stalking Horse Purchaser on the terms described in the Stalking Horse Purchase Agreement as such terms may be improved in connection with the Auction.

20.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

21.     The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

22.     The requirements set forth in Bankruptcy Local Rule 9013-1 and the Procedures for Complex Chapter 11 Cases in the Southern District of Texas are satisfied by the contents of the Motion.

23.     Notwithstanding Bankruptcy Rule 6004(h), this Order shall be immediately effective and enforceable upon entry hereof.

24.     The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated:_____, 2023

_____
UNITED STATES BANKRUPTCY JUDGE

**Exhibit 1**

**Bidding Procedures**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>NOBLE HOUSE HOME FURNISHINGS LLC, et al.,<br><br>Debtors. [1] | Chapter 11<br><br>Case No. 23-90773 (CML)<br><br>(Jointly Administered) |

## BIDDING PROCEDURES FOR THE SALE OF THE DEBTORS' ASSETS

On September 11, 2023, the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of Texas (the "Court").

On September [●], 2023, the Court entered the *Order (I) Approving Bidding Procedures for the Sale of the Debtors' Assets, (II) Approving Bid Protections, (III) Scheduling Certain Dates with Respect Thereto, (IV) Approving the Form and Manner of Notice Thereof, and (V) Approving Contract Assumption and Assignment Procedures* [Docket No. [●]] (the "Bidding Procedures Order"),[2] by which the Court approved the following procedures (the "Bidding Procedures").

These Bidding Procedures set forth the process for a potential auction (the "Auction") for the sale or sales (any such sale, a "Sale") of some or all of the assets of the Debtors (the "Property").

---

**Copies of the Bidding Procedures Order or other documents related thereto are available upon request to Epiq by calling 833-909-4386 or visiting the Debtors' restructuring website at https://dm.epiq11.com/NobleHouseHomeFurnishings**

---

## Assets to be Auctioned

These Bidding Procedures set forth the terms by which prospective bidders, if any, may qualify for and participate in an Auction, thereby competing to make the highest or otherwise best offer or combination of offers which in the aggregate will make the highest or otherwise best offer to purchase some or all of the Debtors' Property. The Debtors may consider bids from multiple

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification numbers, are: Noble House Home Furnishings LLC (1671); Best Selling Home Decor Furniture, LLC (5580); Le Pouf, LLC (8197); NH Services LLC (9626), and Heavy Metal, Inc. (3124). The Debtors' service address in these Chapter 11 cases are 700 Milam Street, Suite 1300, Houston, TX 77002.

[2] All capitalized terms used but not immediately defined shall have the meanings ascribed to them elsewhere in these Bidding Procedures or the Bidding Procedures Order.

1

bidders (including multiple bids submitted by the same bidder) in any combination for the Property.

The following is a table setting forth key dates and deadlines with respect to the Sale process:

| Event or Deadline | Date and Time |
|---|---|
| Qualified Bid Deadline | October 18, 2023, at 5:00 p.m. (prevailing Central Time) |
| Auction (if applicable) | The Auction will be held on October 23, 2023, at 10:00 a.m. (prevailing Central Time) via remote video[3] |
| Cure Objection Deadline | 14 days after service of cure notice |
| Sale Objection Deadline | October 24, 2023, at 4:00 p.m. (prevailing Central Time) |
| Sale Hearing | October ___, 2023, at ___:___ ___.m. |
| Outside Closing Date | October 31, 2023 |

**I.    Public Announcement of Auction.**

Within three (3) business days after entry of the Bidding Procedures Order, the Debtors shall serve on the Notice Parties a notice of the Auction and Sale (the "Sale Notice"). Within five (5) business days after entry of the Bidding Procedures Order, the Debtors shall publish the Sale Notice, with any modifications necessary for ease of publication, on the case-specific website maintained by Epiq to provide notice to any other potential interested parties.

**II.    Potential Bidder Requirements.**

To participate in the bidding process or otherwise be considered for any purpose hereunder, a person or entity (other than the Stalking Horse Purchaser) interested in purchasing some or all of the Debtors' Property (a "Potential Bidder") must deliver or have previously delivered to the Debtors the following documents (collectively, the "Preliminary Bid Documents"):

a.    an executed confidentiality agreement (a "Confidentiality Agreement") in form and substance acceptable to the Debtors;

b.    a non-binding written indication of interest specifying, among other things, with respect to any proposed Sale, the identity of the Property to be acquired, the amount and type of consideration to be offered, and any other material terms to be included in a bid by such party;

---

[3]    If the Debtors decide to hold a live, in-person Auction, Qualified Bidders shall still have the ability to submit Bids remotely.

c.      preliminary proof by the Potential Bidder of its financial capacity to close the proposed Sale (which may include current audited or verified financial statements of, or verified financial commitments ("Financial Statements") obtained by, the Potential Bidder (or, if the Potential Bidder is an entity formed for the purpose of acquiring the property to be sold, the party that will bear liability for a breach) as well as an overview of any recent transactions), the adequacy of which must be reasonably acceptable to the Debtors after consultation with the Consultation Parties (as defined below);

d.      identity of the Potential Bidder, including its legal name, jurisdiction and form of organization, and details regarding the ownership and capital structure of the Potential Bidder, as well as the identity of any controlling persons, significant direct or indirect equity or debt investors, and/or guarantors of such entity, and any known connections the Potential Bidder has to the Debtors or their advisors, any statutory committee appointed in these cases (if any) or its advisors, the DIP Lenders or their advisors, or any creditor or equity security interest holder of the Debtors;

e.      a list with the names and contact information for any financial, legal and other advisors the Potential Bidder has engaged to assist in connection with the proposed Sale; and

f.      a description of the nature and extent of any due diligence the Potential Bidder wishes to conduct.

The Debtors, in their reasonable discretion, and after consultation with the Consultation Parties, may agree to waive some or all of the Potential Bidder requirements set forth above. Each Potential Bidder shall comply with all reasonable requests for information and access by the Debtors or their advisors regarding the ability of such Potential Bidder, as applicable, to consummate a proposed Sale. Promptly after a Potential Bidder delivers Preliminary Bid Documents, the Debtors shall (a) determine and notify each Potential Bidder as to whether such Potential Bidder has submitted acceptable Preliminary Bid Documents, (b) provide copies of any such notices to the Notice Parties, and (c) provide copies of such Preliminary Bid Documents to the following parties (each, a "Consultation Party" and collectively, the "Consultation Parties"): (i) the DIP Agent and the Prepetition Agent, with notice to their counsel Morgan, Lewis & Bockius LLP, One Federal St., Boston, MA 02110-1726; Attn: Christopher L. Carter, Esq.; and (ii) any statutory committee appointed in these chapter 11 cases (if any), with notice to its counsel.

Other than the Stalking Horse Purchaser, only those Potential Bidders that have submitted acceptable Preliminary Bid Documents to the reasonable satisfaction of the Debtors and their advisors, after consultation with the Consultation Parties, may submit bids to purchase the Debtors' Property. The Debtors reserve the right to work with any Potential Bidder to cure any deficiencies in the Preliminary Bid Documents.

III.    **Obtaining Due Diligence Access**.

Only Potential Bidders that have submitted acceptable Preliminary Bid Documents to the reasonable satisfaction of the Debtors and their advisors shall be eligible to receive information and access to the Debtors' electronic data room and to additional non-public, non-privileged information regarding the Debtors. For the avoidance of doubt, the Stalking Horse Purchaser is eligible to receive information and access to the Debtors consistent with the terms of the Stalking Horse Purchase Agreement. All information requests must be directed to the Debtors' investment banker, Lincoln Partners Advisors LLC. The Debtors will provide to each Potential Bidder (including the Stalking Horse Purchaser) reasonable due diligence information, as requested by such Potential Bidder in writing, as soon as reasonably practicable after such request, and the Debtors shall post substantially all written due diligence provided to any Potential Bidder to the Debtors' electronic data room. Potential Bidders will not, directly or indirectly, contact or initiate or engage in discussions in respect of matters relating to the Debtors or a potential transaction with any customer, supplier, or contractual counterparty of the Debtors without the prior written consent of the Debtors. The due diligence period will end on the Bid Deadline (as defined herein).

In connection with the provision of due diligence information to Potential Bidders, the Debtors shall not furnish any confidential information relating to the Debtors or a potential transaction to any person except a Potential Bidder or such Potential Bidder's duly authorized representatives to the extent provided in an applicable Confidentiality Agreement.

The Debtors and their advisors shall coordinate all reasonable requests for additional information and due diligence access from Potential Bidders; *provided* that the Debtors may decline to provide such information to Potential Bidders who, in the Debtors' reasonable business judgment, after consultation with the Consultation Parties, have not established, or who have raised doubt, that such Potential Bidders intend in good faith to, or have the capacity to, consummate any Sale. For any Bidder who is a competitor or customer of the Debtors or is affiliated with any competitors or customers of the Debtors, the Debtors reserve the right, after consultation with the Consultation Parties, to withhold or modify any diligence materials that the Debtors determine are commercially sensitive or otherwise inappropriate for disclosure to such bidder.

---

**Lincoln Partners Advisors LLC, Attn: Zach Messenger (zmessenger@lincolninternational.com) shall coordinate all requests for additional information and due diligence access on behalf of the Debtors.**

---

A.    **Communications with Potential Bidders (including Qualified Bidders)**.

Notwithstanding anything to the contrary in these Bidding Procedures, all substantive direct communications, including any diligence requests, with Potential Bidders and Qualified Bidders shall be through Lincoln Partners Advisors LLC (via email shall be acceptable).

B.    **Due Diligence from Potential Bidders (including Qualified Bidders)**.

Each Potential Bidder (including any Qualified Bidder) shall comply with all reasonable

requests for additional information and due diligence access requested by the Debtors or their advisors regarding the ability of such Potential Bidder (including any Qualified Bidder) to consummate its contemplated Sale. Failure by a Potential Bidder (including any Qualified Bidder, but excluding the Stalking Horse Purchaser) to comply with such reasonable requests for additional information and due diligence access may be a basis for the Debtors, after consultation with the Consultation Parties, to determine that such bidder is no longer a Qualified Bidder or that a bid made by such bidder is not a Qualified Bid.

### C.       No Communications Among Potential Bidders.

There must be no communications between or amongst Potential Bidders, or between Potential Bidders and the Consultation Parties, unless the Debtors have previously authorized such communication in writing. Should any Potential Bidder attempt to communicate directly with another Potential Bidder or the Consultation Parties, such Potential Bidder or the Consultation Parties, as applicable shall immediately inform, in writing, the Debtors' counsel and the Debtors' investment banker. The Debtors reserve the right, in their reasonable business judgment and upon consultation with the Consultation Parties, to disqualify any Potential Bidders that have communications between and amongst themselves without the prior consent of the Debtors. The Debtors further reserve their right, in their reasonable business judgment to disqualify any Potential Bidders that have communications with a Consultation Parties, and to strip any Consultation Parties that violates this provision (except as otherwise provided in this paragraph) of its consultation rights hereunder without the prior consent of the Debtors; *provided* that the Debtors shall provide such Consultation Parties with notice that the Debtors are exercising their rights to strip the Consultation Parties of its consultation rights and shall work in good faith with such Consultation Parties to resolve the issue without the need to strip the Consultation Parties of their consultation rights.

## IV.       Credit Bidding.

Subject in all respects to the Bankruptcy Code, other applicable law, and the satisfaction in cash or assumption of claims secured by senior liens, if any, the DIP Agent and the Prepetition ABL Agent may, subject to section 363(k) of the Bankruptcy Code, credit bid all or any of the respective portion of the DIP Lenders' and the Prepetition ABL Parties' outstanding DIP Obligations or Prepetition ABL Obligations (as defined in the DIP Order) (the "Credit Bid"). Any Credit Bid shall be a Qualified Bid without the need to provide any Deposit, and the Secured Parties shall be a Qualified Bidder in connection with any such Credit Bid, and any such Credit Bid shall be a Qualified Bid; provided that the DIP Lenders and the Prepetition ABL Parties have waived the right to credit bid so long as the Stalking Horse Purchaser is approved.

## V.       Bid Protections.

Recognizing the Stalking Horse Purchaser will expend time, energy and resources, and that the Stalking Horse Purchaser provides a floor bid with respect to the Property that it offers to purchase, the Debtors are authorized (pursuant to the Bidding Procedures Order) to provide the following bidding protections to the Stalking Horse Purchaser.

1.       The Debtors have agreed to pay the Stalking Horse Purchaser, upon the

5

terms set forth in the Stalking Horse Purchase Agreement, (A) a breakup fee in the amount of $3,400,000 (the "Breakup Fee"), and (B) the actual and reasonable documented expenses incurred by Buyer in connection with the Stalking Horse Purchase Agreement up to $550,000 (the "Expense Reimbursement" and, together with the Breakup Fee, the "Bid Protections"), in each case pursuant to an in accordance with terms of the Stalking Horse Purchase Agreement and Bidding Procedures Order.

2.      Any Bid submitted on or before the Bid Deadline by a party or parties other than the Stalking Horse Purchaser must be in an amount that is sufficient to pay the Breakup Fee and Expense Reimbursement and result in additional consideration to the Debtors' estates in the amount of at least $250,000 (as compared to the Purchase Price offered by the Stalking Horse Purchaser), after payment of the Breakup Fee and Expense Reimbursement. For the avoidance of doubt, any Bid submitted on or before the Bid Deadline must be at least $93,300,000.

## VI.   **Bid Requirements**.

To be selected to acquire the Property or to be eligible to participate in the Auction, if applicable, a Potential Bidder (other than the Stalking Horse Purchaser) must deliver to the parties set forth in Section VII below a written, irrevocable, and binding offer for purchase of the Property (the "Bid") that must be determined by the Debtors in their business judgment, after consultation with the Consultation Parties, to satisfy each of the following conditions (collectively, the "Bid Requirements"):

a.      **Identity**: Each Bid must fully disclose the identity of each entity and each entity's shareholders, partners, investors, and ultimate controlling entities that will be bidding for or purchasing the applicable Property or otherwise participating in connection with such Bid, and the complete terms of any such participation, along with sufficient evidence that the Potential Bidder is legally empowered to complete the transactions on the terms contemplated by the parties. Each Bid must also include contact information for the specific person(s) whom Debtors' counsel and investment banker should contact regarding such Bid;

b.      **Identity of Property and Purchase Price**: Each Bid must clearly state which of the Property the Potential Bidder seeks to acquire and which liabilities of the applicable Debtor the Potential Bidder agrees to assume. Each Bid must clearly set forth the purchase price to be paid, including cash and non-cash components, if any, including any assumption of liabilities (collectively, the "Purchase Price"). The Purchase Price should be a single point value in U.S. Dollars for the total enterprise value of the Property the Potential Bidder seeks to acquire on a cash-free, debt-free basis; *provided* that the Potential Bidder shall include an allocation of such Purchase Price among the Property the Potential Bidder seeks to acquire;

c.      **Satisfaction of DIP Obligations and Prepetition ABL Obligations**: Each Bid must provide for (a) the payment in full in cash of the DIP Obligations and Prepetition ABL Obligations on the closing date of the Sale, and (b) either (i) the cancellation and return of all outstanding letters of credit under the DIP Facility (as defined in the DIP Orders) and/or (ii) the furnishing to the DIP Agent of a

cash deposit, or at the discretion of the DIP Agent a backup standby letter of credit satisfactory to the DIP Agent, in an amount equal to 105% of the face amount of all letters of credit or such other amount as is acceptable to the DIP Agent.

d.     **Markup of the Purchase Agreement**: Each Bid must be accompanied by executed transaction documents, including a draft purchase agreement, and a markup of the Stalking Horse Purchase Agreement, including the exhibits, schedules and ancillary agreements related thereto, and any other related material documents integral to such Bid pursuant to which the Potential Bidder proposes to effectuate the proposed Sale, along with copies that are marked to reflect any amendments and modifications from the form purchase agreement provided to such Potential Bidder, which amendments and modifications may not be materially more burdensome than the provisions in the Stalking Horse Purchase Agreement, or otherwise inconsistent with these Bidding Procedures. The Debtors, in their reasonable business judgment, after consultation with the Consultation Parties, will determine whether any such amendments and modifications are materially more burdensome;

e.     **Committed Financing**: Each Bid must include committed financing, documented to the Debtors' reasonable satisfaction, after consultation with the Consultation Parties, that demonstrates the Potential Bidder has received sufficient debt and equity funding commitments to satisfy such Potential Bidder's Purchase Price and other obligations under its Bid, including the identity and contact information of the specific person(s) or entity(s) responsible for such committed financing whom Debtors' counsel and investment banker should contact regarding such committed financing. Such funding commitment shall not be subject to any internal approval, syndication requirements, diligence or credit committee approvals, and shall have covenants and conditions reasonably acceptable to the Debtors. The Debtors may in their reasonable business judgment and after consultation with the Consultation Parties waive this condition on a case-by-case basis;

f.     **Pro Forma Capital Structure**: Each Bid must include a description of the Potential Bidder's pro forma capital structure;

g.     **Contingencies; No Financing or Diligence Outs**: Any Bid shall not be conditioned on the obtaining or the sufficiency of financing, any internal approval, or on the outcome or review of due diligence, and each Bid must identify with particularity each and every condition to closing, including the executory contracts and unexpired leases for which assumption and assignment is required. The Potential Bidders are expected to have completed all of their due diligence by the Bid Deadline, including all business, legal, accounting, and other confirmatory diligence. The extent and nature of any remaining due diligence should be set forth in a specific list attached to each Bid;

h.     **As-Is, Where-Is**: Each Bid must include a written acknowledgement and

representation that the Potential Bidder: (i) has had an opportunity to conduct any and all due diligence prior to making its offer; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Property in making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the completeness of any information provided in connection therewith, except as expressly stated in the Potential Bidder's proposed purchase agreement;

i.    **Authorization**: Each Bid must contain evidence that the Potential Bidder has obtained authorization or approval from its shareholders and/or its board of managers or directors, as applicable, with respect to the submission of its Bid and the consummation of the Sale contemplated by such Bid;

j.    **Adequate Assurance of Future Performance**: Each Bid must (i) identify the Contracts to be assumed and assigned in connection with the proposed Sale, (ii) provide for the payment of all Cure Costs related to such Contract by the Potential Bidder, and (iii) demonstrate, in the Debtors' reasonable business judgment, that the Potential Bidder can provide adequate assurance of future performance under all such Contracts;

k.    **Government Approvals**: Each Bid must include a description of all governmental, licensing, regulatory, or other approvals or consents that are required to close the proposed Sale, together with evidence satisfactory to the Debtors, after consultation with the Consultation Parties, of the ability to obtain such consents or approvals in a timely manner, as well as a description of any material contingencies or other conditions that will be imposed upon, or that will otherwise apply to, the obtainment or effectiveness of any such consents or approvals;

l.    **Government Approvals Timeframe**: Each Bid must set forth (i) an estimated timeframe for obtaining any required governmental, licensing, regulatory, or other approvals or consents for consummating any proposed Sale, and (ii) the basis for such estimate;

m.    **Compliance with Bankruptcy Code and Non-Bankruptcy Law; Acknowledgment**: Each Bid must comply in all respects with the Bankruptcy Code and any applicable non-bankruptcy law. Each Bid must also include a written acknowledgment that the Bidder agrees to all of the terms of the Sale set forth in these Bidding Procedures and that it has not engaged in any collusion, coordination, or unfair competitive practices with respect to its Bid;

n.    **Irrevocable**: A Potential Bidder's Bid must be binding and irrevocable unless and until the Debtors accept a higher Bid and such Potential Bidder is not selected as the Backup Bidder (as defined herein);

o.     **No Fees**: Each Potential Bidder presenting a Bid or Bids will bear its own costs and expenses (including legal fees) in connection with the proposed Sale, and by submitting its Bid is agreeing to refrain from and waive any assertion or request for a breakup fee, transaction fee, termination fee, expense reimbursement, or any similar type of payment or reimbursement on any basis, including under section 503(b) of the Bankruptcy Code;

p.     **Joint Bids**: The Debtors will be authorized to approve joint Bids in their reasonable discretion on a case-by-case basis;

q.     **Adherence to Bidding Procedures**: By submitting its Bid, each Potential Bidder is agreeing to abide by and honor the terms of these Bidding Procedures and agrees not to submit a Bid or seek to reopen the Sale process or the Auction (if held) after conclusion of the selection of the Successful Bidder (as defined herein). By submitting its Bid, each Potential Bidder is agreeing to comply in all respects with the Bankruptcy Code and any applicable non-bankruptcy law;

r.     **Consent to Jurisdiction**: Each Potential Bidder must submit to the jurisdiction of the Court and waive any right to a jury trial in connection with any disputes relating to the Debtors' qualification of Bids, the Auction (if held), the construction and enforcement of these Bidding Procedures, the Sale documents, and consummation of a Sale (or Sales) (including confirmation of chapter 11 plan in connection therewith), as applicable;

s.     **Backup Bid**: Each Bid must provide that the Potential Bidder will serve as a Backup Bidder if the Potential Bidder's Bid is the next highest or otherwise best Bid, ready to close the Sale on the terms stated in the next highest or otherwise best Bid within two business days of the failure of the Successful Bidder to close;

t.     **Expected Closing Date**: Each Bid must state the Potential Bidder's expected date of closing of the Sale, which shall be no later than October 31, 2023; *provided*, such closing date may be extended pursuant to the terms of an asset purchase agreement; and

u.     **Letters of Credit**: Any Bid must provide that the applicable bidder agrees that the obligations of any non-Debtor affiliate of the Debtors with regard to any letters of credit issued on behalf of the Debtor with respect to the applicable purchased assets will either be assumed, replaced, or continued, as applicable.

Only Bids fulfilling all of the preceding requirements contained in this section may, at the Debtors' reasonable discretion, after consultation with the Consultation Parties, be deemed to be "Qualified Bids," and only those parties submitting Qualified Bids may, at the Debtors' reasonable discretion, after consultation with the Consultation Parties, be deemed to be "Qualified Bidders." All information disclosed by any Potential Bidder in connection with all of the preceding requirements will promptly be made available by the Debtors to the Consultation Parties; *provided* that any confidential financing and/or equity commitment documents received

from any such Potential Bidder shall only be shared with the Consultation Parties on a "professionals' eyes only" basis.

No later than one (1) business day following the Bid Deadline, the Debtors shall determine, after consultation with the Consultation Parties, which Potential Bidders are Qualified Bidders and will notify the Potential Bidders whether Bids submitted constitute Qualified Bids, which will enable such Qualified Bidders to participate in the Auction (if held). Any Bid that is not deemed a Qualified Bid shall not be considered by the Debtors; *provided*, *however*, that if the Debtors receive a Bid prior to the Bid Deadline that does not satisfy the requirements of a Qualified Bid, the Debtors shall provide the Potential Bidder with the opportunity to remedy any deficiencies prior to the Bid Deadline. The Debtors may accept a single Qualified Bid or multiple Bids for non-overlapping material portions of the Property such that, if taken together in the aggregate, would otherwise meet the standards for a single Qualified Bid (in which event those multiple bidders will be treated as a single Qualified Bidder for purposes of selecting the Successful Bidder; *provided* that the Debtors also reserve the right, in consultation with the Consultation Parties, to conduct more than one Sale process or Auction with respect to non-overlapping material portions of the Property).

For the avoidance of doubt, the Stalking Horse Purchaser shall be deemed to be a Qualified Bidder, the Stalking Horse Purchase Agreement shall be deemed a Qualified Bid, and the Stalking Horse Purchaser may participate in the Auction (if any) with respect to the Property.

## VII.    Bid Deadline.

Binding Bids must be received (via email shall be acceptable) by (a) the Debtors' counsel, Pachulski Stang Ziehl & Jones LLP, 10100 Santa Monica Boulevard, 13th Floor, Los Angeles, California 90067, Attn.: Richard M. Pachulski (rpachulski@pszjlaw.com) and Teddy Kapur (tkapur@pszjlaw.com); and (b) the Debtors' investment banker, Lincoln Partners Advisors LLC, Attn: Zach Messenger (zmessenger@lincolninternational.com), in each case so as to be **actually received** no later than **5:00 p.m. (prevailing Central Time) on October 18, 2023** (the "Bid Deadline").

## VIII.    Evaluation of Qualified Bids.

Prior to the Auction (if held), the Debtors and their advisors will evaluate Qualified Bids and identify the Qualified Bid(s) that is, in the Debtors' reasonable business judgment, after consultation with the Consultation Parties, the highest or otherwise best Bid (the "Starting Bid"). The Starting Bid shall include the amount provided for in the Stalking Horse Purchase Agreement, *plus* the amount of the Bid Protections, *plus* $250,000. In addition, prior to the selection of the Successful Bidder, the Debtors may, in the Debtors' reasonable business judgment, engage in negotiations with bidders with respect to their Bids. For the avoidance of doubt, the Debtors may, after consultation with the Consultation Parties, select more than one Qualified Bid to collectively serve as the Starting Bid in an Auction (if held) if each such Qualified Bid contemplates the purchase of different Property. In conducting the evaluation of the Qualified Bids, the Debtors will take into consideration the following non-exclusive factors:

a.      the amount of the Purchase Price of the Qualified Bid;

b.      the value to be provided to the Debtors under the Bid, including the net economic effect upon the Debtors' estates, taking into account the Bid Protections;

c.      the proposed changes or modifications to the Stalking Horse Purchase Agreement delivered in connection with such Qualified Bid and the comparative favorability of the terms set forth in such proposed purchase agreement versus the Stalking Horse Purchase Agreement;

d.      the assets and liabilities excluded from the Qualified Bid and any executory contracts or leases or other liabilities proposed to be assumed;

e.      any benefit to the Debtors' bankruptcy estates from any assumption of liabilities or waiver of liabilities;

f.      the certainty of a Qualified Bid leading to a confirmed chapter 11 plan;

g.      the transaction structure and execution risk, including conditions to, timing of, and certainty of closing; termination provisions; availability of financing and financial wherewithal to meet all commitments; and required governmental or other approvals; and

h.      any other factors the Debtors may, consistent with their fiduciary duties, reasonably deem relevant.

Promptly after determination of the Starting Bid and prior to the Auction, the Debtors will (a) notify the Stalking Horse Purchaser and (b) distribute a copy of the Starting Bid to each Qualified Bidder who has submitted a Qualified Bid with respect to such Property.

If any Bid is determined by the Debtors not to be a Qualified Bid, the Debtors will refund such Qualified Bidder's Good Faith Deposit within five (5) business days after the Bid Deadline.

## IX.     **No Qualified Bids**.

If no Qualified Bids other than the Stalking Horse Purchase Agreement are received by the Bid Deadline, then the Debtors, after consultation with the Consultation Parties, may cancel the Auction, and may decide, in the Debtors' reasonable business judgment, to designate the Stalking Horse Purchase Agreement as the Successful Bid, and pursue entry of the Sale Order approving a Sale of the Debtors' Property to the Stalking Horse Purchaser pursuant to the Stalking Horse Purchase Agreement. The Debtors shall file notice of any cancellation of the Auction and designation of the Stalking Horse Purchase Agreement as the Successful Bid with the Court, within two business days of the determination of such election by the Debtors.

X.      **Auction**.

If one or more Qualified Bids are received by the Bid Deadline with respect to any applicable non-overlapping Property, then the Debtors shall conduct the Auction with respect to such Property. The Auction will be held on **October 23, 2023**, at **10:00 a.m. (prevailing Central Time)**, via videoconference or such other form of remote communication arranged by counsel to the Debtors, or such later time or other place as the Debtors determine, after consultation with the Consultation Parties, in which case the Debtors shall timely notify all Qualified Bidders of such later time or other place, and file a notice of the change on the Court's docket for these chapter 11 cases.[4]

The Auction will be conducted in accordance with the following procedures (the "Auction Procedures"):

a.      except as otherwise provided herein, the Auction will be conducted openly;

b.      only Qualified Bidders, including the Stalking Horse Purchaser, shall be entitled to bid at the Auction;

c.      the Qualified Bidders, including the Stalking Horse Purchaser, shall appear at the Auction via remote video or through duly authorized representatives via remote video at the Auction;

d.      only the following parties shall be permitted to attend the Auction: authorized representatives of each of the Qualified Bidders (including the Stalking Horse Purchaser), the Debtors, and the Consultation Parties and their respective advisors;

e.      bidding at the Auction will begin at the applicable Starting Bid;

f.      Bids at the Auction, including any Bids by the Stalking Horse Purchaser, must be made in minimum increments of such amount as the Debtors determine and announce at or prior to the Auction, after consultation with the Consultation Parties, of additional value (including after payment of the Bid Protections to the Stalking Horse Purchaser);

g.      each Qualified Bidder will be permitted a reasonable time to respond to previous bids at the Auction, as determined by the Debtors in consultation with the Consultation Parties;

h.      the bidding will be transcribed or recorded to ensure an accurate recording of the bidding at the Auction;

---

[4]     If the Debtors decide to hold a live, in-person Auction, Qualified Bidders shall still have the ability to submit Bids remotely.

i.        no Qualified Bidders (or their respective representatives) may communicate with one another, collude, or otherwise coordinate for purposes of participating in the Auction, and each Qualified Bidder will be required to confirm on the record of the Auction that (i) it has not engaged in any collusion, coordination, or unfair competitive practices with respect to the bidding or the Sale and (ii) its Bid represents an irrevocable, binding, good faith, and bona fide offer to purchase some or all of the Property identified in such Bid if such Bid is selected as the Successful Bid; *provided*, *however*, that two or more Qualified Bidders may coordinate to the extent they wish to provide a combined bid if the Debtors, after consultation with the Consultation Parties, approve such coordination in their reasonable discretion;

j.        the Auction will not close unless and until all Qualified Bidders have been given a reasonable opportunity to submit an overbid at the Auction to the then-prevailing highest bid, subject to the Debtors' right, in consultation with the Consultation Parties, to require last and final bids to be submitted on a "blind" basis;

k.        the Debtors reserve the right, in their reasonable business judgment, after consultation with the Consultation Parties, to adjourn the Auction one or more times to, among other things, (i) facilitate discussions between the Debtors and Qualified Bidders, (ii) allow Qualified Bidders to consider how they wish to proceed, and (iii) provide Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, in their reasonable business judgment, after consultation with the Consultation Parties, may require that the Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt and/or equity funding commitments to consummate the proposed transaction at the prevailing amount; and

l.        the Auction will be governed by such other Auction Procedures as may be announced by the Debtors and their advisors, after consultation with the Consultation Parties, from time to time on the record at the Auction; *provided* that such other Auction Procedures are (i) not inconsistent with the Bidding Procedures Order, the Stalking Horse Purchase Agreement, the Bankruptcy Code, or any other order of the Court, (ii) disclosed orally or in writing to all Qualified Bidders, and (iii) determined by the Debtors, after consultation with the Consultation Parties, to further the goal of attaining the highest or otherwise best offer for the applicable Property.

For the avoidance of doubt, nothing in the Auction Procedures (if an Auction is held) will prevent the Debtors from exercising their respective fiduciary duties under applicable law (as reasonably determined in good faith by the Debtors).

XI.   **Acceptance of the Successful Bid**.

The Auction shall continue until only one Qualified Bid is the highest or otherwise best bid. The Auction shall continue until only one Qualified Bid is the highest or otherwise best bid to purchase some or all of the Property in the Debtors' reasonable business judgment (after consultation with the Consultation Parties) and in a manner consistent with the exercise of their fiduciary duties and outlined below in further detail (a "Successful Bid"), and that further bidding is unlikely to result in a different Successful Bid or Successful Bids that would be acceptable to the Debtors, at which point, the Auction will be closed. When determining the highest or otherwise best Qualified Bid, as compared to other Qualified Bids, the Debtors may consider the following factors in addition to any other factors that the Debtors deem appropriate: (a) the amount and nature of the total consideration; (b) the likelihood of the Qualified Bidder's ability to close a Sale and the timing thereof; (c) the net economic effect of any changes to the value to be received by each of the Debtors' estates from the Sale contemplated by the Bid Documents; and (d) the tax consequences of such Qualified Bid.

For the avoidance of doubt, the Debtors may select more than one Qualified Bid to collectively serve as a Successful Bid if each such Qualified Bid contemplates the purchase of different Property. The Qualified Bidder or Qualified Bidders having submitted the Successful Bid or Successful Bids will be deemed the "Successful Bidder" or "Successful Bidders," with respect to the applicable Property. The Debtors shall promptly file notice of the Successful Bid(s) and the Successful Bidder(s) with the Court. The Debtors shall present the results of the Auction at a hearing (the "Sale Hearing") and shall seek Court approval to enter into a binding purchase agreement or other definitive documentation with the Successful Bidder(s) on the terms of the Successful Bid(s) (the order approving such entry, the "Sale Order"). For the avoidance of doubt, the Sale Order shall deem the Debtors' selection of the Successful Bid(s) final and, subject to the designation of the Backup Bid, the Debtors shall not solicit or accept any further bids or offers to submit a bid after such selection; *provided* that, notwithstanding anything to the contrary in these Bidding Procedures, nothing in these Bidding Procedures shall require the board of directors, board of managers, or such similar governing body of any Debtor to take or refrain from taking any action that would be inconsistent with applicable law or its fiduciary obligations under applicable law.

Each Successful Bidder and the Debtors shall, as soon as commercially reasonable and practicable, complete and sign all agreements, contracts, instruments, or other documents evidencing and containing the terms upon which each such Successful Bid was made.

XII.   **Designation of Backup Bidder**.

The Qualified Bidder or Qualified Bidders with the second highest or otherwise best bid(s) or combination(s) of bids (each, a "Backup Bid") to purchase any or all of the applicable Property (each, a "Backup Bidder") will be determined by the Debtors, after consultation with the Consultation Parties, at the conclusion of the Auction and will be announced at that time to all the Qualified Bidders participating in the Auction. Each Backup Bidder shall be required to keep its Qualified Bid open and irrevocable until the closing of the transaction with the applicable Successful Bidder or, in the case of the Stalking Horse Purchaser, until the earlier of (i) 7 days

14

after the Sale Hearing or (ii) October 31, 2023. The Backup Bidder's good faith deposit (if any) shall be held in escrow until the closing of the transaction with the applicable Successful Bidder. If for any reason a Successful Bidder fails to consummate the purchase of such Property within the time permitted after the entry of the Sale Order, then the Backup Bidder will automatically be deemed to have submitted the Successful Bid for such Property, and the Backup Bidder shall be deemed a Successful Bidder for such Property and shall be required to consummate the Sale with the Debtors as soon as is commercially practicable without further order of the Court; *provided* that the Debtors shall file a notice with the Court.

## XIII.   Approval of Sale.

The Debtors will present the results of the Auction to the Court for approval at the Sale Hearing, at which certain findings will be sought from the Court regarding the Auction, including, among other things, that: (a) the Auction was conducted, and the Successful Bidder or Successful Bidders were selected, in accordance with the Bidding Procedures; (b) the Auction was fair in substance and procedure; (c) the Successful Bid or Successful Bids were Qualified Bids as defined in the Bidding Procedures; and (d) consummation of any Sale(s) as contemplated by the Successful Bid(s) in the Auction will provide the highest or otherwise best offer for the Debtors and the Debtors' Property and is in the best interests of the Debtors and their estates.

The Sale Hearing is presently scheduled to commence on **October [], 2023**, at **[ ] [a/p].m. (prevailing Central Time)**, or as soon thereafter as counsel may be heard, before the Honorable [•], United States Bankruptcy Court for the Southern District of Texas.

## XIV.   Return of Good Faith Deposit.

The good faith deposit of a Successful Bidder (including, without limitation, the "Deposit" under and as defined in the Stalking Horse Purchase Agreement) shall, upon consummation of any Sale, be credited to the purchase price paid for the applicable Property. If a Successful Bidder fails to consummate the Sale, then the good faith deposit (if any) shall be forfeited to, and retained irrevocably by, the Debtors, and the Debtors specifically reserve the right to seek all available damages from the defaulting Successful Bidder.

The good faith deposit (including, without limitation, the "Deposit" under and as defined in the Stalking Horse Purchase Agreement) of any Qualified Bidders that are not Successful Bidders or Backup Bidders  will be returned within two (2) business days after the Auction or upon the permanent withdrawal of the applicable proposed Sale, and the good faith deposit (including, without limitation, the "Deposit" under and as defined in the Stalking Horse Purchase Agreement) of any Backup Bidders will be returned within two (2) business days after the consummation of the applicable Sale or upon the permanent withdrawal of the applicable proposed Sale.

Each good faith deposit shall be held in interest free escrow and at no time shall be deemed property of the Debtors' estates absent further order of the Court, except as otherwise provided herein.

## XV.    **Reservation of Rights**.

The Debtors reserve their rights to modify these Bidding Procedures in their reasonable business judgment as long as not inconsistent with the Stalking Horse Purchase Agreement, after consultation with the Consultation Parties, in a manner consistent with the exercise of their fiduciary duties, and in any manner that will best promote the goals of the bidding process, or impose, at or before the Auction (if held), additional customary terms and conditions on the sale of some or all of the Debtors' Property, including, without limitation: (a) with the prior written consent of the DIP Lenders, extending the deadlines set forth in these Bidding Procedures; (b) adjourning the Auction; (c) modifying the Auction Procedures or adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (d) canceling the Auction; (e) rejecting any or all Bids or Qualified Bids; and (f) adjusting the applicable minimum overbid increment, including by requesting that Qualified Bidders submit last or final bids on a "blind" basis. For the avoidance of doubt, and subject to the termination provisions of the Stalking Horse Purchase Agreement, the Debtors reserve the right at any point prior to the selection of the Successful Bidder, and after consultation with the Consultation Parties, to terminate the Sale processes contemplated hereunder with respect to any or all of the Debtors' Property and seek to sell any or all Property pursuant to section 363(b) of the Bankruptcy Code.

## XVI.    **Consent to Jurisdiction.**

All Qualified Bidders at the Auction will be deemed to have consented to the core jurisdiction of the Court and waived any right to a jury trial in connection with any disputes relating to any Sale, the Auction, and the construction and enforcement of these Bidding Procedures, any written indications of interest, any Preliminary Bid Documents, or any Bid documents, as applicable, and consented to the entry of a final order or judgment in any way related to these Bidding Procedures, the bid process, the Auction, the Sale Hearing, or the construction and enforcement of any agreement or any other document relating to a Sale if it is determined that the Court would lack Article III jurisdiction to enter such a final order or judgment absent the consent of the parties.

Any parties raising a dispute relating to these Bidding Procedures must request that such dispute be heard by the Court on an expedited basis.

## XVII. **Fiduciary Out**.

Notwithstanding anything to the contrary in these Bidding Procedures, nothing in these Bidding Procedures or the Bidding Procedures Order shall require a Debtor or the board of directors, board of managers, or similar governing body of a Debtor, after consulting with counsel, to take any action or to refrain from taking any action related to any sale transaction to the extent taking or failing to take such action would be inconsistent with applicable law or its fiduciary obligations under applicable law.

Further, notwithstanding anything to the contrary in these Bidding Procedures, through the date of the Auction (if held), nothing in these Bidding Procedures or the Bidding Procedures

Order shall diminish the right of the Debtors and their respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives to: (a) consider, respond to, and facilitate alternate proposals for sales or other restructuring transactions involving any or all of the Debtors' Property (each an "Alternate Proposal"); (b) provide access to non-public information concerning the Debtors to any entity or enter into confidentiality agreements or nondisclosure agreements with any entity; (c) maintain or continue discussions or negotiations with respect to Alternate Proposals; (d) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiation of Alternate Proposals; and (e) enter into or continue discussions or negotiations with holders of claims against or equity interests in a Debtor or any other party in interest in these chapter 11 cases (including the United States Trustee), or any other entity regarding Alternate Proposals.

**XVIII. DIP Order**.

Notwithstanding anything to the contrary contained in these Bidding Procedures or otherwise: (i) the rights of the DIP Agent and Prepetition ABL Agent to consent to the sale of any portion of their collateral, including, without limitation, any Property, on terms and conditions acceptable to the DIP Agent and the Prepetition ABL Agent, are hereby expressly reserved and not modified, waived or impaired in any way by these Bidding Procedures, (ii) subject to the terms of the DIP Orders (and the Stalking Horse Purchase Agreement, as applicable), all proceeds generated from the sale of any Property shall be paid to the DIP Agent and the Prepetition ABL Agent upon the closing of such Sale for permanent application against the DIP Obligations and the Prepetition ABL Obligations in accordance with the terms and conditions of the DIP Orders, the DIP Documents and the Prepetition ABL Documents, until such time as all DIP Obligations and Prepetition ABL Obligations have been Paid in Full (as defined in the DIP Orders); and (iii) nothing in these Bidding Procedures shall amend, modify, or impair any provision of any order with respect to the DIP financing (including, but not limited to the DIP Orders) entered by the Bankruptcy Court in these cases, or the rights of the Debtors, the DIP Agent, the DIP Lenders, the Prepetition ABL Agent or the Prepetition ABL Parties thereunder; *provided that*, for the avoidance of doubt, the DIP Agent and Prepetition ABL Agent have consented to the sale of the Purchased Assets (as defined in the Stalking Horse Purchase Agreement) to the Stalking Horse Purchaser on the terms described in the Stalking Horse Purchase Agreement as such terms may be improved in connection with the Auction.

**<u>Exhibit 2</u>**

**(Stalking Horse Purchase Agreement)**

**EXECUTION VERSION**

**ASSET PURCHASE AGREEMENT**

**BY AND AMONG**

**NOBLE HOUSE HOME FURNISHINGS LLC AND CERTAIN AFFILIATES,**

**AS SELLER**

**and**

**GIGACLOUD TECHNOLOGY INC**

**AS BUYER**

**DATED AS OF SEPTEMBER 11, 2023**

# TABLE OF CONTENTS

**Page**

**ARTICLE I DEFINITIONS** ................................................................................................ 1
    1.1        Definitions ................................................................................................ 1

**ARTICLE II PURCHASE AND SALE** ........................................................................ 10
    2.1        Purchased Assets ..................................................................................... 10
    2.2        Excluded Assets ....................................................................................... 12
    2.3        Nonassignable Assets; Deemed Consent; Additional Excluded Assets. ....... 13
    2.4        Liabilities ................................................................................................ 15
    2.5        Purchase Price ......................................................................................... 15
    2.6        Adjustment to Base Purchase Price .......................................................... 15
    2.7        Withholding ............................................................................................. 17

**ARTICLE III CLOSING; PAYMENT OF PURCHASE PRICE** ........................ 17
    3.1        Closing .................................................................................................... 17
    3.2        Closing Deliveries ................................................................................... 17

**ARTICLE IV REPRESENTATIONS AND WARRANTIES OF SELLER** .......... 18
    4.1        Existence and Power ................................................................................ 19
    4.2        Authorization .......................................................................................... 19
    4.3        Enforceability .......................................................................................... 19
    4.4        Noncontravention ..................................................................................... 19
    4.5        Proceeding .............................................................................................. 20
    4.6        Brokers ................................................................................................... 20
    4.7        Permits .................................................................................................... 20
    4.8        Compliance with Law .............................................................................. 20
    4.9        Absence of Certain Developments ............................................................ 20
    4.10      Financial Statements ................................................................................ 20
    4.11      Employee Benefits and Employee Matters ............................................... 21
    4.12      Material Contracts ................................................................................... 22
    4.13      Intellectual Property; Information Technology .......................................... 22
    4.14      Data Privacy ........................................................................................... 23
    4.15      Taxes ...................................................................................................... 24
    4.16      Insurance ................................................................................................. 24
    4.17      Title to Assets; Real Property .................................................................. 24
    4.18      Environmental Matters ............................................................................. 25
    4.19      OFAC; Foreign Corrupt Practices Act; Anticorruption Laws ..................... 25
    4.20      Material Customers; Material Suppliers .................................................... 26
    4.21      Affiliate Transactions ............................................................................... 26
    4.22      Sufficiency of Assets ............................................................................... 26
    4.23      Products .................................................................................................. 26
    4.24      Product Warranties .................................................................................. 26
    4.25      Company Subsidiaries .............................................................................. 27
    4.26      Inventory ................................................................................................. 27
    4.27      Exclusivity of Representations and Warranties .......................................... 28

**ARTICLE V REPRESENTATIONS AND WARRANTIES OF BUYER** ............ 28

DOCS_SF:109415.13 61051/001

| | | |
|---|---|---|
| 5.1 | Existence and Power | 28 |
| 5.2 | Authorization | 28 |
| 5.3 | Enforceability | 28 |
| 5.4 | Governmental and Third Party Authorizations | 28 |
| 5.5 | Noncontravention | 28 |
| 5.6 | Brokers | 29 |
| 5.7 | Proceedings | 29 |
| 5.8 | Financial Capability | 29 |
| 5.9 | Solvency | 29 |
| 5.10 | Independent Investigation | 29 |
| 5.11 | Exclusivity of Representations and Warranties | 30 |

**ARTICLE VI PRE-CLOSING COVENANTS** ............................................................ 30

| | | |
|---|---|---|
| 6.1 | Conduct of Business | 30 |
| 6.2 | Pre-Closing Access to Information | 31 |
| 6.3 | Supplemental Disclosure | 32 |
| 6.4 | Efforts to Close | 32 |
| 6.5 | Contact with Customers, Suppliers and Other Business Relations | 33 |
| 6.6 | Bankruptcy Matters | 33 |
| 6.7 | Access to Books and Records | 34 |
| 6.8 | Employee Matters | 34 |

**ARTICLE VII COVENANTS OF BUYER AND SELLERS** ...................................... 35

| | | |
|---|---|---|
| 7.1 | Public Announcements | 35 |
| 7.2 | Tax Matters | 36 |

**ARTICLE VIII CONDITIONS TO CLOSING** ......................................................... 37

| | | |
|---|---|---|
| 8.1 | Conditions to Obligation of Buyer | 37 |
| 8.2 | Conditions to Obligation of Seller | 37 |
| 8.3 | Frustration of Closing Conditions | 38 |

**ARTICLE IX TERMINATION** ............................................................................... 38

| | | |
|---|---|---|
| 9.1 | Termination | 38 |
| 9.2 | Effect of Termination; Termination Fee. | 40 |

**ARTICLE X SURVIVAL AND RELEASE** ............................................................. 40

| | | |
|---|---|---|
| 10.1 | Survival | 40 |

**ARTICLE XI MISCELLANEOUS** .......................................................................... 41

| | | |
|---|---|---|
| 11.1 | Notices | 41 |
| 11.2 | Amendments and Waivers | 42 |
| 11.3 | Expenses | 42 |
| 11.4 | Successors and Assigns | 42 |
| 11.5 | Governing Law | 43 |
| 11.6 | Consent to Jurisdiction; Service of Process; Waiver of Jury Trial | 43 |
| 11.7 | Counterparts | 43 |
| 11.8 | No Third Party Beneficiaries | 44 |
| 11.9 | Entire Agreement | 44 |
| 11.10 | Disclosure Schedules | 44 |
| 11.11 | Captions | 44 |

11.12    Remedies......................................................................................... 44
11.13    Severability ................................................................................... 45
11.14    Interpretation ................................................................................ 45
11.15    Prevailing Party............................................................................. 46
11.16    Further Assurances........................................................................ 46

Schedules

Schedule 1.1(b) – Other Permitted Liens
Schedule 2.1(a) – Accounts Receivable
Schedule 2.1(b) – Tangible Personal Property
Schedule 2.1(d) – Assigned Contracts
Schedule 2.1(e) – Deposits and Prepayments re Assigned Contracts
Schedule 2.1(f) – Permits
Schedule 2.2(p) – Other Excluded Assets
Schedule 2.4(a)(iv) – Customer Refunds and Rebates
Schedule 4.1 – Corporate Existence
Schedule 4.7 – Permits
Schedule 4.10 – Financial Statements
Schedule 4.11(a) – Employee Benefit Plans of Purchased Subsidiaries
Schedule 4.11(b) – Employees
Schedule 4.12(a) – Material Contracts
Schedule 4.13(a) – Intellectual Property
Schedule 4.13(d) – Intellectual Property Exceptions
Schedule 4.14(b) – Security Incidents
Schedule 4.15(b) – Tax Challenges
Schedule 4.17(c) – Leased Real Property
Schedule 4.20(a) – Material Customer Exceptions
Schedule 4.21 – Affiliate Transactions
Schedule 4.23 – Product Liability and Recalls
Schedule 4.24 – Product Warranties

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (the "Agreement"), dated as of September 11, 2023, is entered into by and among Noble House Home Furnishings LLC, Best Selling Home Decor Furniture, LLC, Le Pouf, LLC, and NH Services LLC (together, "Seller"), and GigaCloud Technology Inc ("Buyer") (or an assignee or nominee of Buyer pursuant to Section 11.4 below). Seller and Buyer are referred to herein as the "Parties".  Capitalized terms used but not otherwise defined herein have the meaning ascribed to such terms in Article I.

## RECITALS

A.      Seller is in the business of manufacturing, distributing, and retailing an extensive selection of indoor and outdoor home furnishings, through an innovative "just in time" supply chain network (the "Business").

B.      Seller will be a chapter 11 debtor and debtor-in-possession in a bankruptcy case (the "Bankruptcy Case") to be filed in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court").

C.      Seller intends to seek entry of *an Order Approving (a) Bid Procedures; (b) the Form and Manner of Notice; (c) the Procedures for Determining Cure Amounts for Executory Contracts and Unexpired Leases; and (d) Granting Related Relief* or similar relief by the Bankruptcy Court (the "Procedures Order").   Consistent with the Procedures Order, this Agreement is subject to higher and better bids for the Business.

E.      Seller desires to sell to Buyer, pursuant to section 363(f) of the Bankruptcy Code (as defined in Section 1.1) and with the approval of the Bankruptcy Court, substantially all of the assets of Seller used exclusively in connection with or arising out of the operation of the Business, and Buyer desires to purchase such assets from Seller, all on the terms and conditions set forth in this Agreement.

## AGREEMENTS

NOW, THEREFORE, in consideration of the foregoing premises and the representations, warranties, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE I
## DEFINITIONS

1.1      **Definitions**.  When used in this Agreement, the following terms shall have the meanings assigned to them in this Section 1.1.

"Accounts Receivable" shall mean all bona fide accounts receivable, notes receivable, and other amounts payable to Seller (on a consolidated basis) in connection with the Business as of the Closing Date.

-1-

"Affiliate" means, with respect to any specified Person, any other Person directly or indirectly controlling, controlled by or under common control with such specified Person. For purposes of this definition, the terms "controlling," "controlled by," or "under common control with" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise, or the power to elect more than fifty percent (50%) of the directors, managers, general partners, or persons exercising similar authority with respect to such Person.

"Agreed Statement" has the meaning set forth in Section 7.1.

"Agreement" has the meaning set forth in the Preamble hereto.

"Allocation" has the meaning set forth in Section 7.2(c).

"Ancillary Documents" means any agreements, instruments and documents delivered at the Closing pursuant to this Agreement.

"Anticorruption Laws" means all Laws of any jurisdiction applicable to the Seller or the Business from time to time concerning or relating to bribery or corruption.

"Approval Order" has the meaning set forth in Section 6.6(a).

"Assigned Contracts" has the meaning set forth in Section 2.1(d).

"Assumed Liabilities" has the meaning set forth in Section 2.4(a).

"Banc of America Loan" means the Master Loan and Security Agreement, dated as of September 2, 2016, between Seller and Banc of America Leasing & Capital, LLC (or any successor thereto), as amended, and all equipment notes issued thereunder, with respect to financed equipment utilized in the Business.

"Bankruptcy Case" has the meaning ascribed in the Recitals.

"Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time.

"Bankruptcy Court" has the meaning set forth in the Recitals.

"Base Purchase Price" has the meaning set forth in Section 2.5.

"Benefit Plan" means: (a) any material Employee Plan and (b) any material employment, severance or similar contract or arrangement (whether or not written) or agreement, arrangement, plan or policy (whether or not written) providing any compensation or benefits to any Employee (including any agreement, arrangement, plan or policy making available bonuses, equity awards, or deferred compensation) other than an Employee Plan, to which Seller has Liability.

"Bill of Sale" has the meaning set forth in Section 3.2(b)(i).

"Books and Records" means all of the books and records, in all formats (both tangible and intangible), used or maintained by or on behalf of Seller in connection with or otherwise related to the Business, including (a) executed copies of all of the written Assigned Contracts, (b) all equipment, product and other warranties pertaining to the Purchased Assets, (c) all technical information and any data, maps, computer files, diagrams, blueprints and schematics, (d) all filings made with or records required to be kept by any Governmental Entity (including all backup information on which such filings are based), (e) all research and development reports, (f) all equipment and operating logs, (g) all financial and accounting records, (i) all employment records with respect to Transferred Employees, and (h) all creative, promotional or advertising materials.

"Business" has the meaning set forth in the Recitals.

"Business Day" means a day other than a Saturday, Sunday or other day on which commercial banks located in New York, New York are authorized or required by Law to close.

"Buyer" has the meaning set forth in the Preamble hereto.

"Buyer Closing Certificate" has the meaning set forth in Section 8.2(c).

"Charges" has the meaning set forth in Section 7.2(a).

"Closing" has the meaning set forth in Section 3.1.

"Closing Date" has the meaning set forth in Section 3.1.

"Closing Date Net Working Capital" means the Current Assets as of the Closing Date minus the Current Liabilities as of the Closing Date.  Set forth as **Exhibit A** hereto is an illustrative calculation of the Closing Date Net Working Capital.

"Code" means the Internal Revenue Code of 1986, as amended, and regulations promulgated thereunder.

"Confidentiality Agreement" means that certain Confidentiality Agreement, dated as of July 26, 2023, with GigaCloud Technology.

"Contract" means any oral or written legally binding agreement, contract, license, lease, sublease, commitment or arrangement (including any employment, marketing, distributor or other type of contract or agreement).

"Contract Assignments" has the meaning set forth in Section 3.2(b)(ii).

"COVID-19" means SARS-CoV-2 or COVID-19, and any evolutions or variants thereof or related or associate epidemics, pandemics or diseases existing prior to the Closing Date.

"Current Assets" means, as of the Closing Date: (i) the outstanding accounts receivable of Seller and each Purchased Subsidiary on a consolidated basis and (ii) the current inventory of Seller and each Purchased Subsidiary on a consolidated basis, (excluding any inventory comprising any HM (SKU) that has not been received since January 1, 2023), calculated on a

combined basis in accordance with GAAP and solely to the extent constituting a type of current asset designated as Included Inventory and listed under the "Inventory" tab in **Exhibit A**. For the avoidance of doubt and notwithstanding anything to the contrary set forth herein, Current Assets shall in no event include any cash or cash equivalents.

"Current Liabilities" means, as of any date or time, the accounts payable, accrued expenses and other working capital liabilities of Seller and each Purchased Subsidiary on a consolidated basis aged not more than 90 days and that were incurred in the Ordinary Course of Business, calculated in accordance with GAAP, in the case of and solely to the extent constituting a type of current liability designated as "Included" on the illustrative calculation of the Closing Date Net Working Capital attached hereto as **Exhibit A**. For the avoidance of doubt and notwithstanding anything to the contrary set forth herein, Current Liabilities shall in no event include any indebtedness for trade payables outside of Ordinary Course of Business.

"Deposit" has the meaning set forth in Section 3.2(a)(i).

"Effect" has the meaning set forth within the definition of Material Adverse Effect.

"Employee" means any employee of Seller or any Purchased Subsidiary (whether salaried or hourly, and full-time or part-time), whether or not actively employed on the date hereof, including employees on vacation and leave of absence, including maternity, family, sick, military or disability leave.

"Employee Plan" means (i) any plan, program, policy, contract, agreement or other arrangement providing for employment, compensation, bonus, performance award, incentive compensation, retirement, pension, disability, life insurance, health or medical benefits, sick leave, vacation, severance, and other fringe, welfare or other employee benefit renumeration of any kind, in each case, whether or not in writing, including each "employee benefit plan," as defined in Section 3(3) of ERISA, that: (a) is subject to Title I of ERISA; (b) is maintained, administered or contributed any Purchased Subsidiary, with regard to any employee of a Purchased Subsidiary; and (c) covers any Employee of a Purchased Subsidiary.

"Environmental Laws" means Laws relating to pollution, natural resources, Hazardous Materials, or the protection of the environment or to occupational health and safety.

"Environmental Permits" means any permit, certificate, consent, registration, notice, approval, identification number, license or other authorization required under any applicable Environmental Law.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and regulations promulgated thereunder.

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded HM's" means any HM's that have not been ordered since January 1, 2023 and that are listed on Exhibit A under the heading "Excluded HM's".

"FCPA" has the meaning set forth in Section 4.19(b).

"GAAP" means United States generally accepted accounting principles, consistently applied, as in effect when applied by Seller.

"General Enforceability Exceptions" means general principles of equity and by bankruptcy, insolvency or similar Laws and general equitable principles affecting the rights of creditors generally.

"Governmental Entity" means (i) any nation, state, commonwealth, province, territory, county, municipality, district or other jurisdiction of any nature, foreign or domestic, (ii) any federal, state, local, municipal, or other government of the foregoing, (iii) any governmental or quasi-governmental entity of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal) or (iv) anybody (including any international or multinational body) exercising, or entitled to exercise any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature, including any arbitral tribunal.

"Hazardous Materials" means any material, substance or waste that is listed, classified, regulated, characterized or otherwise defined as "hazardous," "toxic," "radioactive," a "pollutant," or "contaminant," (or words of similar intent or meaning) under any Environmental Laws, including any quantity of asbestos in any form, urea formaldehyde, PCBs, radon gas, mold, crude oil or any fraction thereof, all forms of natural gas, petroleum products, petroleum breakdown products, petroleum by-products or petroleum derivatives.

"HM" means a part, subassembly, packaging / shipping material, or finished product.  An SKU is comprised of a single HM or combination of HM's.

"Holdback Amount" has the meaning set forth in Section 2.6(b).

"Included Inventory" means all inventory of Seller and any Purchased Subsidiary less any inventory comprised of Excluded HM's in accordance with the "Inventory" tab contained in Exhibit A.

"Intellectual Property" means: (a) patents, pending applications for patents and statutory invention registrations, including continuations, continuations-in-part, divisions, provisional and non-provisional applications, reexaminations, reissues and extensions; (b) trademarks, service marks, trade names, corporate names, and other indicia of source of origin, including all common law rights thereto and all goodwill associated therewith and registrations and pending applications for registration thereof; (c) works of authorship, copyrights, and all applications and registrations thereof; (d) domain name registrations; (e) trade secrets, know-how, confidential or proprietary technical, business and other information, including processes, techniques, methods, formulae, designs, product specifications, algorithms, supplier information, prospect lists, customer lists, projections, analyses, market studies and similar proprietary items that are in Seller's possession, and all rights therein and thereto; (f) inventions (whether patentable or unpatentable, and whether or not reduced to practice), invention disclosures, mask works, circuit designs and other designs, industrial design rights, discoveries, ideas, developments, data, and software; (g) all other proprietary and intangible rights; and (h) all copies and tangible embodiments thereof (in whatever form or medium).

-5-

"<u>IT Systems</u>" means any and all information, payment and communications technologies owned or controlled or leased, licensed or used by Seller or a Purchased Subsidiary and used in the conduct of the Business, including all computers, hardware, software (whether in object or source code form), databases, servers, workstations, routers, hubs, switches, data communication lines, networks and all other information technology systems included therein.

"<u>Law</u>" means any federal, state, local, municipal or foreign statute, law, ordinance, directive, ordinance, treaty, code, rule, regulation or other requirement of any Governmental Entity.

"<u>Leased Real Property</u>" has the meaning set forth in Section 4.17(c).

"<u>Liability(ies)</u>" means with respect to any Person, any direct or indirect liabilities, obligations (including reasonable attorney's fees and reasonable costs of investigation and defense), commitments, indebtedness, claim, loss, damage, deficiency, assessment, fine, penalty, or responsibility of such Person of any kind or nature, whether fixed or unfixed, choate or inchoate, liquidated or unliquidated, secured or unsecured, asserted or unasserted, due or to become due, accrued or unaccrued, vested or unvested, executory, determined, determinable, absolute, known or unknown, contingent or otherwise, regardless of whether or not the same is required to be accrued on any financial statements of such Person.

"<u>Lien</u>" means, with respect to any property or asset, any mortgage, lien, pledge, security interest, hypothecation, charge or any other similar encumbrance in respect of such property or asset.

"<u>Material Adverse Effect</u>" means any change, event, development, or effect (each, an "<u>Effect</u>") that, individually or taken together with all other Effects that exist or have occurred, has or would reasonably be expected to have a material adverse effect on the Business, assets, liabilities, financial condition or results of operations of Seller, taken as a whole; *provided that* none of the following shall be taken into account (either alone or in combination) in determining whether there is or has been a Material Adverse Effect: any adverse change, event, circumstance, or development arising from or relating to: (a) any action required by this Agreement or any action taken (or omitted to be taken) with the written consent of or at the written request of the Buyer; (b) the Bankruptcy Case and/or the requirements of any budget in connection with any debtor-in-possession financing or use of cash collateral; (c) the announcement, pendency or completion of the transactions contemplated by this Agreement, including losses or threatened losses of employees, customers, suppliers, distributors or others having relationships with Seller; (d) any failure of Seller to meet any internal or published projections, forecasts or revenue or earnings predictions; (e) general economic or political conditions (except to the extent that such Effect has had or would reasonably be expected to have a disproportionate adverse effect on Seller relative to comparable companies operating in the same industry); (f) any changes in financial, banking or securities markets in general, including any disruption thereof and any decline in the price of any security or any market index or any change in prevailing interest rates; (g) acts of war (whether or not declared), armed hostilities or terrorism, or the escalation or worsening thereof; (h) any changes in applicable Laws or accounting rules (including GAAP) or the enforcement, implementation or interpretation thereof; (i) any natural or man-made disaster or acts of God; or (j) any epidemics, pandemics, disease outbreaks, or other public health emergencies including, without limitation,

-6-

the SARS-COV-2 virus or the related COVID-19 pandemic; *provided that* in the cases of clauses (a) through (j) above, such change, event, development, or effect shall only be considered in determining whether a Material Adverse Effect has occurred if such change, event, development, or effect impacts Seller materially and disproportionately to the impact that such change, event, development, or effect generally has upon other Persons operating in the same or substantially similar industries or markets as Seller. For the avoidance of doubt, neither the filing of the Bankruptcy Case, the filing of the Sale Motion or any actions taken in furtherance of the transactions contemplated by this Agreement, nor the consequences or effects of or changes or developments arising from the filing or any such actions shall be deemed to be a Material Adverse Event for purposes of this Agreement.

"Material Contracts" has the meaning set forth in Section 4.12(a).

"Material Customers" has the meaning set forth in Section 4.20(a).

"Material Suppliers" has the meaning set forth in Section 4.20(b).

"Nonassignable Asset" has the meaning set forth in Section 2.3.

"Non-Automated Equipment" means the equipment, fixtures, vehicles and personal property secured by the Banc of America Loan as set forth on Schedule 1.1 under the heading "Non-Automated Equipment" but excluding (for avoidance of doubt) any warehouse automation equipment or systems and any fixtures or personal property related to such equipment or system.

"Non-Automated Equipment Price" has the meaning set forth in Section 2.5.

"OFAC" has the meaning set forth in Section 4.19(a).

"Order" means any award, injunction, judgment, decree, order, ruling, subpoena or verdict or other decision issued, promulgated or entered by any Governmental Entity of competent jurisdiction.

"Ordinary Course of Business" means, with respect to Seller, the ordinary course of business consistent with its past custom and practice, subject to changes in operations resulting from Seller operating as a distressed business with limited liquidity, very significant reductions in personnel, and subject to changes resulting from the filing and/or pendency of the Bankruptcy Case or the requirements of any debtor in possession financing in the Bankruptcy Case.

"Organizational Documents" means, with respect to any entity, as applicable, the certificate of incorporation, articles of incorporation, bylaws, articles of organization, partnership agreement, limited liability company agreement, formation agreement, joint venture agreement and other similar organizational documents of such entity (in each case, as amended through the date of this Agreement).

"Outside Date" has the meaning set forth in Section 9.1(d).

"Parties" has the meaning set forth in the Preamble hereto.

"Permit" means any authorization, approval, consent, certificate, governmental license, registration, variance, exemption, order, exemption, qualification, waiver, permit or franchise of or from any Governmental Entity.

"Permitted Liens" means: (a) Liens for Taxes that are not yet due and payable or that are being contested in good faith by appropriate proceedings, in each case, solely to the extent set forth on Seller's financial statements in accordance with GAAP; (b) statutory Liens (or contractual restatements thereof) of landlords and workers', carriers', materialmen's, suppliers' and mechanics' or other like Liens incurred in the Ordinary Course of Business; (c) Liens granted in favor of Wells Fargo Bank, N.A. under its senior secured credit facility and purchase money Liens on fixed assets or the interests of lessors under capital leases to the extent that such Liens or interests secure permitted purchase money indebtedness and so long as (i) such Lien attaches only to the fixed asset purchased or acquired and the proceeds thereof, and (ii) such Lien only secures the indebtedness that was incurred to acquire the fixed asset purchased or acquired or any refinancing in respect thereof; (d) purported Liens evidenced by the filing of UCC financing statements relating solely to funded debt or operating leases or consignment or bailee arrangements; (e) any right, interest, Lien or title of a licensor, sublicensor, licensee, sublicensee, lessor or sublessor under any license, sublicense, lease, sublease or other similar agreement or in the property being leased or licensed; (f) with regard to any real property, (i) any zoning, building codes and other land use Laws regulating the use or occupancy of real property or the activities conducted thereon, (ii) any zoning restrictions, easements and other reservations, covenants, conditions, oil and gas leases, mineral severances and Liens, (iii) any easements, rights-of-way, building or use restrictions, prescriptive rights, encroachments, protrusions, rights and party walls, and (iv) any matters that would be disclosed by an accurate survey or inspection of the real property used by Seller or any Purchased Subsidiary, in each case, only to the extent that such Liens do not materially and adversely affect Seller or any Purchased Subsidiary; (g) any and all Liens encumbering the underlying fee interest of the Leased Real Property only to the extent that such Liens do not materially and adversely affect Seller or any Purchased Subsidiary; (h) pledges and deposits made in the ordinary course of business in compliance with worker's compensation or other unemployment insurance, and other social security laws or regulations; (i) Liens granted in the Ordinary Course of Business on the unearned portion of insurance premiums securing the financing of insurance premiums; (j) Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods; (k) Liens arising solely by virtue of any statutory or common law provisions relating to bankers' liens, liens in favor of securities intermediaries, and rights of setoff or similar rights and remedies; and (l) Liens set forth on Schedule 1.1(b).

"Person" means an individual, a corporation, a partnership, a limited liability company, a trust, an unincorporated association, a Governmental Entity, or any other entity or body.

"Personal Information" means any information that is considered "personally identifiable information," "personal information" or "personal data" by any applicable Privacy Laws.

"Privacy Laws" means any applicable Laws, regulations, and requirements relating to the data privacy, information security, data breach notification, and the processing of Personal Information, including as applicable, the Federal Trade Commission Act, General Data Protection

-8-

Regulation ("GDPR"), and U.S. state privacy laws and regulations including the California Consumer Privacy Act.

"Proceeding" means any action, suit, litigation, arbitration, proceeding, investigation (including any civil, criminal, administrative, investigative or appellate proceeding or any informal proceeding) or other dispute resolution proceeding before any Governmental Entity, arbitrator, regulatory body or any other Person.

"Procedures Order" is defined in the Recitals above.

"Purchased Assets" has the meaning set forth in Section 2.1.

"Purchased Subsidiaries" has the meaning set forth in Section 2.1(j).

"Purchase Price" has the meaning set forth in Section 2.5.

"Real Property Leases" means all leases, subleases, tenancy agreements, licenses, and other occupancy Contracts with respect to real property pursuant to which Seller or any Purchased Subsidiary is a party.

"Release" means disposing, discharging, injecting, spilling, leaking, pumping, pouring, leaching, dumping, emitting, escaping or emptying into or upon the indoor or outdoor environment, including any soil, sediment, subsurface strata, surface water, drinking water, ground water, ambient air, the atmosphere or any other media.

"Registered IP" means all Seller IP that is registered, filed, pending or issued under the authority of, with or by any Governmental Entity and all applications for any of the foregoing and renewals thereof.

"Representatives" with respect to a particular Person shall mean the directors, managers, officers, employees, consultants, financial advisors, counsel, accountants and other authorized representatives and agents of such Person and any successors in interest thereto, including attorneys, accountants, consultant, investment bankers, financial and restructuring advisors.

"Retained Liabilities" has the meaning set forth in Section 2.4(b).

"Sale Motion" has the meaning set forth in Section 6.6(a).

"Schedule Supplement" has the meaning set forth in Section 6.3.

"Security Incident" means any breach of the security of or other unauthorized access to or use of or other compromise to the integrity or availability of the IT Systems and the data and information stored thereon.

"Seller" has the meaning set forth in the Preamble hereto.

"Seller Closing Certificate" has the meaning set forth in Section 8.1(c).

"Seller Closing Notice" has the meaning set forth in Section 9.1(f).

"Seller Disclosure Schedules" means the disclosure schedules delivered by Seller concurrently with the execution and delivery of this Agreement.

"Seller IP" means all Intellectual Property owned by Seller.

"Seller's Knowledge" or any similar phrase means the actual, current knowledge after reasonable due inquiry of Marshall Bernes, Kean Jin Ooi, Josh Dannett, Melissa Gelbart and Gayla Bella only.  For the avoidance of doubt, none of such individuals shall have any personal liability or obligations regarding such knowledge.

"SKU" means a unique identification number that defines an item at the identifiable inventory level.

"Tangible Personal Property" has the meaning set forth in Section 2.1(b).

"Target Net Working Capital" means $45,938,903.

"Tax" or "Taxes" means all U.S. federal, state, provincial, local and foreign income, profits, franchise, license, gross receipts, occupation, premium, windfall profits, environmental, customs, duties, capital stock, severance, stamp, payroll, sales, employment, unemployment, disability, use, ad valorem, recapture, unclaimed property, escheat, personal and real property, withholding, excise, production, transfer, alternative minimum, registration, value added, occupancy, estimated and other taxes, charges, fees, levies, or other like assessments, including any interest, penalty, or addition thereto, whether disputed or not.

"Tax Returns" any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Termination Fee" has the meaning set forth in Section 9.2(b).

"Transfer Taxes" means sales, use, transfer, real property transfer, recording, documentary, stamp, registration and stock transfer Taxes and any similar Taxes.

"U.S." or "United States" means the United States of America.

## ARTICLE II
## PURCHASE AND SALE

2.1    **Purchased Assets**.  Upon the terms and subject to the conditions of this Agreement, at the Closing, Seller shall sell, transfer, assign, convey and deliver to Buyer, and Buyer shall purchase from Seller, free and clear to the extent provided in the Approval Order of all Liens, all of Seller's right, title and interest in and to all of Seller's property and assets, real, personal or mixed, tangible and intangible, held for use or used in the Business, wherever located (collectively, the "Purchased Assets"), as follows (but excluding, for avoidance of doubt, all of the Excluded Assets):

(a)     all accounts and notes receivable (whether current or non-current), including, without limitation, the Accounts Receivable, and all causes of action specifically pertaining to the collection of the foregoing, in each case to the extent arising exclusively out of the operation of the Business (excluding any intercompany Accounts Receivable between and among Seller), including, without limitation, but subject to updating by Seller prior to the Closing to reflect activity during the period following mutual execution and delivery of this Agreement, the items set forth in Schedule 2.1(a);

(b)     all tangible personal property, including computer hardware, manufacturing equipment, office equipment, accessories, machinery, furniture, and fixtures owned by Seller as of the Closing and listed or set forth on Schedule 2.1(b) (collectively, the "Tangible Personal Property");

(c)     all supplies, goods, materials, work in process, inventory and stock in trade owned and held by Seller for use in connection with the operation of the Business;

(d)     all of Seller's rights under the Contracts identified on Schedule 2.1(d) which remain on Schedule 2.1(d) at Buyer's election subject to the provisions of Section 2.3 (collectively, the "Assigned Contracts");

(e)     all of Seller's rights relating to deposits and prepayments with respect to the Assigned Contracts, which deposits and prepayments are listed on Schedule 2.1(e);

(f)     all Permits used by Seller or for the operation of the Business, including without limitation, those listed on Schedule 2.1(f), in each case, to the extent transferrable and assignable;

(g)     all warranties (express and implied) that continue in effect with respect to any Purchased Asset (including, without limitation, warranties provided for under any Assigned Contract), to the extent assignable;

(h)     all Intellectual Property owned or held by Seller or any Purchased Subsidiary, including without limitation the name "Noble House Home Furnishings" and all rights and title to any other brands under which Seller or any Purchased Subsidiary distributes or has distributed  its products (and all variants thereof) and all trademarks, trade names, service marks, domain names, websites and software programs identified with the Business, to the fullest extent permitted by Law;

(i)     all intangible personal property owned or held by Seller, but in all cases only to the extent of Seller's interest and only to the extent transferable including, without limitation, the customer and supplier relationships of the Business, the goodwill of the Business, processes, catalogues, customer lists and other customer data bases, advertising materials, and telephone numbers identified with the Business;

(j)     all equity interests in Noble Home Furnishings Canada, Inc., Noble House Home Furnishings UK Limited, Noble House Home Furnishings, S. De R.L. De C.V., Noble House Home Furnishings (HK) Limited, Noble House Home Furnishings Vietnam Company Limited, Noble House Home Furnishings (MY) Sdn. Bhd, Fujian Baimei Electronic Commerce

Co., Ltd. and Baimei (Fujian) Network Information Technology Co., Ltd (collectively, the "Purchased Subsidiaries");

(k)     all Books and Records, except as specifically provided in Section 2.2(j); and

(l)     all claims or causes of action of Seller, including all preference or avoidance claims and actions of Seller arising under Sections 544, 547, 548, 549, and 550 of the Bankruptcy Code as against any vendor or supplier to the Business, *provided that* all such preference or avoidance claims and actions of Seller shall be deemed waived upon Closing.

2.2     **Excluded Assets**.  Seller and Buyer expressly agree and acknowledge that the Purchased Assets will not include any assets of any kind, nature, character or description (whether real, personal or mixed, whether tangible or intangible, whether absolute, accrued, contingent, fixed or otherwise, and wherever situated) that are not expressly included within the definition of Purchased Assets (the "Excluded Assets"), including, without limitation the following assets and properties all of which Seller shall retain as Excluded Assets):

(a)     all cash and cash equivalents (including bank account balances, certificates of deposit and other time deposits and petty cash) and marketable and other securities;

(b)     all rights under this Agreement and any Ancillary Agreement;

(c)     all cash deposits and prepaid items other than those described in Section 2.1(e);

(d)     the equity interests in Seller and in any subsidiaries of Seller that are not Purchased Subsidiaries;

(e)     all Benefit Plans (including all trusts, insurance policies and administration service Contracts related thereto), and all assets in respect of any Benefit Plan;

(f)     (i) any intercompany Accounts Receivable between and among the entities that make up Seller and (ii) any Contracts between Seller, on the one hand, and any of its Affiliates, on the other hand; for the avoidance of doubt, all accounts, notes receivable or payable, or any other claims that may exist between and among Seller, on the one hand, and any of the Purchased Subsidiaries, on the other hand, whether characterized as an asset or a liability of either Seller or any Purchased Subsidiary, shall be deemed waived, released, and extinguished as of the Closing;

(g)     any Contract to which Seller is a party that (i) is not an Assigned Contract or (ii) is an Assigned Contract but is not assumable and assignable pursuant to the terms thereof or as a matter of applicable law (including, without limitation, any Assigned Contract with respect to which any consent requirement in favor of the counter-party thereto is not satisfied and may not be overridden pursuant to Section 365 of the Bankruptcy Code) (collectively, "Excluded Contracts");

(h)     the organizational documents, minute books, member ledger, books of account or other records having to do with the limited liability company organization of Seller, and all employee related files or records, other than records related to the Transferred Employees;

(i)      all Tax assets (including Tax refunds and prepayments) and Tax Returns of Seller or any of its Affiliates, with respect to the Purchased Assets or the Business, for taxable periods ending on or prior to the Closing Date;

(j)      any Books and Records which Seller is required by applicable Law to retain; *provided that* Seller shall provide Buyer with copies of any Books and Records relating primarily to the Business, the Purchased Assets and Assumed Liabilities at or prior to the Closing;

(k)      all insurance policies of Seller, and all benefits, rights and claims and proceeds thereunder;

(l)      all refunds for prepaid insurance premiums or insurance prepayments, including any assets securing customs import bonds and other assets or deposits provided to insurance or surety companies issuing customs bonds for the payment of duties, taxes, fines or penalties associated with importing goods into the United States;

(m)      except as provided in Sections 2.1(d), (e), (g) and (l), all claims or causes of action of Seller, including all preference or avoidance claims and actions of Seller, including, without limitation, any such claims and actions arising under Sections 544, 547, 548, 549 and 550 of the Bankruptcy Code;

(n)      any Tangible Personal Property held by Seller pursuant to a Contract where Buyer does not assume the underlying Contract relating to such Tangible Personal Property at the Closing;

(o)      any software or other item of intangible property (including Intellectual Property) held by Seller pursuant to a license or other Contract where Buyer does not assume the underlying Contract relating to such intangible personal property at the Closing;

(p)      any derivative contract, including interest rate swap, exchange rate hedge, any forward or option contracts or any other financial instrument which derives its value from an underlying asset and the value of which cannot be determined with certainty as of the date hereof;

(q)      any equipment, fixture, vehicle or item of personal property secured by the Banc of America Loan which does not constitute Non-Automated Equipment; and

(r)      any assets specifically set forth or described on Schedule 2.2(p).

2.3      **Nonassignable Assets; Deemed Consent; Additional Excluded Assets.**

(a)      Nonassignable Assets.  Nothing in this Agreement, the Bill of Sale or the Contract Assignments or the consummation of the transactions contemplated hereby or thereby shall be construed as an attempt or agreement to assign or transfer any Purchased Asset (including any Assigned Contract or Permit) to Buyer which by its terms or by Law is not assignable or transferable without a consent or is cancelable by a third party in the event of an assignment or transfer (a "Nonassignable Asset"), unless and until such consent shall have been obtained (including by virtue of the effect of the Approval Order rendering certain consents to be unnecessary) or Law satisfied.  Seller and Buyer shall use diligent and reasonable best efforts to

-13-

obtain any consent that may be required and satisfy any Law necessary to the assignment or transfer of a Nonassignable Asset to Buyer, and Seller shall take all such commercially reasonable actions as may be necessary to effect the assignment or transfer of the Nonassignable Asset. Unless and until any such consent that may be required is obtained or Law satisfied, Seller shall establish an arrangement reasonably satisfactory to Buyer under which Buyer would obtain the claims, rights and benefits and assume the corresponding liabilities and obligations under such Nonassignable Asset (including by means of any subcontracting, sublicensing or subleasing arrangement) or under which Seller would enforce for the benefit of Buyer, with Buyer assuming and agreeing to pay Seller's obligations and reasonable expenses, any and all claims, rights and benefits of Seller against a third party thereto; *provided that* in no event shall Buyer be required to enter into any such arrangement with respect to any Nonassignable Asset for which a required consent is necessary.  Seller shall promptly transmit over to Buyer all payments received by such Seller in respect of all Nonassignable Assets.  If and when the applicable consents or approvals, the absence of which caused the deferral of transfer of any Nonassignable Asset pursuant to this Section, are obtained, the transfer of the applicable Nonassignable Asset to Buyer shall automatically and without further action be effected in accordance with the terms of this Agreement.

(b)     Deemed Consent.  As part of the Sale Motion (or, as necessary in one or more separate motions), Seller shall request that by providing adequate notice of its intent to assume and assign any Assigned Contract, if any, the Bankruptcy Court shall deem any non-debtor party to such Assigned Contract that does not file an objection with the Bankruptcy Court during the applicable notice period to have given any required consent to the assumption of the Assigned Contract by Seller and assignment to Buyer if, and to the extent that, pursuant to the Approval Order or other order of the Bankruptcy Court, Seller is authorized to assume and assign such Assigned Contract to Buyer and Buyer is authorized to accept such Assigned Contract pursuant to Section 365 of the Bankruptcy Code.

(c)     Additional Excluded Assets.  Notwithstanding any other provision of this Agreement to the contrary, until three (3) Business Days prior to the Closing, Buyer will have the right, in its sole and absolute discretion, to provide written notice to Seller of Buyer's election to designate any right, property, interest, Contract or other asset (or portion thereof) as an Excluded Asset (including any such asset that was immediately prior to such designation an Purchased Asset), and upon such designation such asset will constitute an Excluded Asset for all purposes of this Agreement.  Similarly, notwithstanding any other provision of this Agreement to the contrary, until three (3) Business Days prior to the Closing, Buyer will have the right, in its sole and absolute discretion, to provide written notice to Seller of Buyer's election to designate any Contract previously designated as an Excluded Asset as a Purchased Asset, and upon such designation such Contract will constitute a Purchased Asset for all purposes of this Agreement.  If Buyer exercises its rights in this Section to designate any right, property, interest, Contract, or other asset (or portion thereof) as an Excluded Asset or any Contract as a Purchased Asset, then the Parties acknowledge and agree that while there may be resulting changes in the Assumed Liabilities as a result of such designation or change in designation, there will be no increase or reduction in the Purchase Price, nor will there be any delay to the Closing. For the avoidance of doubt, to the extent that Buyer designates any Contract or asset as an Excluded Asset at least three (3) days prior to Closing, no liabilities, whatsoever, arising from such asset or Contract shall be assumed by Buyer as Assumed Liabilities.

-14-

2.4     **Liabilities**.

(a)     Subject to the terms and conditions of this Agreement, at the Closing, Buyer shall assume and agree to perform, pursuant to the Bill of Sale and the Contract Assignments, as applicable, only the following Liabilities of Seller (collectively, the "Assumed Liabilities"):

(i)     all Liabilities of Seller under the Assigned Contracts;

(ii)    all Liabilities arising after the Closing Date with respect to the Purchased Assets or Buyer's operation of the Business;

(iii)   all cure obligations required to be paid pursuant to the Approval Order as a condition to Buyer's assumption of the Assigned Contracts;

(iv)    obligations to customers of Seller for refunds, rebates, returns, discounts and the like existing as of the Closing Date, including without limitation, those set forth on Schedule 2.4(a)(iv);

(v)     any product liability or warranty claims but only with respect to Products sold by Buyer following Closing;

(vi)    all accounts payable, accrued expenses and other working capital liabilities of the Business that were incurred in the Ordinary Course of Business since the filing of the Bankruptcy Case and remained unpaid in the Ordinary Course of Business and which are outstanding as of the Closing; and

(b)     Except for the Assumed Liabilities described in Section 2.4(a), Buyer shall not assume, nor be obligated to pay, perform, satisfy or discharge, any Liability of Seller or any Affiliate of Seller (collectively, the "Retained Liabilities").

2.5     **Purchase Price**.   Subject to the provisions of this Agreement, the aggregate consideration to be paid by Buyer to Seller for the Purchased Assets shall be **Eighty-Five Million Dollars ($85,000,000.00)**, subject to adjustment or holdback solely as described in Section 2.6 (as so adjusted, the "Base Purchase Price"), plus an additional **Four Million One Hundred Thousand Dollars ($4,100,000.00)** to be allocated to Banc of America Leasing & Capital, LLC for the Non-Automated Equipment (the "Non-Automated Equipment Price" and, with the Base Purchase Price, the "Purchase Price").  For the avoidance of doubt, the Non-Automated Equipment Price is offered solely to the extent such Non-Automated Equipment is included as Purchased Assets. The Purchase Price shall be paid as and when and otherwise in accordance with the provisions of Sections 2.6 and 3.2(a).

2.6     **Adjustment to Base Purchase Price**.

(a)     Working Capital Adjustment.   No less than three (3) days prior to Closing, Seller shall deliver to Buyer, in accordance with this Agreement, a good faith estimate of the Closing Date Net Working Capital, reflecting all components (and the amounts thereof) necessary to compute the Closing Date Net Working Capital, using the same methodology as was used to calculate the Target Net Working Capital in accordance with the illustrative calculation on Exhibit

-15-

A. Seller shall, upon Buyer's request, make the work papers (including the work papers of its accountants), back-up materials and books and records used in preparing the Closing Date Net Working Capital estimate available to Buyer and its accountants. If Seller's estimate of Closing Date Net Working Capital is less than the Target Net Working Capital by $500,000 or more, the Base Purchase Price shall be decreased, on a dollar-for-dollar basis, by an amount equal to the difference between the Target Net Working Capital and the Closing Date Net Working Capital. Likewise, if Seller's estimate of Closing Date Net Working Capital is more than the Target Net Working Capital by $500,000 or more, the Base Purchase Price shall be increased, on a dollar-for-dollar basis, by an amount equal to the difference between the Closing Date Net Working Capital and the Target Net Working Capital.

(b)    Objections/Holdback. No later than twenty-one (21) days following Closing, Buyer shall deliver to Seller a final reconciliation of the Closing Date Net Working Capital. Seller shall have seven (7) days after delivery of such final reconciliation to object to any amount or computation appearing in the final reconciliation of Closing Date Net Working Capital. If Seller does not make any timely objection to such reconciliation, the Closing Date Net Working Capital as delivered by Buyer shall be final and binding on all Parties. If Seller objects to any item or computation appearing in the final Closing Date Net Working Capital, the Parties shall promptly attempt in good faith jointly to resolve such matters and shall adjust the Purchase Price as necessary to resolve the same. If the Parties cannot resolve all such matters within seven (7) days after any objection is asserted by Seller, either Buyer or Seller may engage an independent certified public accounting firm of (U.S.) national reputation mutually satisfactory to Buyer and Seller (a "Neutral Accountant") to resolve any items that remain in dispute. Within seven (7) days following such engagement on notice thereof to the other Party, Buyer on the one hand, and Seller, on the other hand, shall present their respective position on the disputed items to the Neutral Accountant in writing, and Buyer and Seller shall direct the Neutral Accountant, within fourteen (14) days thereafter, acting as an expert and not an arbitrator, to resolve only the matters that were objected to by Seller and not resolved by the Buyer and Seller. The resolution by the Neutral Accountant of such matters shall be within the range of the amounts claimed by the Seller in its objection and the amount claimed by Buyer pursuant to its final reconciliation and shall be binding on the Parties. The fees, costs and expenses of the Neutral Accountant shall be allocated between Seller, on the one hand, and Buyer, on the other hand, in the same proportion that the aggregate amount of the disputed items submitted to the Neutral Accountant that are unsuccessfully disputed by each such Party (as finally determined by the Neutral Accountant) bears to the total amount of such disputed items so submitted. Pending final resolution of the Closing Date Net Working Capital, a portion of the Deposit in the amount of **$5,000,000** (the "Holdback Amount") shall be held back from delivery to Seller at Closing solely for the purpose of satisfying any negative adjustment to the Closing Date Net Working Capital that may be required under this Section 2.6. Once the final Closing Date Net Working Capital is determined consistent with the provisions of this Section 2.6, (to the extent such final adjustment does not require payment to Buyer of an amount in excess of such Holdback Amount, in which case such excess shall also be paid), the Holdback Amount or that portion of the Holdback Amount required to address a negative adjustment shall be paid to Buyer, and the remainder of the Holdback Amount, if any, shall be promptly released to Seller.

(c)    No Modifications. Seller agrees that following the date of this Agreement, neither Seller nor any Purchased Subsidiary will take any actions, with respect to any accounting books, records, policies or procedures upon which the amounts set forth in the Current Assets and

-16-

Current Liabilities would reasonably be expected to be based that would impede or delay the determination of the Closing Date Net Working Capital.

2.7    **Withholding**.  Notwithstanding any provision hereof to the contrary, each of Buyer, Seller, and any of their Affiliates shall be entitled to deduct and withhold from any consideration otherwise payable under the terms of this Agreement such amounts as it is required to deduct and withhold pursuant to any provision of Law, including those related to or regarding Taxes; *provided that* no such withholding shall apply to any payments to Seller hereunder unless Buyer has provided Seller with at least 10 days advance written notice of Buyer's intent to withhold and Buyer reasonably cooperates with Seller to minimize or eliminate such withholding.  To the extent that amounts are so deducted and withheld, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction and withholding was made.

<div align="center">

**ARTICLE III**
**CLOSING; PAYMENT OF PURCHASE PRICE**

</div>

3.1    **Closing**.  Unless this Agreement shall have been terminated in accordance with Section 9.1, the Parties shall consummate the transactions contemplated by this Agreement (the "Closing"), as promptly as practicable but in no event later than three (3) Business Days after the date on which all conditions set forth in Article VIII (except those conditions that are to be satisfied at Closing) have been satisfied (or waived by the Party entitled to the benefit of the same), with such Closing to occur at 11:00 a.m., Central time, or at such other place, date and time as the Parties shall mutually agree in writing (the date on which the Closing occurs, the "Closing Date").  The Closing shall take place via electronic exchange of executed documents and other closing deliveries via email on the Closing Date.  The effective time of Closing shall be 11:59 p.m., Central time on the Closing Date.

3.2    **Closing Deliveries**.

(a)    Payment of Purchase Price.

(i)    Concurrently with the mutual execution and delivery of this Agreement (or on the first Business Day thereafter), Buyer shall deliver to counsel for Seller, Pachulski Stang Ziehl & Jones LLP, an amount equal to **Eight Million Five Hundred Thousand and no/100ths Dollars ($8,500,000.00)** (the "Deposit") by wire transfer of immediately available funds, which such counsel shall hold in a trust account subject to the terms hereof concurrently with the mutual execution and delivery of this Agreement.  The Deposit shall be held by Seller's counsel and released as follows: (1) at the Closing, subject to the holdback in Section 2.6(b), the Deposit shall be credited and applied toward payment of the Base Purchase Price (and paid to Seller); (2) if Seller terminates this Agreement prior to Closing pursuant to Section 9.1(c) or Section 9.1(f) (each, a "Buyer Default Termination"), then the Deposit shall become nonrefundable and shall be paid to Seller for Seller's own account; and (3) if this Agreement is terminated by Seller prior to Closing for any reason other than a Buyer Default Termination, then the Deposit shall be returned to Buyer within two Business Days to an account designated by Buyer in writing by wire transfer of immediately available funds.  The Parties agree that (i) the payment of the Deposit to Seller as a result of a Buyer Default Termination shall not be the sole and

<div align="center">-17-</div>

exclusive remedy with respect to a Buyer Default Termination and (ii) the return of the Deposit to Buyer as contemplated hereby shall not be the sole and exclusive remedy of the Buyer for a breach by Seller of this Agreement.

(ii)    at the Closing, Buyer shall authorize Seller's counsel to deliver the Deposit to Seller, as provided in Section 3.2(a)(i).

(iii)    at the Closing, Buyer shall pay and deliver to Seller, by wire transfer of immediately available good funds of the United States to one or more accounts designated by Seller, an amount equal to the Purchase Price, minus the amount of the Deposit, plus the assumption of the Assumed Liabilities.

(b)    Deliveries by Seller at the Closing.  At the Closing, Seller shall deliver to Buyer the following:

(i)    a Bill of Sale, Assignment and Assumption Agreement or similar document, in a form acceptable to Buyer and Seller (the "Bill of Sale"), duly executed by Seller;

(ii)    one or more Assignment and Assumption Agreements or similar documents, in a form acceptable to Buyer and Seller, with respect to the Assigned Contracts, including, without limitation, an assignment of any real property leases included among the Assigned Contracts (collectively, the "Contract Assignments"), duly executed by Seller;

(iii)    an assignment of all Seller IP, including Trademarks, Domain Names, patents, unregistered trademarks and works of authorship, in a form reasonably acceptable to Buyer, duly executed by Seller;

(iv)    the Seller Closing Certificate; and

(v)    a properly completed and duly executed IRS Form W-9 by Seller.

(c)    Deliveries by Buyer at the Closing.  At the Closing, Buyer shall deliver to Seller the following:

(i)    the Bill of Sale, duly executed by Buyer;

(ii)    the Contract Assignments, duly executed by Buyer; and

(iii)    the Buyer Closing Certificate.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF SELLER

Except as set forth in the Seller Disclosure Schedules, which exceptions or disclosures set forth therein will be deemed to be a part of the representations and warranties made hereunder, Seller hereby represents and warrants to Buyer as follows, in each case with respect to Seller and, as applicable, to the Purchased Subsidiaries:

4.1    **Existence and Power**.  Each entity comprising Seller is a corporation or other entity that is duly organized, validly existing, and in good standing (or its equivalent) under the Laws of the jurisdiction where it is incorporated or organized as set forth in Schedule 4.1.  Each entity comprising Seller has all requisite entity power and authority required to own, lease, or, subject to the provisions of the Bankruptcy Code applicable to debtors in possession, operate the properties and assets now owned, leased or operated by it and to carry on its business as presently conducted.  Each entity comprising Seller is duly licensed or qualified to transact business and is in good standing (or the equivalent thereof, if applicable) to transact business in each jurisdiction set forth in Schedule 4.1, being all jurisdictions in which the nature of the business conducted by it requires such qualification.

4.2    **Authorization**.  Subject to entry of the Approval Order, Seller has all requisite power and authority to execute and deliver, and to perform its obligations under, this Agreement and each Ancillary Document to which Seller is a party, to perform and comply with each of its obligations hereunder and thereunder and, upon entry and effectiveness of the Approval Order, in accordance with the terms hereof and thereof, will have all necessary corporate or similar authority to consummate the transactions contemplated hereby.  Subject to entry of the Approval Order, the execution and delivery by Seller of this Agreement and the other Ancillary Documents to which Seller is or will be a party, the performance and compliance by Seller with each of their obligations herein and therein, and the consummation by it of the transactions have been duly and validly authorized and approved by all necessary corporate or other action on the part of Sellers, and no other corporate or other Proceedings on the part of Seller and no other stockholder votes are necessary to authorize the execution of this Agreement or the other Ancillary Documents, or the performance or consummation by the Seller of the transaction.  Subject to entry of the Approval Order, the execution, delivery and performance by Seller of this Agreement and such Ancillary Documents and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all necessary action on the part of Seller.

4.3    **Enforceability**.  This Agreement has been duly executed and delivered by Seller. Upon entry of the Approval Order, this Agreement shall constitute (and each Ancillary Document to which Seller is or will be a party will constitute at or prior to the Closing) a valid and legally binding obligation of Seller, enforceable against Seller in accordance with its terms, assuming that this Agreement and such Ancillary Documents, where applicable, have been duly executed by the other parties thereto, except as enforcement may be limited by General Enforceability Exceptions.

4.4    **Noncontravention**.  Subject to entry of the Approval Order, the authorization, execution, delivery and performance by the Seller of this Agreement or any Ancillary Documents, and the consummation of the transactions contemplated hereby will not (a) violate or conflict with any provision of the Organizational Documents of Seller, (b) violate any Law or any Order, in each case applicable to Seller, the Purchased Subsidiaries or by which any property or asset of the Seller of any Purchased Subsidiary is bound or affected, (c) constitute a default under, or give rise to termination, cancellation or acceleration of any right or obligation of Seller under, or to a loss of any benefit to which Seller is entitled under any Assigned Contract binding upon Seller, or (d) result in the creation or imposition of any Lien (other than Permitted Liens) on any asset of Seller.  Except as may be required under state securities Laws, no permit, consent, approval or authorization of, notice or declaration to, or filing or registration with any Governmental Entity is required to be made or obtained by Seller in connection with the consummation of the transactions

-19-

contemplated by this Agreement or any Ancillary Document.  The execution and delivery by Seller of this Agreement and the other Ancillary Documents does not and will not, and the consummation by Seller of the transaction and compliance by Seller with any terms or provisions hereof will not, require any consent, approval, authorization or permit of, registration with, or filing with or notification to, any Governmental Entity.

4.5     **Proceeding**.  Except as set forth in Schedule 4.5, there are no Proceedings (other than the Bankruptcy Case) pending, threatened in writing or, to the Seller's Knowledge, otherwise threatened by or against Seller, the Business, the Purchased Assets or the Assumed Liabilities.  As of the date hereof, no Person or Governmental Entity has commenced or threatened in writing, or to the Seller's Knowledge, otherwise threatened to commence any Proceeding that (x) seek or otherwise are reasonably expected to materially adversely affect, delay or interfere with the ability of Seller to consummate the transactions contemplated by this Agreement and the Ancillary Documents or (y) prevent, enjoin or otherwise delay the transactions contemplated by this Agreement.

4.6     **Brokers**.  Except for Lincoln Partners Advisors LLC (whose fees shall be paid by Seller pursuant to a separate agreement), no investment banker, broker, finder, financial advisor or other intermediary is or will be entitled to any fee or commission from Seller in connection with the transactions contemplated by this Agreement or any of the Ancillary Documents.

4.7     **Permits**.  Other than in connection with or as a result of the Bankruptcy Case, Seller has Permits, and the Permits identified in Schedule 4.7 are all the Permits, necessary for the conduct of their business and the use of their properties and assets, as presently conducted and used, and each of the Permits is valid, subsisting and in full force and effect in all material respects, and except as would not be, individually or in the aggregate, have a material adverse effect on the Business or the Purchased Assets, no event has occurred or circumstance exists that may result in the revocation, default, withdrawal, suspension, cancellation, or modification of or to any Permit.

4.8     **Compliance with Law**.  Seller is in compliance with, and since January 1, 2023 has been in compliance, and each Purchased Subsidiary is in compliance with, and since January 1, 2021, has been in compliance, with all Laws and Orders related to the Purchased Assets, except for such past noncompliance as has been remedied and imposes no existing obligations or costs on Seller or any Purchased Subsidiary.

4.9     **Absence of Certain Developments**. Since the commencement of the Bankruptcy Case, no Material Adverse Effect has occurred.

4.10    **Financial Statements**.

(a)     Schedule 4.10 contains: (i) Seller's consolidated unaudited balance sheet as of the latest date available prior to the date hereof and the related unaudited statements of income and cash flows for the year to date, and the prior year, and (ii) Seller's consolidated audited balance sheet and statements on income and cash flow for fiscal years ended December 31, 2022 and December 31, 2021 (all such financial statements referred to in (i) and (ii), the "Seller Financial Statements").  The Seller Financial Statements present fairly, in all material respects, the financial

-20-

condition, results of operations and cash flows of the Seller as of the times and for the periods referred to therein in accordance with GAAP.

(b)     All notes and accounts receivable of the Seller are reflected on their Books and Records, are valid receivables subject to no setoffs or counterclaims (other than for fees charged by the third parties responsible for payment of the receivables under the terms of the agreement with the applicable Seller or Purchased Subsidiary or as agreed to under ordinary course for discretionary programs or promotions), and are current and collectible subject to the reserves for bad debts set forth on the applicable Seller Financial Statements.

4.11    **Employee Benefits and Employee Matters**.

(a)     Schedule 4.11(a) sets forth a complete list of all Employee Benefit Plans as they related to any Purchased Subsidiary. All such Employee Benefit Plans of all Purchased Subsidiaries comply in form and in operation in all material respect with their terms and with the requirements of all applicable Laws.

(b)     With respect to each Employee Benefit Plan, Seller has delivered to Purchaser correct and complete copies of each of the following:  (i) the current plan document together with all amendments; (ii) where applicable, copies of any trust agreements, custodial agreements, insurance policies, administration agreements, participation agreements and similar agreements, and investment management or investment advisory agreements; and (iii) copies of any summary plan descriptions, employee handbooks or similar employee communications relating to any Employee Benefit Plan.

(c)     Schedule 4.11(b) sets forth a correct and complete list of all employees, consultants, officers, directors or temporary employees of the Seller and each Purchased Subsidiary as of the date hereof, and sets forth for each such Person the following: (i) name; (ii) title or position (including whether full or part-time); (iii) the amount of any commission, bonus or other incentive based compensation; and (iv) current annual compensation rate paid to each such person during calendar year 2022 and through the latest date available.

(d)     To the Knowledge of Seller, each Purchased Subsidiary is in material compliance with all applicable laws governing employment and employee relations, including laws relating to employment practices, employment discrimination, sexual and/or other harassment, paid sick and leave time, vacation, disability, civil rights, equal pay, wages, overtime, hours, terms and conditions of employment, leaves of absence, meal and rest breaks, collective bargaining and labor relations, occupational safety and health, workers' compensation, immigration, privacy, classification of employees, consultants and independent contractors, or the withholding and payment of income, social security or similar Taxes. No litigation or other proceeding relating to any such laws are pending, and to the Knowledge of Seller, no litigation or other proceeding alleging a violation of any such applicable laws has been threatened.

(e)     To the Knowledge of Seller, no employee or independent contractor of any Seller or any Purchased Subsidiary is in violation of any term of any employment contract, consulting contract, non-disclosure agreement, common law non-disclosure obligation, non-competition agreement, non-solicitation agreement, proprietary information agreement or any

other agreement relating to confidential or proprietary information, intellectual property, competition, or related matters; and the continued employment by each Seller of its employees, and the performance of the contracts with Seller by its independent contractors, will not result in any such violation.

4.12    **Material Contracts.**

(a)    Schedule 4.12(a) sets forth a list of each Material Contract as of the date of this Agreement.  For purposes of this Agreement, "Material Contract" means any Contract that is utilized in, and material to, the Business.

(b)    Each Material Contract is in full force and effect as of the date of this Agreement and is a valid and binding obligation of Seller or the applicable Purchased Subsidiary thereto and, to the Seller's Knowledge, the other parties thereto, enforceable against each of them in accordance with its terms, except, in each case, as such enforceability may be limited by the General Enforceability Exceptions.

(c)    Neither Seller nor any Purchased Subsidiary has been provided or received any notice of any intention to terminate any Material Contract, and neither Seller, nor, as applicable, any Purchased Subsidiary, has waived any material rights under any Material Contract, except, in each case, (i) as a result of the Bankruptcy Case, (ii) as set forth in Schedule 4.12(a), as may be cured upon entry of the Sale Order, or (iv) for Contracts that have been or will be rejected in the Bankruptcy Case. Complete and correct copies of each Material Contract (including all modifications, amendments, and supplements thereto and waivers hereunder) have been made available to the Buyer.

(d)    Schedule 4.12(a) sets forth Seller's good faith estimate (on a counterparty by counterparty basis) as of the date of this Agreement of the amounts necessary to cure defaults, if any, with respect to any of the Assigned Contracts set forth on Schedule 2.1(d), in each case as determined by Seller or the applicable Purchased Subsidiary based on their books and records and good faith judgment.  Seller shall provide an update of such good faith estimate, if necessary, not less than ten (10) Business Days prior to the Closing Date.

(e)    Each Material Contract is an executory contract capable of being assigned pursuant to Section 365 of the Bankruptcy Code.

4.13    **Intellectual Property; Information Technology**.

(a)    Schedule 4.13(a) sets forth, as of the date of this Agreement, a complete and accurate list of all (i) Registered IP, (ii) domain names included in the Seller IP, and (iii) social media handles included in the Seller IP.  None of the Registered IP is involved in any opposition, cancellation, nullity, reissue, reexamination, inter parties review or proceeding, post-grant review, interference, derivation, or other Proceeding or action challenging the use, validity, issuance, registration, enforceability, inventorship, authorship, or ownership of such Registered IP.

(b)    Except as has not been, or would not be, individually or in the aggregate, material to the Business, the Purchased Assets and the Assumed Liabilities, taken as a whole, the Seller IP that is being assigned per this Agreement together with all Intellectual Property licensed

or made available to Seller pursuant to the Assumed Agreements contain all of the Intellectual Property needed to operate the Business in substantially the same manner as currently conducted by the Seller and any Purchased Subsidiary.

(c)     The Purchased Assets and the Assumed Liabilities, taken as a whole, with respect to each trade secret being transferred as part of the Seller IP, Seller has taken reasonable precautions to protect the secrecy, confidentiality, and value of its trade secrets and, to the Seller's Knowledge, the trade secrets have not been used, divulged, or appropriated either for the benefit of any Person (other than Seller) or to the detriment of Seller and no trade secret is subject to any adverse claim or has been challenged or threatened in any way.

(d)     Except as set forth in Schedule 4.13(d), Seller is not infringing, misappropriating, diluting, or otherwise violating any Intellectual Property rights of any Person, and there is no Proceeding pending or threatened and neither Seller nor any Purchased Subsidiary has received any written charge, complaint, claim, demand, or notice since January 1, 2023 alleging: either (i) any such infringement, misappropriation, dilution, or violation or (ii) challenging the use, validity, inventorship, authorship, ownership, or enforceability of any Seller IP.  Seller is not in breach of any contract relating to the Seller IP, except (A) as a result of the Bankruptcy Case, (B) as has not been, or would not be, individually or in the aggregate, material to the Business, the Purchased Assets and the Assumed Liabilities, taken as a whole, (C) as may be cured upon entry of the Sale Order or (D) for Contracts that have been or will be rejected in the Bankruptcy Case.

(e)     To the Seller's Knowledge, no Person is infringing, misappropriating, diluting or otherwise violating any Seller IP.  The Seller has not threatened, made or asserted any charge, complaint, claim, demand or notice since January 1, 2022 alleging any such infringement, misappropriation, dilution, or violation that has not been fully resolved as of the date hereof.

(f)     Neither Heavy Metal, Inc. nor Christopher Knight, except as covered by an existing license agreement, own any Intellectual Property necessary to operate the Business as currently conducted.

(g)     The IT Systems operate as required by the Seller.

4.14    **Data Privacy**.

(a)     As it relates to the Business and the Purchased Assets, Seller and each Purchased Subsidiary has been at all times since January 1, 2022, and remains in compliance in all material respects with all applicable: (i) externally published policies relating to Seller's and each Purchased Subsidiaries' processing of Personal Information; (ii) the terms of any agreements to which Seller or any Purchased Subsidiary is bound relating to the processing of Personal Information; and (iii) Privacy Laws.

(b)     Except as set forth in Schedule 4.14(b), since January 1, 2022: (i) there have not been any Security Incidents related to the Business, and to the Seller's Knowledge, there are currently no facts or circumstances which would serve as the basis for any Security Incident, which would adversely affect the Business in a material manner, and (ii) there have not been any claims or legal proceedings concerning its use and/or processing of Personal Information.

-23-

(c)     Since January 1, 2022, Seller has implemented and maintained, and continues to maintain as of the date hereof commercially reasonable administrative, technical and physical measures designed to protect Personal Information with respect to the Business and the Seller IP against loss, damage, and unauthorized access, use, modification, or other misuse.

4.15     **Taxes**.

(a)     All income and other Tax Returns relating to the Business or the Purchased Assets that are required by applicable Law to be filed by or with respect to Seller have been timely filed (taking into account any extension of time within which to file), and all such Tax Returns are true, complete, and accurate in all material respects.

(b)     Seller has timely paid all Taxes relating to the Business or the Purchased Assets due and owing by it (whether or not required to be shown on a Tax Return), including any Taxes required to be withheld from amounts owing to, or collected from, any employee, creditor, or other third party and all such Taxes required to be withheld have been properly withheld and remitted, other than Taxes not due as of the date of the filing of the Bankruptcy Case as to which subsequent payment was not required by reason of the Bankruptcy Case or Taxes that are being contested in good faith in appropriate Proceedings as set forth in <u>Schedule 4.15(b)</u>.

(c)     No deficiencies for Taxes relating to the Business or the Purchased Assets have been claimed, proposed or assessed by any Governmental Entity in writing against Seller except for deficiencies which have been fully satisfied by payment, settled or withdrawn or adequately reserved for in accordance with GAAP or other generally accepted accounting principles applicable to the financial statements of Seller.

(d)     There are no audits, examinations, investigations or other Proceedings ongoing or pending against or with respect to Seller with respect to any Taxes relating to the Business or the Purchased Assets and no written notification has been received by Seller that such audit, examination, investigation or other Proceeding has been proposed.

(e)     There are no Liens for Taxes relating to the Business or the Purchased Assets upon any property or assets of the Seller, except for Permitted Liens.

4.16     **Insurance**.  Seller and each Purchased Subsidiary is insured with policies in such amounts and with such deductibles and covering such risks as Seller reasonably believe are generally deemed adequate and customary.

4.17     **Title to Assets; Real Property**.

(a)     Seller, or the applicable Purchased Subsidiary, has good and valid title to, or has good and valid leasehold interests in, all material Tangible Personal Property that is included in the Purchased Assets, free and clear of all Liens other than Permitted Liens, except to the extent that such Lien will not be enforceable against such material Tangible Personal Property following the Closing in accordance with the Sale Order.  The Purchased Assets and all other material Tangible Personal Property owned or leased by Seller, or the applicable Purchased Subsidiary, in connection with the Business are in good operating condition and repair, ordinary wear and tear excepted.

-24-

(b)      Neither Seller nor any Purchased Subsidiary owns any real property.

(c)      Schedule 4.17(c) contains a complete and accurate list of all of leases, subleases, and sub-leases, tenancy agreements, licenses or other rights of occupation (written or oral) affecting any real property used or occupied, or permitted to be used or occupied, by Seller or a Purchased Subsidiary (the "Leased Real Property"), and all amendments, extensions, renewals, guaranties, modifications, or supplements thereto, together with the amount of security deposit thereunder.  True, complete and correct copies of all the Real Property Leases have been delivered or made available to the Buyer prior to the date hereof.

4.18      **Environmental Matters**.

(a)      Neither Seller not any Purchased Subsidiary has received any notification of any allegation of actual or potential responsibility for any Release or threatened Release of any Hazardous Materials, the subject matter of which has not been resolved.

(b)      Neither Seller nor any Purchased Subsidiary has any unresolved obligations pursuant to any consent decree or consent order and is not otherwise subject to any unresolved obligations pursuant to any judgement, decree, or judicial or administrative order, in each case, relating to the compliance with applicable Environmental Laws, Environmental Permits or to the investigation, sampling, monitoring, treatment, remediation, response, removal or cleanup of Hazardous Materials.

(c)      Neither Seller nor any Purchased Subsidiary has treated, stored, disposed of, arranged for the disposal of, transported, handled, released, or, to the Seller's Knowledge, exposed any Person to, any Hazardous Materials except in compliance with applicable Environmental Laws.

4.19      **OFAC; Foreign Corrupt Practices Act; Anticorruption Laws**.

(a)      Neither Seller nor any director, officer, or employee acting on behalf of Seller, is currently, or during the past five (5) years prior to the date hereof has been, subject to any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department ("OFAC").

(b)      Neither Seller nor any director, officer, agent, employee or other person acting on behalf of Seller has during the past five (5) years prior to the date hereof, in the course of its actions for, or on behalf of Seller (i) used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expenses relating to political activity; (ii) made any direct or indirect unlawful payment to any domestic government official "foreign official" (as defined in the U.S. Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations thereunder (collectively, the "FCPA")) or employee from corporate funds; (iii) violated or is in violation of any provision of the FCPA or any applicable non-U.S. anti-bribery statute or regulation; or (iv) made any unlawful bribe, rebate, payoff, influence payment, kickback or other unlawful payment.

(c)      Seller has implemented and maintains in effect policies and procedures that are designed to ensure material compliance by Seller with Anticorruption Laws.

4.20   **Material Customers; Material Suppliers**.

(a)      Seller has disclosed to Buyer the identities of the twenty (20) largest customers (measured by revenue) of Seller on a consolidated basis, (collectively, the "Material Customers").  Except as set forth in Schedule 4.20(a), there has been no written or, to the Seller's Knowledge, oral notice received from any such party of any termination, cancellation or material limitation of, or any materially adverse modification or change in, the business relationship of the Seller with any Material Customer.

(b)      Seller has disclosed to Buyer the identities of the twenty (20) largest vendors and suppliers (measured by fees paid)] of Seller on a consolidated basis (collectively, the "Material Suppliers").

4.21   **Affiliate Transactions**.  Except as set forth in Schedule 4.21, no officer, director, contractor or employee of Seller or any Purchased Subsidiary or any former officer, director, contractor or employee of Seller or any Purchased Subsidiary (a) is a party to any agreement or transaction with Seller having a potential or actual value or a contingent or actual liability exceeding $50,000, other than (i) extensions of credit to directors and officers of the Seller for travel, business or relocation expenses or other employment-related purposes in the Ordinary Course of Business, (ii) employment arrangements in the Ordinary Course of Business and (iii) the Seller Compensation and Benefit Programs, (b) has any interest in any property used in the Business by Seller or any Purchased Subsidiaries or (c) owns any interest in, or is an officer, director, employee or consultant of, any Person which is, or is engaged in business as a supplier or customer of Seller or a Purchased Subsidiary.

4.22   **Sufficiency of Assets**.  Except as has not been, or would not be, individually or in the aggregate, material to the Business, the Purchased Assets and the Assumed Liabilities, taken as a whole, the Purchased Assets are sufficient to allow the Buyer as of immediately following the Closing to conduct the Business as currently conducted by Seller.

4.23   **Products**.  Except as set forth in Schedule 4.23, since January 1, 2022, (a) there has been no Proceeding (or, to the Seller's Knowledge, actions threatened) against Seller or any of its Affiliates which involve personal injury and involve (i) alleged defects in the products sold by the Business or (ii) the failure of any such products to meet any product specifications, and (b) Seller has not voluntarily or involuntarily initiated, conducted or issued, or caused to be initiated, conducted or issued, any recall or market withdrawal concerning any Business Product.

4.24   **Product Warranties**.

(a)      Seller has made available to Buyer complete and correct copies of the standard terms and condition of sale for each of the products of the Business (containing applicable guarantee, warranty and indemnity provisions).

(b)      Except as set forth on Schedule 4.24, neither Seller nor any Purchased Subsidiary has any liability or obligation for personal injuries, replacement or other damages in connection with the manufacture, sale, lease or delivery of any product of the Business prior to the Closing, and there is no pending or threatened claim against Seller or any Purchased Subsidiary for injuries to person or property of employees or any third parties suffered, as a result of any

products of the Business manufactured, sold, or delivered by, or service rendered by or on behalf of Seller or any Purchased Subsidiaries, including claims arising out of the alleged defective or unsafe nature of products.

4.25    **Company Subsidiaries**.

(a)    Schedule 4.25(a) sets forth the name of each Purchased Subsidiary, the jurisdiction in which it is incorporated or organized, the jurisdictions, if any, in which it is qualified to do business or is registered for Taxes of any kind, the number of shares of its authorized capital stock and the number and class of shares thereof duly issued and outstanding.

(b)    Each Purchased Subsidiary is duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation or organization and is duly qualified or authorized to do business as a foreign corporation or entity and is in good standing under the laws of each jurisdiction in which the conduct of its business or the ownership of its properties requires such qualification or authorization.  Each Purchased Subsidiary has all requisite corporate or other power and authority to own, lease and operate its properties and to carry on its business as currently conducted.  All outstanding shares of capital stock of each Purchased Subsidiary have been duly authorized and validly issued and are fully paid and non-assessable and, excluding rights of Seller or Purchased Subsidiaries, is not subject to preemptive rights created by statute, the Organizational Documents of such Purchased Subsidiary, or any agreement to which such Purchased Subsidiary is a party or by which it is bound, and have been offered, issued and sold in compliance with all applicable Laws.  All of the outstanding shares of capital stock of each Purchased Subsidiary are owned of record and beneficially by Seller free and clear of any and all Liens.

(c)    There are no subscriptions, options, warrants, calls, rights, contingent or otherwise, commitments or agreements of any character, written or oral, to which Seller or any Purchased Subsidiary is a party or by which any of them is bound obligating any Purchased Subsidiary (or Seller to cause any such Purchased Subsidiary) to issue, deliver, sell, repurchase or redeem, or cause to be issued, sold, repurchased or redeemed, any shares of the capital stock of such Purchased Subsidiary or obligating such Purchased Subsidiary to grant, extend, change the price of, otherwise amend or enter into any such subscription, option, warrant, call right, commitment or agreement with respect to any of such Purchased Subsidiary's share capital.  There are no outstanding or authorized stock appreciation, phantom stock, profit participation, or other similar rights with respect to any Purchased Subsidiary. Neither Seller nor any Purchased Subsidiary has agreed or is obligated to make any future investment in or capital contribution to any Person.

4.26    **Inventory**.

The inventories of Seller and all Purchased Subsidiaries (including raw materials, supplies, work-in-process, finished goods and other materials) (i) are, taken as a whole, in good, merchantable and useable condition, (ii) are reflected in the Seller Financial Statements at the lower of cost or market in accordance with GAAP, and (iii) in the case of finished goods, are of a quality and quantity historically saleable in the Ordinary Course of Business and, in the case of all other inventories, are of a quality and quantity historically useable in the Ordinary Course of

-27-

Business.   The inventory obsolescence policies of Seller and any Purchased Subsidiary are appropriate for the nature of the products sold and the marketing methods used by Seller or the applicable Purchased Subsidiary, and the reserve for inventory obsolescence reflected in the Seller Financial Statements fairly reflects the amount of obsolete inventory as of its date in accordance with GAAP.

4.27   **Exclusivity of Representations and Warranties**.   Except as set forth in this Article IV, neither Seller nor any other Person is making any representation or warranty of any kind or nature whatsoever, oral or written, express or implied, relating to Seller, the Purchased Assets or the Business (including any relating to financial condition, results of operations, assets or liabilities of Seller), and Seller hereby disclaims any such other representations or warranties.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Seller as follows:

5.1   **Existence and Power**.   Buyer is an entity duly organized, validly existing, and in good standing under the Laws of the state where organized.

5.2   **Authorization**.   Buyer has all requisite power and authority to execute and deliver, and to perform its obligations under, this Agreement and each Ancillary Document to which Buyer is a party or subject.   The execution, delivery, and performance by Buyer of this Agreement and such Ancillary Documents and the consummation of the transactions contemplated hereby and thereby (a) are within Buyer's powers and (b) have been duly authorized by all necessary action on the part of Buyer.

5.3   **Enforceability**.   This Agreement has been duly executed and delivered by Buyer. This Agreement constitutes (and each Ancillary Document to which Buyer is or will be a party will constitute at or prior to the Closing) a valid and legally binding obligation of Buyer, enforceable against Buyer in accordance with its terms, assuming that this Agreement and such Ancillary Documents, where applicable, have been duly executed by the other parties thereto, except as enforcement may be limited by General Enforceability Exceptions.

5.4   **Governmental and Third Party Authorizations**.   No consent, approval or authorization of, declaration to or filing or registration with, any Governmental Entity or any other Person is required to be made or obtained in connection with the execution, delivery and performance by Buyer of this Agreement or any Ancillary Document or the consummation by Buyer of the transactions contemplated by this Agreement or any Ancillary Document.

5.5   **Noncontravention**.   The execution, delivery and performance by Buyer of this Agreement or any Ancillary Documents, and the consummation of the transactions contemplated hereby and thereby, will not (a) violate the Organizational Documents of Buyer, (b) violate any Law or Order, in each case applicable to Buyer, or (c) constitute a default under, or give rise to termination, cancellation or acceleration of any right or obligation of Buyer or to a loss of any benefit to which Buyer is entitled, under any contract, agreement, instrument, commitment or arrangement binding upon Buyer.

5.6     **Brokers**.  Except for Stump & Company (whose fees shall be paid by Buyer pursuant to a separate agreement), no investment banker, broker, finder or other intermediary is or will be entitled to any fee or commission from Buyer or any of its Affiliates in connection with the transactions contemplated by this Agreement or any of the Ancillary Documents.

5.7     **Proceedings**.  There are no Proceedings pending or, to the knowledge of Buyer, threatened against Buyer or any of its Affiliates that seek or otherwise are reasonably expected to (x) materially adversely affect the ability of Buyer to consummate the transactions contemplated by this Agreement and the Ancillary Documents or (y) prevent, enjoin or otherwise delay the transactions contemplated by this Agreement.

5.8     **Financial Capability**.

(a)     Sufficient Funds.  On the Closing Date, Buyer will have unrestricted funds available sufficient to (i) consummate the transactions contemplated by this Agreement, including to make all payments at the Closing contemplated by Section 3.2(a), including payment of the Purchase Price; and (ii) pay all costs and expenses and other amounts required to be paid by Buyer in connection with the Closing or otherwise.  At Closing, Buyer will have the resources and capabilities (financial or otherwise) to perform all of its obligations hereunder, and Buyer has not incurred any Liability or restriction of any kind that would impair or adversely affect such resources and capabilities.

(b)     Obligations Not Conditioned on Financings.  In no event shall the receipt or availability of any funds by Buyer or any Affiliate or any other financing be a condition to any of Buyer's obligations under this Agreement.  Buyer understands and acknowledges and agrees that under the terms of this Agreement, Buyer's obligation to consummate the transactions contemplated by this Agreement is not in any way contingent upon or otherwise subject to Buyer's consummation of any financing arrangements, Buyer's obtaining any financing, or the availability, grant, provision or extension of any financing to Buyer.

5.9     **Solvency**.  Buyer is solvent (a) as of the date of this Agreement and (b) at and immediately after the Closing, after giving effect to the transactions contemplated hereby (including the payment of the Purchase Price and all other amounts required to be paid, borrowed or refinanced in connection with the consummation of the transactions contemplated by this Agreement and all related fees and expenses).

5.10    **Independent Investigation**.   Buyer has conducted its own independent investigation, review and analysis of Seller, the Business, the Purchased Assets and the Assumed Liabilities (and the Material Customers and Material Suppliers in connection with the foregoing), and acknowledges that it has been provided adequate access to the personnel, properties, premises, and other documents and data of Seller for such purpose. Buyer acknowledges and agrees that: (a) in making its decision to enter into this Agreement and consummate the transactions contemplated by this Agreement, Buyer has relied solely upon its own investigation and the express representations and warranties of Seller set forth in Article IV of this Agreement (including related portions of the Seller Disclosure Schedules); and (b) neither Seller nor any other Person has made any representation or warranty as to Seller, the Business, the Purchased Assets or the Assumed Liabilities, except as expressly set forth in Article IV of this Agreement.  Subject to the foregoing,

-29-

Buyer will accept the Purchased Assets at the Closing "AS IS, WHERE IS, and "WITH ALL FAULTS."  In connection with Buyer's investigation of Seller, Buyer and its Affiliates may have received from or on behalf of Seller certain estimates, projections, forecasts and plans, including projected statements of operating revenues and income from operations of Seller and certain business plan information of Seller.  Buyer acknowledges that there are uncertainties inherent in attempting to make any such estimates, projections and other forecasts and plans, that Buyer is familiar with such uncertainties, that Buyer is taking full responsibility for making its own evaluation of the adequacy and accuracy of all estimates, projections and other forecasts and plans so furnished to it (including the reasonableness of the assumptions underlying such estimates, projections and forecasts), and that Buyer shall have no claim against Seller or any of its Affiliates or any Representatives of any of the foregoing with respect thereto.  However, nothing contained in this <u>Section 5.10</u> shall be deemed to limit or restrict in any manner any rights or remedies which Buyer has, or may have at Law, in equity or otherwise, based on fraud, willful misrepresentation or willful breach of warranty hereunder.

5.11    **<u>Exclusivity of Representations and Warranties</u>**.  Except as set forth in this <u>Article V</u>, neither Buyer nor any other Person is making any representation or warranty of any kind or nature whatsoever, oral or written, express or implied, relating to Buyer or its Affiliates, and Buyer hereby disclaims any such other representations or warranties.

## ARTICLE VI
## PRE-CLOSING COVENANTS

6.1    **<u>Conduct of Business</u>**.  Subject to the requirements the Bankruptcy Code and as Buyer may otherwise consent to in writing (which consent shall not be unreasonably withheld, conditioned or delayed), from the date hereof through the Closing or the termination of this Agreement in accordance with its terms:

(a)    Seller shall use reasonable best efforts:

(i)    to continue to operate the Business in the Ordinary Course of Business, subject to the limitations imposed by the Bankruptcy Code and any applicable budget approved by Wells Fargo Bank, N.A.;

(ii)    to maintain the material items of Tangible Personal Property in the same condition as they were on the date of this Agreement, subject to reasonable wear and tear and disposal consistent with the Ordinary Course of Business;

(iii)    to perform all of its post-petition obligations under all Assigned Contracts (but, specifically excluding the obligation to pay any cure amounts owing to the counterparties thereto);

(iv)    to maintain its Books and Records in accordance with past practice; and

(v)    to comply in all material respects with all applicable Laws.

(b)    Seller shall not:

(i) subject any material Purchased Assets to any Lien, except for any Lien secured and granted pursuant to any cash collateral or financing order entered by the Bankruptcy Court;

(ii) make any loans or advances outside the Ordinary Course of Business, or make any loans or advances (whether or not outside the Ordinary Course of Business) to any Affiliate of any Seller (other than another Seller);

(iii) incur, create, assume, guarantee or become liable for any indebtedness for borrowed money other than pursuant to any cash collateral or financing order entered by the Bankruptcy Court.

(iv) sell, lease, transfer, or assign any material Purchased Assets other than in the Ordinary Course of Business;

(v) make any increase to the base compensation of any of its directors, managers, Employees, or officers, except in the Ordinary Course of Business or as may be required by any Law or Contract;

(vi) enter into any employment Contract or collective bargaining agreement;

(vii) terminate any Assigned Contract (other than upon any expiration of the term of any Assigned Contract), materially amend any Assigned Contract, or enter into any Contract that would be an Assigned Contract if such Contract was in effect on the date hereof, in each case, other than in the Ordinary Course of Business; or

(viii) agree to do any of the foregoing.

(c) The provisions of this Section 6.1 are not intended to be, nor will they be construed as, an endeavor on the part of Seller or Buyer to implement the transactions contemplated hereunder prior to the Closing (and satisfaction of the conditions in Article VIII), and the Parties agree that Buyer will not prior to the Closing be entitled to exercise any control over the business or affairs of Seller.

6.2 **Pre-Closing Access to Information**.

(a) From and after the date hereof until the earlier of the Closing Date or the termination of this Agreement in accordance with its terms, upon reasonable notice, and subject to restrictions contained in any confidentiality agreements to which Seller is subject, Seller shall provide Buyer and its authorized Representatives during regular business hours reasonable access to all accountants, counsel, financial advisors and other authorized outside representatives, officers, senior management and employees of Seller in their respective principal place of business, the Seller's books, records, documents, data (including financial and operating data) and other information regarding Seller, and all offices and other facilities of the Seller related to the Business (in a manner so as to not unreasonably interfere with the normal business operations of Seller). Notwithstanding anything to the contrary set forth in this Agreement, during the period from the date hereof until the Closing, neither Seller nor any of its Affiliates (including Seller) shall be

-31-

required to disclose to Buyer or any of its Representatives (i) any information (A) if doing so would violate any Contract, fiduciary duty or Law to which Seller or any of its Affiliates (including Seller) is a party or is subject, (B) if Seller reasonably determined upon the advice of counsel that doing so could result in the loss of the ability to successfully assert attorney-client and work product privileges, (C) if Seller or any of its Affiliates, on the one hand, and Buyer or any of its Affiliates, on the other hand, are adverse parties in a litigation and such information is reasonably pertinent thereto, or (D) if Seller reasonably determines that such information should not be disclosed due to its competitively sensitive nature or (ii) any information relating to Taxes or Tax Returns other than information relating to Seller.  For the avoidance of all doubt, nothing in this Section 6.1(a) shall be deemed to give rise to a contingency, condition or similar right regarding Buyer's satisfaction with any information of any kind to which Buyer is given access prior to the Closing Date.

(b)     All information disclosed pursuant to Section 6.2(a), together with the terms of this Agreement and the information disclosed on Seller Disclosure Schedules, shall be treated as "Confidential Information" pursuant to the terms of the Confidentiality Agreement, the provisions of which are by this reference hereby incorporated herein.

6.3     **Supplemental Disclosure**.  From time to time prior to the Closing, Seller shall have the right (but not the obligation) to supplement or amend the Seller Disclosure Schedules with respect to any matter arising after the date hereof or, with respect to representations and warranties qualified by Seller's Knowledge, of which Seller becomes aware after the date hereof (each a "Schedule Supplement"), and each such Schedule Supplement shall automatically be deemed to be incorporated into and to supplement and amend the Seller Disclosure Schedules.   Any disclosure in any such Schedule Supplement shall not be deemed to have cured any inaccuracy in or breach of any representation or warranty contained in this Agreement, including for purposes of termination rights contained in this Agreement or of determining whether or not the conditions in Article VIII have been met; provided that if as a result of matters disclosed in such Schedule Supplement, Buyer has the right to (pursuant to Section 9.1), but does not elect to, terminate this Agreement within five (5) Business Days of its receipt of such Schedule Supplement, then Buyer shall conclusively be deemed to have waived all conditions to its obligations hereunder or rights to terminate this Agreement with respect to the matters disclosed therein under Section 8.1 and Section 9.1 or otherwise.

6.4     **Efforts to Close**.

(a)     Subject to the terms of this Agreement, each of Buyer and Seller shall use their reasonable best efforts to cause the conditions to Closing to be satisfied and for the Closing to occur as promptly as reasonably practicable.

(b)     In the event any Proceeding by any Governmental Entity or other Person is commenced which challenges the validity or legality of the transactions contemplated hereby or seeks damages in connection therewith, the Parties agree to cooperate and use reasonable best efforts to defend against such Proceeding and, if an injunction or other order is issued in any such action, suit or other proceeding, the Parties agree to take reasonable actions to have such injunction or other order lifted, in order to expeditiously consummate the consummation of the transactions contemplated by this Agreement prior to the Outside Date; *provided that* nothing in this

Section 6.4(b) shall be deemed to extend or otherwise affect the Outside Date or the Parties' rights in connection therewith.

(c)     Buyer expressly acknowledges and agrees that (i) Seller and its Affiliates have no responsibility for any financing that Buyer may seek to raise in connection with the consummation of the transactions contemplated by this Agreement, (ii) it is not a contingency or condition to Closing under this Agreement (nor to the consummation of the transactions contemplated by this Agreements and the Ancillary Documents), for Buyer to obtain any equity, debt or other type of financing whatsoever for such transactions, and (iii) Buyer does not have the right to terminate this Agreement or to otherwise refuse to consummate such transactions by reason of Buyer's failure to obtain financing for its acquisition.

6.5     **Contact with Customers, Suppliers and Other Business Relations**.  During the period from the date of this Agreement until the earlier of the Closing or the termination of this Agreement in accordance with its terms, Buyer hereby agrees that it is not authorized to and shall not (and shall not permit any of its Representatives or Affiliates to) contact any employee, customer, supplier, distributor or other material business relation of Seller, regarding Seller, its business or the transactions contemplated by this Agreement without the prior written (including by e-mail) consent of Seller, which consent will not be unreasonably withheld, conditioned or delayed.

6.6     **Bankruptcy Matters**.

(a)     Approval Order. Promptly after the commencement of the Bankruptcy Case, Seller shall file a motion (the "Sale Motion") seeking an order (the "Approval Order") from the Bankruptcy Court, which, among other things, (i) approves the sale of the Purchased Assets to Buyer on the terms and conditions set forth in this Agreement and authorizes Seller to proceed with this transaction, (ii) includes a specific finding that Buyer is a good faith buyer of the Purchased Assets, (iii) orders Buyer to pay, concurrently with the Closing and as a condition to Seller's assumption and assignment thereof, all cure amounts owing to the counterparties to the Assigned Contracts, and (iv) states that the sale of the Purchased Assets to Buyer shall be free and clear of all Liens (other than Permitted Liens) to the extent provided in section 363(f)(3) of the Bankruptcy Code.  The form of the Approval Order shall be in form and substance reasonably satisfactory to Buyer.  If requested by Seller or the Bankruptcy Court, Buyer shall provide adequate assurance of future performance (satisfactory to the Bankruptcy Court) to the counterparties to the Assigned Contracts.  Following the filing of the Sale Motion, Seller shall use reasonable best efforts to obtain the Approval Order.  If the Bankruptcy Court refuses to issue the Approval Order, then Buyer or Seller may terminate this Agreement in accordance with Section 9.1(h).  In the event that a third party is approved by the Bankruptcy Court as the purchaser of the Purchased Assets at the hearing on the Sale Motion, notwithstanding anything to the contrary in this Agreement, this Agreement shall not terminate, but rather shall become a "back-up bid" which shall remain open for acceptance by Seller for a period of fifteen (15) days following the Outside Date.  Upon entry of the Approval Order in accordance with the provisions of this Section 6.6, the conditions set forth in Section 8.1(e) and Section 8.2(e) shall be deemed satisfied.

(b)     Procedures Order. The transaction contemplated by this Agreement shall be conducted in all respects in accordance with the process and procedures established in and the

-33-

provisions of the Procedures Order, which shall be in form and substance reasonably satisfactory to Buyer, and Buyer agrees to be bound by the Procedures Order and the obligations thereunder, including in connection with, among other things, bidding, overbidding, the sale auction, refraining from collusion, return of deposits, and standing as a backup bidder for the Purchased Assets shall be as established and determined in accordance with the Procedures Order.

(c)     Competing Bids.  This Agreement and the transactions contemplated hereby are subject to Sellers' right and ability to consider the higher or better competing bids with respect to the Business and the Purchased Assets in accordance with the Procedures Order.  In furtherance thereof, Seller shall have the right to, and may cause its Representatives and Affiliates to, (a) initiate contact with, solicit or encourage submission of any inquiries, proposals, offers or bids by, and negotiate with, any Person (in addition to Buyer and its Affiliates) in connection with any sale or other disposition of the Purchased Assets and (b) respond to any request for information or due diligence inquiry, or make management available for such purposes, to any such Person.

(d)     Winding Up; Dissolution; Liquidation.  Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall prohibit Seller from ceasing its operations or winding up its affairs at any time after the Closing Date, it being acknowledged and agreed by Buyer that Seller intends to wind up its affairs and liquidate and dissolve its existence as soon as reasonably practicable following the Closing Date or the consummation of a liquidating plan under Chapter 11 of the Bankruptcy Code.

6.7     **Access to Books and Records**.  After the Closing, Buyer and Seller shall use reasonable best efforts to maintain until the fifth anniversary of the Closing Date all Books and Records relating to Seller or any of their assets or liabilities prior to the Closing in the manner such Books and Records are maintained immediately prior to the Closing Date in all material respects. For a period of five (5) years following the Closing, (a) Seller or any of its Representatives, upon reasonable notice, shall have access during normal business hours to examine, inspect and copy such Books and Records, and (b) Buyer shall provide Seller and its Representatives with, or cause to be provided to Seller and its Representatives, such Books and Records as Seller or its Representatives shall reasonably request in connection with any Proceeding to which Seller is a party (including, without limitation, in connection with Seller's (or its successor's) administration of the Bankruptcy Case) or in connection with the requirements of any Laws applicable to Seller. Seller and its Representatives shall have the right to make copies of such Books and Records at Seller's sole cost.  Buyer shall not be obligated to provide the other party with access to any books or records (including personnel files) pursuant to this Section 6.7 where such access would violate any Law or any attorney-client privilege. Buyer may require Seller and its Representatives to execute a non-disclosure agreement prior to providing access to Books and Records. For the avoidance of doubt, any information provided to Sellers pursuant to this Section 6.7 shall be treated as Confidential Information.

6.8     **Employee Matters**.

(a)     Effective as of immediately before the Closing, Buyer may offer employment, on terms of employment generally consistent with those provided by Seller as of just prior to the Closing, to the employees of Seller or any subsidiary of Seller not being purchased pursuant to this Agreement.  All such employees who satisfy Buyer's standard pre-employment

-34-

screening process and accept such offers of employment with are hereinafter referred to as the "Transferred Employees" and such acceptance of offers shall be effective immediately after the Closing.

(b)     Nothing contained herein is intended to or shall (i) confer upon any Transferred Employee any separate right to employment or continued employment with Seller, Buyer or any of their respective Affiliates or any benefits under any applicable Benefit Plan or Buyer Benefit Plan, (ii) create any third-party beneficiary rights or other rights of any kind with respect to any Person other than the parties to this Agreement, or (iii) constitute an employee.

(c)     The provisions of this Section 6.8 are for the sole benefit of the Parties and nothing herein, express or implied, is intended or shall be construed to (i) constitute the establishment or adoption of or an amendment to any employee benefit plan for purposes of ERISA or otherwise be treated as an amendment or modification of any Benefit Plan or other compensation or benefit plan, agreement or arrangement, (ii) limit the right of Seller, Buyer or any of their respective Affiliates to amend, terminate or otherwise modify any Benefit Plan or other compensation or benefit plan, agreement or arrangement, (iii) prevent or restrict in any way the right of Buyer or any of its Affiliates to terminate, reassign, promote or demote any of the Employees after the Closing or to change the title, powers, duties, responsibilities, functions, locations or terms and conditions of employment of such Employees, or (iv) confer upon or give any Person, other than the Parties and their respective permitted successors and assigns, any legal or equitable third-party beneficiary or other rights or remedies with respect to the matters provided for in this Section 6.8, under or by reason of any provision of this Agreement.

6.9     **Treatment of Inventory**.  Prior to Closing, neither Seller nor any Purchased Subsidiary shall, without the prior written consent of Buyer, (i) make or agree to make any bulk sales of inventory to any liquidator or wholesaler, (ii) sell or dispose of any inventory qualifying as a Current Asset hereunder at prices below the first cost book value of such inventory, or (iii) sell or dispose of any inventory acquired prior to January 1, 2023 (and not constituting a Current Asset) at a discount or promotional rate that is 30% or more from the first cost book value of such inventory.

## ARTICLE VII
## COVENANTS OF BUYER AND SELLERS

7.1     **Public Announcements**.  Neither Buyer nor Seller shall, nor shall any of their respective controlled Affiliates (including, with respect to Seller prior to the Closing, and Buyer after Closing, Seller), without the prior written approval of both Buyer and Seller, issue any press release or otherwise make any public statement with respect to this Agreement or the transactions contemplated by this Agreement (any such press release or public statement so approved by the Parties, an "Agreed Statement"), *provided that* such restrictions on press releases and public statements shall not apply to (i) any disclosure as may be required by applicable Law or by obligations pursuant to any listing agreement with any national securities exchange or stock market, in which case the Party required to make the release or announcement shall allow the other Party reasonable time to comment on such release or announcement in advance of such issuance, (ii) any disclosure made in connection with the enforcement of any right or remedy relating to this Agreement or the Ancillary Documents or the transactions contemplated hereby or thereby,

(iii) any disclosure that is consistent with (and does not reveal any information beyond what is already included in) a prior Agreed Statement, or (iv) any disclosure or statement made in the Bankruptcy Case that is required in connection with the filing of the Bankruptcy Case or appropriate in the furtherance of such filing, the administration of the Bankruptcy Case, or the transactions contemplated herein (including, without limitation, the Sale Motion)..

      7.2    **Tax Matters**.

      (a)    <u>Prorations</u>.  Personal property, ad valorem, use and intangible taxes and assessments, common area maintenance charges, utility charges and rental payments with respect to the Purchased Assets and the Leased Real Property included in the Assumed Contracts (collectively, "<u>Charges</u>") shall be prorated on a per diem basis and apportioned on a calendar year basis between Seller, on the one hand, and Buyer, on the other hand, as of the date of the Closing. Seller shall be liable for that portion of such Charges relating to, or arising in respect of, periods on or prior to the Closing Date, and Buyer shall be liable for that portion of such Charges relating to, or arising in respect of, any period after the Closing Date; provided, however, for avoidance of doubt, in no event shall Buyer be liable for fees or penalties assessed after the Closing Date for breaches occurring on or prior to the Closing Date.

      (b)    <u>Transfer Taxes</u>.  Buyer shall pay all Transfer Taxes arising out of or in connection with the transactions contemplated by this Agreement.  Seller shall cooperate with Buyer by delivering to Buyer such resale or similar certificates as may be applicable, however. Buyer shall file all necessary Tax Returns and other documentation with respect to all such Transfer Taxes and if required by applicable Law, Seller shall join in the execution of any such Tax Returns and other documentation.

      (c)    <u>Allocation of Purchase Price</u>.  The Purchase Price and other items required to be included thereunder shall be allocated among the Purchased Assets by Buyer.  No later than 30 days following the Closing, Buyer shall prepare and provide to Seller a proposed allocation (the "<u>Allocation</u>") for Seller's review. Seller shall have 30 days to review the Allocation.  If Seller does not notify Buyer in writing of any objections within such 30-day period or if Seller and Buyer resolve all such objections, none of the Parties, nor any of their respective Affiliates, shall take any position (whether in financial statements, audits, tax returns or otherwise) which is inconsistent with the Allocation, unless required to do so by applicable Law.  If prior to the end of such 30-day period, Buyer and Seller are unable to so agree on the Allocation then such Allocation shall not be binding on the Parties.  Seller shall timely and properly prepare, execute, file and deliver all documents, forms and other information as Buyer may reasonably request to prepare the Allocation.  In the event that the Allocation is binding on the Parties, (i) in case of any adjustment to the Purchase Price, requiring an amendment to the Allocation, Buyer shall prepare and deliver such amended Allocation to Seller, which shall be prepared in a manner consistent with the Allocation, and (ii) if the Allocation is disputed by any Governmental Entity, the Party receiving notice of such dispute shall promptly notify the other Party.

**ARTICLE VIII**
**CONDITIONS TO CLOSING**

8.1    **Conditions to Obligation of Buyer**.  The obligation of Buyer to consummate the transactions contemplated by this Agreement is subject to the satisfaction (or waiver by Buyer in writing and in Buyer's sole discretion) of the following conditions:

(a)    The representations and warranties of Seller contained in Article IV of this Agreement shall be true and correct (without giving effect to any materiality or Material Adverse Effect qualifications set forth herein) in all respects as of the date of this Agreement and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects), except where the failure of such representations and warranties to be true and correct would not have a Material Adverse Effect.

(b)    Seller shall have performed or complied in all material respects with all obligations and covenants required by this Agreement to be performed or complied with by Seller, on or prior to the Closing Date.

(c)    Buyer shall have received a certificate, dated as of the Closing Date and signed by an authorized officer of Seller, to the effect that the conditions set forth in Sections 8.1(a) and 8.1(b) have been satisfied (the "Seller Closing Certificate").

(d)    No temporary restraining order, preliminary or permanent injunction or other Order preventing the consummation of the transactions contemplated by this Agreement shall be in effect, and there shall be no proceeding brought by any Governmental Entity pending before any court of competent jurisdiction seeking such an Order.

(e)    The Bankruptcy Court shall have entered the Approval Order in accordance with Section 6.6(a), and the Approval Order shall be unstayed and in full force and effect as of the Closing Date.

(f)    Seller has made or is prepared to immediately make all of the deliveries required by Section 3.2(b).

8.2    **Conditions to Obligation of Seller**.  The obligation of Seller to consummate the transactions contemplated by this Agreement is subject to the satisfaction (or waiver by Seller, in writing and in Seller's sole discretion) of the following conditions:

(a)    The representations and warranties of Buyer set forth in Article V of this Agreement shall be true and correct in all respects as of the date of this Agreement and as of the Closing Date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects), except where the failure of such representations and warranties to be true and correct would not have a not have a material adverse effect on Buyer's ability to consummate the transactions contemplated hereby.

DOCS_SF:109415.13 61051/001

(b)     Buyer shall have performed or complied in all material respects with all obligations and covenants required by this Agreement to be performed or complied with by Buyer on or prior to the Closing Date.

(c)     Seller shall have received a certificate dated as of the Closing Date by an authorized officer of Buyer to the effect that the conditions set forth in <u>Sections 8.2(a)</u> and <u>8.2(b)</u> have been satisfied (the "<u>Buyer Closing Certificate</u>").

(d)     No temporary restraining order, preliminary or permanent injunction or other Order preventing the consummation of the transactions contemplated by this Agreement shall be in effect, and there shall be no proceeding brought by any Governmental Entity pending before any court of competent jurisdiction seeking such an Order.

(e)     The Bankruptcy Court shall have entered the Approval Order in accordance with <u>Section 6.6(a)</u>, and the Approval Order shall be unstayed and in full force and effect as of the Closing Date.

(f)     Buyer has made or is prepared to immediately make all of the deliveries required by <u>Sections 3.2(a)</u> and <u>3.2(c)</u>.

8.3     **<u>Frustration of Closing Conditions</u>**.  No Party may rely on or assert the failure of any condition set forth in this <u>Article VIII</u>, as the case may be, if such failure results from or was caused primarily by such Party's failure to comply with any provision of this Agreement.

**ARTICLE IX**
**TERMINATION**

9.1     **<u>Termination</u>**.  This Agreement may be terminated, and the transactions contemplated herein may be abandoned, prior to the Closing solely as follows; *provided that* any Party desiring to terminate this Agreement pursuant to this <u>Section 9.1</u> shall give written notice of such termination to the other Parties to this Agreement:

(a)     by the mutual written consent of Seller and Buyer;

(b)     by Buyer, if any of the representations or warranties of Seller set forth in <u>Article IV</u> shall not be true and correct such that the condition to Closing set forth in <u>Section 8.1(a)</u> would not be satisfied and the breach or breaches causing such representations or warranties not to be true and correct is not cured within five (5) days after written notice thereof is delivered from Buyer to Seller; *provided that* Buyer shall provide supporting documentation with any such notice of termination pursuant to this <u>Section 9.1(b)</u>; *provided further that* Buyer shall not have the right to terminate this Agreement pursuant to this <u>Section 9.1(b)</u> if Buyer is then in material violation or breach of any of its covenants, obligations, representations or warranties set forth in this Agreement and such violation or breach would give rise to the failure of a condition set forth in <u>Section 8.2(a)</u> or <u>Section 8.2(b)</u>;

(c)     by Seller, if any of the representations or warranties of Buyer set forth in <u>Article V</u> shall not be true and correct such that the condition to Closing set forth in <u>Section 8.2(a)</u> would not be satisfied and the breach or breaches causing such representations or warranties not

to be true and correct is not cured within five (5) days after written notice thereof is delivered from Seller to Buyer; *provided that* Seller shall not have the right to terminate this Agreement pursuant to this <u>Section 9.1(c)</u> if Seller is then in material violation or breach of any of its covenants, obligations, representations or warranties set forth in this Agreement and such violation or breach would give rise to the failure of a condition set forth in <u>Section 8.1(a)</u> or <u>Section 8.1(b)</u>;

(d)    by Buyer or Seller, if the Closing shall not have occurred on or before the date that is no later than October 31, 2023 (the "<u>Outside Date</u>"); *provided that* a Party shall not have the right to terminate this Agreement pursuant to this <u>Section 9.1(d)</u> if the failure of the Closing to occur by the Outside Date results from or was caused by the failure of the Party seeking to terminate this Agreement to comply with any provisions of this Agreement, including, without limitation, <u>Section 6.4</u>; *provided further* that to the extent the Closing has not occurred by the Outside Date, and the failure of Closing to occur was not as a result of actions by Buyer, Buyer shall have an allowable claim for the full amount of the Termination Fee. If Closing has not occurred by the Outside Date, Seller shall use reasonable best efforts to request that Wells Fargo Bank, N.A., as lender to Seller, agrees to extend the Outside Date by up to seven (7) days;

(e)    by either Buyer or by Seller, if any Governmental Entity shall have issued an Order or taken any other action permanently enjoining, restraining or otherwise prohibiting the Closing and such Order or other action shall have become final and nonappealable; *provided that* the Party seeking to terminate this Agreement pursuant to this <u>Section 9.1(e)</u> shall have used reasonable best efforts to remove such Order, injunction, restraint or prohibition, and such Order, injunction, restraint or prohibition shall not have been principally caused by the breach by such Party of its covenants or agreements under this Agreement;

(f)    by Seller, if all of the conditions set forth in <u>Section 8.2</u> (not including conditions which are to be satisfied by actions taken at the Closing; *provided that* such conditions shall have been capable of being satisfied as of the date of termination of this Agreement) have been satisfied or validly waived by Buyer, Seller has given notice to Buyer in writing that Seller is prepared to consummate the transactions contemplated by this Agreement (a "<u>Seller Closing Notice</u>"), and Buyer fails to consummate the transactions contemplated by this Agreement on the date the Closing should have occurred pursuant to <u>Section 3.1</u>, or, if later, on the third (3rd) Business Day immediately following the date of delivery of such Seller Closing Notice;

(g)    by Buyer, if all of the conditions set forth in <u>Section 8.1</u> (not including conditions which are to be satisfied by actions taken at the Closing; *provided that* such conditions shall have been capable of being satisfied as of the date of termination of this Agreement) have been satisfied or validly waived by Seller, Buyer has given notice to Seller in writing that Buyer is prepared to consummate the transactions contemplated by this Agreement (a "<u>Buyer Closing Notice</u>"), and Seller fails to consummate the transactions contemplated by this Agreement on the date the Closing should have occurred pursuant to <u>Section 3.1</u>, or, if later, on the third (3rd) Business Day following the date of delivery of such Buyer Closing Notice; or

(h)    by Seller or Buyer, if the Bankruptcy Court does not issue the Approval Order in accordance with <u>Section 6.6(a)</u>, subject to this Agreement becoming a "back-up" bid under certain circumstances consistent with the requirements of <u>Section 6.6(a)</u>.

9.2     **Effect of Termination; Termination Fee.**

(a)     <u>Effect of Termination</u>.  In the event of the termination of this Agreement pursuant to <u>Section 9.1</u>, this entire Agreement shall forthwith become void (and there shall be no liability or obligation on the part of Buyer, Seller or its officers, directors or equity holders) with the exception of (i) the provisions of <u>Section 3.2(a)(i)</u>, <u>Section 6.2(b)</u>, <u>Section 9.1</u>, this <u>Section 9.2</u> and <u>Article XI</u>, together with all applicable defined terms set forth in <u>Article I</u>, each of which provisions shall survive such termination and remain valid and binding obligations of the Parties and (ii) any liability of any Party for any willful breach of this Agreement prior to such termination. For the avoidance of doubt, the Confidentiality Agreement shall survive any termination of this Agreement in accordance with its terms and shall automatically be extended until such date that is two (2) years following the date of termination of this Agreement, and nothing in this <u>Article IX</u> shall be construed to discharge or relieve any party to the Confidentiality Agreement of its obligations thereunder.

(b)     <u>Termination Fee</u>.  If (x) (i) this Agreement is terminated pursuant to <u>Section Section 9.1(h)</u>; (ii) the Bankruptcy Court approves a third party as the purchaser of the Purchased Assets at the hearing on the Sale Motion (or any subsequent sale), and (iii) such alternative sale closes, or (y) this Agreement is terminated pursuant to <u>Section 9.1(d)</u>, then, subject to the approval of the Bankruptcy Court (which Seller shall seek through the Procedures Order), Seller shall pay to Buyer (solely, in the case of a termination pursuant to clause (x) above, from the proceeds of such alternative sale), a fee of **$3,400,000.00** and reimburse actual and reasonable documented expenses incurred by Buyer in connection with this Agreement up to **$550,000** (the "<u>Termination Fee</u>"), by wire transfer of immediately available funds no later than five (5) Business Days after such sale closing. The claim of Buyer in respect of the Termination Fee shall constitute a superpriority administrative expense claim, senior to all other administrative expense claims of Seller other than any carve-out and any administrative claims or debtor-in-possession financing obligations arising under any cash collateral or financing order entered by the Bankruptcy Court, as administrative expenses under sections 503 and 507(b) of the Bankruptcy Code in the Bankruptcy Case and shall be paid in cash (solely, in the case of clause (x) above, from the sale proceeds from any alternative sale or sales).  The Parties agree that the Termination Fee is not a penalty, but is liquidated damages in a reasonable amount that will compensate Buyer in circumstances in which the Termination Fee is payable, which amount would otherwise be impossible to calculate with precision, and that the Termination Fee shall be Buyer's sole and exclusive remedy with respect to such termination. For the avoidance of doubt, nothing set forth herein with respect to the Termination Fee is intended to preclude Buyer, upon a termination by Buyer pursuant to <u>Section 9.1</u>, from pursuing any remedies at law or in equity available to it as a result of Seller's breach hereof.

<div align="center">

**ARTICLE X**
**SURVIVAL AND RELEASE**

</div>

10.1     **Survival**.  None of the representations and warranties of the Parties in this Agreement, in any instrument delivered pursuant to this Agreement, in the Seller Disclosure Schedules or any Exhibits attached hereto shall survive Closing, and no Party shall, or shall be entitled to, make any claim or initiate any action against any other Party with respect to any such representation or warranty from or after the Closing.  None of the covenants or agreements of the

<div align="center">-40-</div>

Parties in this Agreement shall survive Closing, and no Party hereto shall, or shall be entitled to, make any claim or initiate any action against any other Party with respect to any such covenant or agreement from or after the Closing, other than (a) the covenants and agreements of the Parties contained in this Article X, Section 3.2 and Section 7.1, which shall survive the consummation of the transactions until fully performed in accordance with their respective terms, (b) those other covenants and agreements contained herein that by their terms apply, or are to be performed in whole or in part, after the Closing, which shall survive the consummation of the transactions until fully performed in accordance with their respective terms and (c) any rights or remedies of any Person for breach of any such surviving covenant or agreement.  However, nothing contained in this Section X shall be deemed to limit or restrict in any manner any rights or remedies which Buyer or Seller has, or may have at Law, in equity or otherwise, based on intentional fraud, willful misrepresentation or willful breach of warranty hereunder.

## ARTICLE XI
## MISCELLANEOUS

11.1    **Notices**.    Any notice, request, demand, waiver, consent, approval or other communication which is required or permitted hereunder shall be in writing and shall be deemed given: (a) on the date established by the sender as having been delivered personally, (b) on the date delivered by a private courier as established by the sender by evidence obtained from the courier, (c) on the date delivered by email (if sent prior to 5:00 p.m.  New York City time, or if sent later, then on the next Business Day), or (d) on the fifth Business Day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid.  Such communications, to be valid, must be addressed as follows:

If to Buyer, to:

GigaCloud Technology Inc
118 Brea Canyon Road
Walnut, CA 91789
Attn: Iman Schrock, President
Email: iman.schrock@gigacloudtech.com

With a required copy (which shall not constitute notice) to:

Moore & Van Allen
100 North Tryon Street, Suite 4700
Charlotte, NC 28202
Attn: Steven Gruendel
Email: stevegruendel@mvalaw.com

If to Seller, to:

Noble House Home Furnishings LLC
c/o Riveron Consulting, LLC
265 Franklin Street, 10th Floor
Boston, MA 02110

Attn: Gayla Bella, Chief Financial Officer
Email: gayla.bella@riveron.com

-and-

c/o Melissa Gelbart
21325 Superior Street
Chatsworth, CA 91311
Email: melissag@noblehousefurniture.com

With a required copy (which shall not constitute notice) to:

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd, Suite 1300
Los Angeles, CA 90067
Attn: Teddy Kapur and Maxim B. Litvak
E-mail: tkapur@pszjlaw.com; mlitvak@pszjlaw.com

or to such other address or to the attention of such Person or Persons as the
recipient Party has specified by prior written notice to the other Parties hereto.

11.2   **Amendments and Waivers**.  Any provision of this Agreement may be amended
or waived if, and only if, such amendment or waiver is in writing and is duly executed, in the case
of an amendment, by each Party to this Agreement, or in the case of a waiver, by the Party against
whom the waiver is to be effective.  No failure or delay by any Party in exercising any right or
privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof
preclude any other or further exercise thereof or the exercise of any other right, power or privilege.
Any waiver of any term or condition shall not be construed as a waiver of any subsequent breach
or a subsequent waiver of the same term or condition, or a waiver of any other term or condition
of this Agreement.

11.3   **Expenses**.  Except as otherwise provided in this Agreement, each Party shall bear
its own costs and expenses in connection with the negotiation, documentation and consummation
of the transactions contemplated by this Agreement, including all legal, accounting, financial
advisory, consulting and all other fees and expenses of third parties, whether or not the transactions
contemplated by this Agreement are consummated.

11.4   **Successors and Assigns**.  This Agreement may not be assigned by any Party
(whether by operation of law or otherwise) without the prior written consent of the other Parties.
Subject to the foregoing, all of the terms and provisions of this Agreement shall inure to the benefit
of and be binding upon the Parties and their respective permitted successors and assigns. Buyer.
Notwithstanding the foregoing, Buyer may assign, in whole or in part, its rights under this
Agreement without Seller's consent to an entity that is under common control of Buyer or in which
Buyer has a significant equity interest, provided written notice thereof is delivered to Seller prior
to the Closing.  Such assignee will execute an instrument whereby such assignee assumes the
obligations of such Buyer under this Agreement. No assignment by Buyer shall release or

-42-

otherwise relieve such Buyer from any obligations hereunder. Any attempted or purported assignment that is not in accordance with the terms of this <u>Section 11.4</u> shall be void *ab initio*.

11.5   **Governing Law**.  This Agreement and the exhibits and schedules hereto shall be governed by and interpreted and enforced in accordance with the Laws of the State of Delaware, without giving effect to any choice of Law or conflict of Laws rules or provisions (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware.

11.6   **Consent to Jurisdiction; Service of Process; Waiver of Jury Trial**.  Any suit, action or other proceeding arising out of or relating to this Agreement or any transaction contemplated hereby shall be brought exclusively in the shall be brought exclusively in the Bankruptcy Court.  Each of the Parties hereby irrevocably submits to the exclusive jurisdiction of such court for the purpose of any such suit, action or other proceeding.  A final judgment in any such suit, action or other proceeding may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.  Each Party irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement or the transactions contemplated hereby in such court, and hereby irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.  Each Party further agrees that service of any process, summons, notice or document by U.S. registered mail to such Party's respective address set forth herein shall be effective service of process for any such action, suit or proceeding.  Nothing in this <u>Section 11.6</u>, however, shall affect the right of any Party to serve legal process in any other manner permitted by Law.  EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREBY OR THE ACTIONS OF SUCH PARTY IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE AND ENFORCEMENT HEREOF.

11.7   **Counterparts**.

(a)   This Agreement may be executed in counterparts, each of which when executed and delivered shall be deemed to be an original and all of which counterparts taken together shall constitute but one and the same instrument.  This Agreement shall become effective when each Party shall have received a counterpart hereof signed by the other Party.  The Parties agree that the delivery of this Agreement, the Ancillary Documents and any other agreements and documents at the Closing may be effected by means of an exchange of facsimile signatures or other electronic delivery.  Delivery of an executed counterpart of a signature page to this Agreement by facsimile or scanned pages shall be effective as delivery of a manually executed counterpart to this Agreement.

(b)   No Party shall raise the use of a facsimile machine or electronic transmission to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine or electronic transmission as a defense to the formation or enforceability of this Agreement and each Party forever waives any

such defense.  The words "execution," "executed," "signed," "signature," and words of like import in this Agreement shall include images of manually executed signatures transmitted by facsimile or other electronic format (including, without limitation, "pdf," "tif" or "jpg") and other electronic signatures (including, without limitation, SignNow and DocuSign).

11.8    **No Third Party Beneficiaries**.  No provision of this Agreement is intended to or shall confer upon any Person other than the Parties any rights or remedies of any nature whatsoever under or by reason of this Agreement.

11.9    **Entire Agreement**.  This Agreement, the Ancillary Documents, schedules, including the Seller Disclosure Schedules and the other documents, instruments and agreements specifically referred to herein or therein or delivered pursuant hereto or thereto, together with the Confidentiality Agreement, set forth the entire understanding of the Parties with respect to the subject matter hereof and the transactions contemplated hereby.  All schedules, including any Seller Disclosure Schedules, referred to herein are intended to be and hereby are specifically made a part of this Agreement and incorporated by reference herein.  Any and all previous agreements and understandings between or among the Parties regarding the subject matter hereof, whether written or oral, are superseded by this Agreement, except for the Confidentiality Agreement which shall continue in full force and effect in accordance with its terms.

11.10    **Disclosure Schedules**.  Except as otherwise provided in the Seller Disclosure Schedules, all capitalized terms therein shall have the meanings assigned to them in this Agreement.  Matters reflected in the Seller Disclosure Schedules are not necessarily limited to matters required by this Agreement to be disclosed.  No disclosure in the Seller Disclosure Schedules relating to any possible breach or violation of any agreement or Law shall be construed as an admission or indication that any such breach or violation exists or has actually occurred.

11.11    **Captions**.  All captions and section headings contained in this Agreement are for convenience of reference only, do not form a part of this Agreement and shall not affect in any way the meaning or interpretation of this Agreement.

11.12    **Remedies**.

(a)    Buyer agrees that irreparable damage would occur in the event that Buyer fails to perform any of the provisions of this Agreement in accordance with their specific terms. Accordingly, Seller shall be entitled to pursue specific performance of the terms hereof, including an injunction or injunctions to prevent breaches of this Agreement by Buyer and to enforce specifically the terms and provisions of this Agreement, this being in addition to any other remedy to which Seller is entitled at law or in equity.  Buyer hereby further waives (a) any defense in any action for specific performance that a remedy at law would be adequate and (b) any requirement under any law to post security as a prerequisite to obtaining equitable relief.

(b)    Seller agrees that irreparable damage would occur in the event that Seller fails to perform any of the provisions of this Agreement in accordance with their specific terms. Accordingly, Buyer shall be entitled to pursue specific performance of the terms hereof, including an injunction or injunctions to prevent breaches of this Agreement by Seller and to enforce specifically the terms and provisions of this Agreement, this being in addition to any other remedy

-44-

to which Buyer is entitled at law or in equity. Seller hereby further waives (i) any defense in any action for specific performance that a remedy at law would be adequate and (ii) any requirement under any law to post security as a prerequisite to obtaining equitable relief.

11.13  **Severability**.  Any provision of this Agreement which is invalid or unenforceable in any jurisdiction shall be ineffective to the extent of such invalidity or unenforceability without invalidating or rendering unenforceable the remaining provisions hereof, and any such invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.  Upon such determination that any term or other provision of this Agreement is invalid, illegal or unenforceable under applicable Law, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

11.14  **Interpretation**.  The Parties have participated jointly in the negotiation and drafting of this Agreement, and any rule of construction or interpretation otherwise requiring this Agreement to be construed or interpreted against any Party by virtue of the authorship of this Agreement shall not apply to the construction and interpretation hereof. The Parties agree that any drafts of this Agreement or any Ancillary Document prior to the final fully executed drafts shall not be used for purposes of interpreting any provision thereof, and each of the Parties agrees that no Party or any Affiliate thereof shall make any claim, assert any defense or otherwise take any position inconsistent with the foregoing in connection with any Proceeding among any of the foregoing.  For the purposes of this Agreement, except as otherwise expressly provided herein or unless the context otherwise requires:  (a) the meaning assigned to each term defined herein shall be equally applicable to both the singular and the plural forms of such term and vice versa, and words denoting either gender shall include both genders as the context requires; (b) where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning; (c) the terms "hereof," "herein," "hereunder," "hereby" and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement (including any exhibit or schedule hereto) as a whole and not to any particular provision of this Agreement; (d) when a reference is made in this Agreement to an Article, Section, paragraph, Exhibit or Schedule, such reference is to an Article, Section, paragraph, Exhibit or Schedule to this Agreement (provided that references to "Schedules" herein shall be deemed to refer to the applicable schedule of the Seller Disclosure Schedules), unless otherwise specified; (e) the word "include," "includes," and "including" when used in this Agreement shall be deemed to be followed by the words "but not limited to," unless otherwise specified; (f) the word "extent" in the phrase "to the extent" shall mean the degree to which a subject or other thing extends, and such phrase shall not mean simply "if" and (g) all accounting terms used and not defined herein have the respective meanings given to them under GAAP.  All dollar or "$" amounts set forth in this Agreement shall refer to U.S. dollars unless explicitly indicated otherwise.  Time is of the essence for each and every provision of this Agreement.  In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" mean "to but excluding" and the word "through" means "to and including." Whenever the last day for the exercise of any privilege or the discharge of any duty hereunder shall fall upon a day that is not a Business Day, the Party having such privilege or duty may exercise such privilege or discharge such duty on the next succeeding day that is a Business Day.  Any reference in this Agreement to "made available" means a document or other information that was

-45-

provided or made available to Buyer and its Representatives in Seller's electronic or virtual data rooms, management presentations or in any other form.

11.15   **Prevailing Party**.   In the event of any Proceeding in connection with this Agreement or any Ancillary Document, the prevailing Party in any such Proceeding shall be entitled to recover from the other Party its costs and expenses, including, without limitation, reasonable legal fees and expenses.

11.16   **Further Assurances**.   Following the Closing, each of the Parties shall, and shall cause their respective Affiliates to, execute and deliver such additional documents, instruments, conveyances and assurances, and take such further actions (at no material cost or expense to the Party to whom the request is directed) as may be reasonably required to carry out the provisions hereof and give effect to the Closing transactions contemplated by this Agreement; *provided that* neither Party shall be required by this Section 11.16 to initiate or join in any Proceeding.   After the Closing, Seller shall promptly transfer or deliver to Buyer cash, checks (which shall be properly endorsed) or other property that Seller may receive in respect of any item that constitutes part of the Purchased Assets or relates to the Assumed Liabilities.   After the Closing, Buyer shall promptly transfer or deliver to Seller cash, checks (which shall be properly endorsed) or other property that Buyer may receive in respect of any item that is an Excluded Asset or relates to the Retained Liabilities.

<p style="text-align:center">* * * *</p>

<p style="text-align:center">[Signature page follows]</p>

     IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be duly executed on its behalf as of the date first above written.

**SELLER:**

**NOBLE HOUSE HOME FURNISHINGS LLC**
**BEST SELLING HOME DECOR FURNITURE, LLC**
**LE POUF, LLC**
**NH SERVICES LLC**

By: _____
    Name:
    Title:

**BUYER:**

**GIGACLOUD TECHNOLOGY INC**

By: _____
    Name:
    Title:

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be duly executed on its behalf as of the date first above written.

**SELLER:**

**NOBLE HOUSE HOME FURNISHINGS LLC**
**BEST SELLING HOME DECOR FURNITURE, LLC**
**LE POUF, LLC**
**NH SERVICES LLC**


By: _____
    Name:
    Title:


**BUYER:**

**GIGACLOUD TECHNOLOGY INC**

By: _____
    Name:    Iman Schrock
    Title:    president

**EXHIBIT A**

**<u>Closing Date Working Capital</u>**

[CONFIDENTIAL; NOT TO BE FILED PUBLICLY]

**Exhibit 3**

**(Form of Sale Notice)**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>NOBLE HOUSE HOME FURNISHINGS LLC, et al.,<br><br><div align="right">Debtors. [1]</div> | Chapter 11<br><br>Case No. 23-90773 (CML)<br><br>(Jointly Administered) |

**NOTICE OF AUCTION FOR THE SALE OF THE DEBTORS' ASSETS FREE AND
CLEAR OF ANY AND ALL CLAIMS, INTERESTS, AND ENCUMBRANCES**

      **PLEASE TAKE NOTICE** that the above-captioned debtors and debtors in possession (collectively, the "Debtors") are soliciting offers for a transaction or transactions, any of which may include the purchase of some or all of the Debtors' Property and assumption of certain liabilities of the Debtors, consistent with the bidding procedures (the "Bidding Procedures")[2] approved by the United States Bankruptcy Court for the Southern District of Texas (the "Court") by entry of an order on [●] [Docket No. [●]] (the "Bidding Procedures Order"). **All interested bidders should carefully read the Bidding Procedures and Bidding Procedures Order**. To the extent that there are any inconsistencies between this notice and the Bidding Procedures or the Bidding Procedures Order, the Bidding Procedures or the Bidding Procedures Order, as applicable, shall govern in all respects.

> **Copies of the Bidding Procedures Order or other documents related thereto, including the Stalking Horse Purchase Agreement or an exhibit identifying the Property, as applicable, are available upon request to Epiq by calling 833-909-4386 or visiting the Debtors' restructuring website at https://dm.epiq11.com/NobleHouseHomeFurnishings**

      **PLEASE TAKE FURTHER NOTICE** that the Bid Deadline is **October 18, 2023**, at **5:00 p.m. (prevailing Central Time)**, and that any person or entity who wishes to participate in the Auction must comply with the participation requirements, bid requirements, and other requirements set forth in the Bidding Procedures.

      **PLEASE TAKE FURTHER NOTICE** that the Debtors intend to conduct the Auction, at

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification numbers, are: Noble House Home Furnishings LLC (1671); Best Selling Home Decor Furniture, LLC (5580), Le Pouf, LLC (8197), NH Services, LLC (9626), and Heavy Metal, Inc. (3124). The Debtors' service address in these Chapter 11 cases is 700 Milam Street, Suite 1300, Houston, TX 77002.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Bidding Procedures Order or the Bidding Procedures, as applicable.

<div align="center">1</div>

which time they will consider proposals submitted to the Debtors and their professionals, by and pursuant to the Bidding Procedures as set forth in the Bidding Procedures Order, beginning on **October 23, 2023**, at **10:00 a.m. (prevailing Central Time)** via videoconference or such other form of remote communication arranged by counsel to the Debtors.

**PLEASE TAKE FURTHER NOTICE** that the Debtors expect to seek approval of any Sales at the Sale Hearing, which is presently scheduled to commence on **October [●], 2023**, at **[●] [a./p.].m. (prevailing Central Time)**, or as soon thereafter as counsel may be heard, before the Honorable [●] in the United States Courthouse, 515 Rusk Street, Houston, Texas 77002.

**PLEASE TAKE FURTHER NOTICE** that, except as otherwise set forth in the Bidding Procedures Order with respect to objections to proposed cure amounts or the assumption and assignment of Assigned Contracts, objections, if any, to a proposed Sale **must**: (a) be in writing; (b) conform to the applicable provisions of the Bankruptcy Rules and the Bankruptcy Local Rules; (c) state with particularity the legal and factual basis for the objection and the specific grounds therefor; and (d) be filed with the Court by **October 24, 2023**, at **4:00 p.m. (prevailing Central Time)**; *provided, however,* that any objections to the manner in which the Auction was conducted and the identity of the Successful Bidder or Backup Bidder may be filed up to 24 hours prior to the Sale Hearing, or, if the Debtors elect not to proceed with an Auction, two (2) business days following the notification filed with the Court of such election not to proceed with an Auction.

### CONSEQUENCES OF FAILING TO TIMELY MAKE AN OBJECTION

**ANY PARTY OR ENTITY WHO FAILS TO TIMELY MAKE AN OBJECTION TO A SALE ON OR BEFORE THE SALE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO SUCH SALE, INCLUDING WITH RESPECT TO THE TRANSFER OF THE SELLING DEBTORS' PROPERTY FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, EXCEPT AS SET FORTH IN THE STALKING HORSE PURCHASE AGREEMENT.**

## NO SUCCESSOR OR TRANSFEREE LIABILITY

The Sale Order is expected to provide, among other things, that the Successful Bidder from the Sale will have no responsibility for, and the Property will be sold free and clear of, any successor liability, including the following:

To the greatest extent allowable by applicable law, the Successful Bidder shall not be deemed, as a result of any action taken in connection with the Stalking Horse Purchase Agreement (in the case where the Stalking Horse Purchaser is the Successful Bidder) or a separate purchase agreement entered into with the Successful Bidder (if the Stalking Horse Purchaser is not the Successful Bidder), the consummation of the Sale, or the transfer or operation of the Property, to (a) be a legal successor, or otherwise be deemed a successor to the Debtors (other than with respect to any obligations as an assignee under the Assigned Contracts arising after the effective date); (b) have, de facto or otherwise, merged with or into the Debtors; or (c) be an alter ego or mere continuation or substantial continuation of the Debtors, in the case of each of (a), (b), and (c), including, without limitation, within the meaning of any foreign, federal, state or local revenue law, pension law, the Employee Retirement Income Security Act, the Consolidated Omnibus Budget Reconciliation Act, the WARN Act (29 U.S.C. §§ 2101 et seq.), the Fair Labor Standard Act, Title VII of the Civil Rights Act of 1964 (as amended), the Age Discrimination and Employment Act of 1967 (as amended), the Federal Rehabilitation Act of 1973 (as amended), the National Labor Relations Act (29 U.S.C. § 151, et seq.), environmental liabilities, debts, claims or obligations, any liabilities, debts or obligations of or required to be paid by the Debtors for any taxes of any kind for any period, labor, employment, or other law, rule or regulation (including without limitation filing requirements under any such laws, rules or regulations), or under any products liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine.

All rights of any party to set off any claims, debts, or obligations owed by or to the Successful Bidder in connection with the assets shall be extinguished on the effective date pursuant to the Sale Order. Other than as expressly set forth in the Stalking Horse Purchase Agreement (or another Successful Bidder's purchase agreement, as applicable) with respect to assumed liabilities, the Successful Bidder shall not have any responsibility for (a) any liability or other obligation of the Debtors or related to the assets or (b) any claims (as such term is defined by section 101(5) of the Bankruptcy Code) against the Debtors or any of their predecessors or affiliates. To the greatest extent allowed by applicable law, the Successful Bidder shall have no liability whatsoever with respect to the Debtors' (or their predecessors' or affiliates') respective businesses or operations or any of the Debtors' (or their predecessors' or affiliates') obligations based, in whole or part, directly or indirectly, on any theory of successor or vicarious liability of any kind or character, or based upon any theory of antitrust, environmental, successor or transferee liability, de facto merger or substantial continuity, labor and employment or products liability, whether known or unknown as of the effective date, now existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated, including liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of the Property prior to the effective date.

3

**PLEASE TAKE FURTHER NOTICE** that the Debtors reserve the right, after consultation with the Consultation Parties and in their reasonable business judgment and subject to the exercise of their fiduciary duties, to modify the Bidding Procedures and/or to terminate discussions with any Potential Bidders at any time, to the extent not materially inconsistent with the Bidding Procedures.

**PLEASE TAKE FURTHER NOTICE** that copies of the Bidding Procedures Motion, Bidding Procedures, and Bidding Procedures Order, as well as all related exhibits, are available: free of charge upon request to Epiq by calling 833-909-4386 or visiting the Debtors' restructuring website at https://dm.epiq11.com/NobleHouseHomeFurnishings, or for a fee via PACER by visiting http://www.txs.uscourts.gov.

Dated: September __, 2023

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/*
Michael D. Warner (SBT 00792304)
Maxim B. Litvak (SBT 24002482)
Benjamin L. Wallen (SBT 24102623)
440 Louisiana Street, Suite 900
Houston, TX 77002
Telephone: (713) 691-9385
Facsimile:  (713) 691-9407
mwarner@pszjlaw.com
mlitvak@pszjlaw.com
bwallen@pszjlaw.com

-and-

Richard M. Pachulski (pending *pro hac vice*)
Teddy M. Kapur (pending *pro hac vice*)
Gregory V. Demo (pending *pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
rpachulski@pszjlaw.com
tkapur@pszjlaw.com
gdemo@pszjlaw.com

*Proposed Counsel to the Debtors and Debtors in Possession*

**<u>Exhibit 4</u>**

**<u>Form of Cure Notice</u>**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>NOBLE HOUSE HOME FURNISHINGS LLC, et al.,<br><br>                         Debtors. [1] | Chapter 11<br><br>Case No. 23-90773 (CML)<br><br>(Jointly Administered) |

**NOTICE TO CONTRACT PARTIES TO POTENTIALLY ASSUMED EXECUTORY
CONTRACTS AND UNEXPIRED LEASES**

---

> **YOU ARE RECEIVING THIS NOTICE BECAUSE YOU
> OR ONE OF YOUR AFFILIATES IS A COUNTERPARTY TO AN
> EXECUTORY CONTRACT OR UNEXPIRED LEASE WITH ONE OR MORE
> OF THE DEBTORS AS SET FORTH ON EXHIBIT A ATTACHED HERETO.**

       **PLEASE TAKE NOTICE** that on September [●], 2023, the United States Bankruptcy Court for the Southern District of Texas (the "Court") entered the *Order (I) Approving Bidding Procedures for the Sale of the Debtors' Assets, (II) Approving Bid Protections, (III) Scheduling Certain Dates with Respect Thereto, (IV) Approving the Form and Manner of Notice Thereof, and (V) Approving Contract Assumption and Assignment Procedures* [Docket No. [●]] (the "Bidding Procedures Order"),[2] authorizing the Debtors to conduct an auction (the "Auction") to select a party or parties to purchase some or all of the Debtors' assets (the "Property"). The Auction will be governed by the bidding procedures (attached to the Bidding Procedures Order as **Exhibit 1** the "Bidding Procedures")).

       **PLEASE TAKE FURTHER NOTICE** that, pursuant to the Bidding Procedures and the terms of any Successful Bid, the Debtors **may** assume and assign to the Successful Bidder certain of the Assigned Contracts listed on the Assigned Contracts Schedule, attached hereto as **Exhibit A**, to which you are a counterparty, upon approval of the Sale. The Assigned Contracts Schedule can also be viewed on the Debtors' case website (https://dm.epiq11.com/NobleHouseHomeFurnishings). The Debtors have conducted a review of their books and records and have determined that the cure amount for unpaid monetary

---

[1]  The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification numbers, are:  Noble House Home Furnishings LLC (1671); Best Selling Home Decor Furniture, LLC (5580), Le Pouf, LLC (8197), NH Services LLC (9626), and Heavy Metal, Inc. (3124).  The Debtors' service address in these Chapter 11 cases is 700 Milam Street, Suite 1300, Houston, TX 77002.

[2]  All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Bidding Procedures Order or the Bidding Procedures, as applicable.

obligations under such Assigned Contracts is as set forth on **Exhibit A** attached hereto (the "Cure Costs").

       **PLEASE TAKE FURTHER NOTICE** that if you disagree with the proposed Cure Costs, object to a proposed assignment to the Successful Bidder of any Assigned Contract, or object to the ability of the Successful Bidder to provide adequate assurance of future performance with respect to any Assigned Contract, your objection must: (i) be in writing; (ii) comply with the applicable provisions of the Bankruptcy Rules, Bankruptcy Local Rules, and any order governing the administration of these chapter 11 cases; (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed Cure Costs, state the correct cure amount alleged to be owed to the objecting Contract Counterparty, together with any applicable and appropriate documentation in support thereof; and (iv) if you object to proposed Cure Costs or a proposed assignment to the Successful Bidder of any Assigned Contract, be filed with the Court **no later than _____, 2023**, at **4:00 p.m. (prevailing Central Time)** (the "Cure Objection Deadline"), and if you object to the ability of the Successful Bidder to provide adequate assurance of future performance with respect to any Assigned Contract, be filed with the Court **no later than the later of (a) the Sale Objection Deadline and (b) 4:00 p.m. (prevailing Central Time) on the date that is 21 days following the date of service of any applicable Supplemental Cure Notice** (the "Adequate Assurance Objection Deadline"), in each case, by the following parties: (a) the Debtors' counsel, Pachulski Stang Ziehl & Jones LLP, 10100 Santa Monica Boulevard, 13th Floor, Los Angeles, California 90067, Attn.: Richard M. Pachulski (rpachulski@pszjlaw.com) and Teddy Kapur (tkapur@pszjlaw.com); and (b) the United States Trustee for the Southern District of Texas, 515 Rusk Street, Suite 3516, Houston, Texas 77002, Attn.: Aubrey Thomas (aubrey.thomas@usdoj.gov).

       **PLEASE TAKE FURTHER NOTICE** that if no objection to (a) the Cure Costs(s), (b) the proposed assignment and assumption of any Assigned Contract, or (c) adequate assurance of the Successful Bidder's ability to perform is filed by the Cure Objection Deadline or Adequate Assurance Objection Deadline, as applicable, then (i) you will be deemed to have stipulated that the Cure Costs as determined by the Debtors are correct, (ii) you will be forever barred, estopped, and enjoined from asserting any additional cure amount under the proposed Assigned Contract, and (iii) you will be forever barred, estopped, and enjoined from objecting to such proposed assignment to the Successful Bidder on the grounds that the Successful Bidder has not provided adequate assurance of future performance as of the closing date of the Sale.

       **PLEASE TAKE FURTHER NOTICE** that any Cure Objection in connection with the Successful Bid that otherwise complies with these procedures yet remains unresolved as of the commencement of the Sale Hearing, shall be heard at a later date to be fixed by the Court.

       **PLEASE THAT FURTHER NOTICE** that, notwithstanding anything herein, the mere listing of any Assigned Contract on the Cure Notice does not require or guarantee that such Assigned Contract will be assumed by the Debtors at any time or assumed and assigned, and all rights of the Debtors and the Successful Bidder with respect to such Assigned Contract are reserved. Moreover, the Debtors explicitly reserve their rights, in their reasonable discretion, to seek to reject or assume each Assigned Contract pursuant to section 365(a) of the Bankruptcy Code and in accordance with the procedures allowing the Debtors and/or the Successful Bidder,

as applicable, to designate any Assigned Contract as either rejected or assumed on a post-closing basis.

**PLEASE TAKE FURTHER NOTICE** that, nothing herein (i) alters in any way the prepetition nature of the Assigned Contracts or the validity, priority, or amount of any claims of a counterparty to any Assigned Contract against the Debtors that may arise under such Assigned Contract, (ii) creates a postpetition contract or agreement, or (iii) elevates to administrative expense priority any claims of a counterparty to any Assigned Contract against the Debtors that may arise under such Assigned Contract.

Dated: _____, 2023

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/* _____

Michael D. Warner (SBT 00792304)
Maxim B. Litvak (SBT 24002482)
Benjamin L. Wallen (SBT 24102623)
440 Louisiana Street, Suite 900
Houston, TX 77002
Telephone: (713) 691-9385
Facsimile:  (713) 691-9407
mwarner@pszjlaw.com
mlitvak@pszjlaw.com
bwallen@pszjlaw.com

-and-

Richard M. Pachulski (pending *pro hac vice*)
Teddy M. Kapur (pending *pro hac vice*)
Gregory V. Demo (pending *pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
rpachulski@pszjlaw.com
tkapur@pszjlaw.com
gdemo@pszjlaw.com

*Proposed Counsel to the Debtors and Debtors in Possession*

DOCS_NY:48317.8 61051/002
\v