## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| NOBLE HOUSE HOME FURNISHINGS, LLC, et al.,[1] | Case No. 23-90773 (CML) |
| Debtors | (Joint Administration Pending) |

## DECLARATION OF GAYLA BELLA IN SUPPORT
## OF DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY RELIEF

I, Gayla Bella, pursuant to section 1726 of title 28 of the United States Code, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.      I am the Chief Financial Officer (the "CFO") of Noble House Home Furnishings, LLC ("Noble House" and together with the other above-captioned debtors, the "Debtors", and, together with each Debtor's direct and indirect non-Debtor subsidiaries, the "Company"), having been appointed by Noble House's Board to said position in December 2022.   As CFO of Noble House, I have gained a substantial understanding of the Debtors and their non-Debtor affiliates' day-to-day operations, businesses, and financial affairs.

2.      I am also a Managing Director of Riveron Management Services, LLC ("Riveron"), a national business advisory firm, which I joined in 2017.   Riveron has been serving as the Company's restructuring advisor since September 2022. I have extensive experience in turnaround management, and have served as the chief financial officer for both a professional services firm and consumer products retailer.  I have significant consulting experience and expertise in the areas

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification numbers, are:  Noble House Home Furnishings LLC (1671); Best Selling Home Decor Furniture, LLC (5580), Le Pouf, LLC (8197), NH Services LLC (9626), and Heavy Metal, Inc. (3124).  The Debtors' service address in these Chapter 11 cases is 700 Milam Street, Suite 1300, Houston, TX 77002.

of cash management, debt restructuring, divestitures, due diligence, mergers and acquisitions, profit improvement, and valuation.

3.     Except as otherwise indicated herein, the facts set forth in this declaration (this "Declaration") are based upon my personal knowledge, my review of relevant documents, information provided to me by employees of or advisors to the Debtors, including my colleagues at Riveron, or my opinion based upon my experience, knowledge, and information concerning the Debtors' operations.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.

4.     Headquartered in Chatsworth, California, the Company is a distributor, manufacturer and retailer of indoor and outdoor home furnishings with distribution throughout e-commerce channels including partners such as Amazon, Wayfair, Overstock, Target and Home Depot, fulfilling direct to consumer orders from its distribution centers. Family-owned since its founding in 1992, the Company designs, markets and sells its products under several brands including Christopher Knight Home, NobleHouse, LePouf, OkiOki, Best Selling and GDFStudio, and leases offices, warehouses, and other sites in California, Georgia and Texas.

5.     On September 11, 2023 (the "Petition Date"), the Debtors each commenced a voluntary case under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas (the "Court") and continue to operate their business and manage their properties as debtors in possession.

6.     To minimize any adverse effects of filing the bankruptcy petitions (the "Petitions") and to preserve value for the benefit of all stakeholders, the Debtors have filed a number of motions requesting various forms of "first day" relief (collectively, the "First Day Pleadings").  I submit, and am authorized by the Debtors to submit, this Declaration in support of the Petitions and the

First Day Pleadings. The relief requested in the First Day Pleadings is necessary to preserve and maximize the value of the Debtors' estates and allow them to sustain their current operations in chapter 11 and effectuate a going concern sale.

## **INTRODUCTION**

7.      As a result of the current market conditions, including high inflation and softer consumer purchases in the furniture space, and faced with limited liquidity, the Company has commenced these chapter 11 cases to effectuate a going-concern sale of the Debtors' assets to a stalking horse buyer, subject to an auction process and any higher and better bids. While the Company experienced rapid revenue growth during the COVID 19 pandemic, supply chain issues, driven by freight and delivery times, drove up costs of goods. As sales began to decline in 2022, higher expenses capitalized in inventory and infrastructure growth posed challenges. Despite the best efforts of the Company and its advisors to cut costs and secure the capital necessary to preserve the business as a going concern, the Company is unable to meet its financial obligations. The Company has worked in concert with its secured lender to develop an appropriate budget to facilitate an expedited sale that will maximize value and recoveries for stakeholders in these cases.

8.      This Declaration is intended to provide a summary overview of the Debtors' business and the circumstances leading to the commencement of these chapter 11 cases, and to support the relief that the Debtors seek in the First Day Pleadings. I have organized this Declaration as follows:

- **Part I** provides a general overview of the Company's corporate history and business operations;

- **Part II** describes the circumstances leading to the commencement of these chapter 11 cases; and

- **Part III** sets forth the evidentiary basis for the relief requested in each of the First Day Pleadings.

# I.

## THE COMPANY'S HISTORY AND BUSINESS OPERATIONS

**A.**     **General Background**

9.     Noble House, together with its affiliates, has been in the furniture and home furnishings industry (supply, retail, and distribution) for over 20 years since 1992, and 10 years in e-commerce.  Including indoor and outdoor furnishings, the Company has a wide and diverse range of products, including over 100 categories of products and 8,000 core SKUs. Family-owned since its founding in 1992, the Debtors operate several furniture brands including Christopher Knight Home, LePouf, OkiOki, NobleHouse, Best Selling and GDFStudio.

10.     The majority of the Company's net sales are through e-commerce channels (direct fulfillment for third party websites and the Company's own e-commerce websites).  The direct fulfillment for third party websites includes, but is not limited to Ebay.com, Costco.com, Wayfair.com, Amazon.com, WalMart.com, HomeDepot.com, Lowes.com and Target.com.  The Company's e-commerce websites include GDFStudio.com, OkiOki.com, and LePoufhome.com. Primarily all sales and deliveries of merchandise to the end customers/users are purchased though e-commerce and market place sites.  The Company also sells through wholesale channels, primarily to the Big Box retailers – TJMaxx, Home Goods, Marshalls, Ross Stores and others; such arrangements comprise only approximately 1% of the Company's revenues.  The Company also maintains a physical outlet store.

11.     The Company has a broad base of over 50 suppliers, supported by an internally developed and maintained IT system that allows for end-to-end inventory tracking supporting available inventory, review responses and delivery management.  The Company sources globally from China, Malaysia, Vietnam and India, and operated a bean bag and pouf manufacturing arm

in the United States.  The Company has over two million square feet of in its distribution centers to hold inventory and is supported by its trucking/logistics operation, NH Services, Inc.

12.      As of the Petition Date, the Debtors' offices and facilities (all leased) consist of their corporate headquarters, a 100,000 sq. ft. facility, and an outlet store located in Chatsworth, California; a corporate office in Houston, Texas; distribution facilities in El Monte and Ontario, California, and Savannah, Georgia; and LePouf manufacturing and showroom sites in Las Vegas.

13.      As of the Petition Date, the Debtors had approximately 275 employees (less than 30% of whom are full-time employees and the balance are hourly employees) in the areas of corporate, operations, customer service, IT, marketing and sales, product development, warehouses, stores/outlet, accounting, HR and deliveries.  As discussed further below, the Company regularly supplements its workforce with many independent contractors through staffing agency support in order to maintain its flexibility for the higher demands during the summer months.  As discussed herein, the Debtors also utilize back-office functions provided by overseas non-Debtor affiliates.  None of the Debtors' employees are represented by a labor union or covered by a collective bargaining agreement.

14.      For the years ended December 31, 2022 and 2021, the Company had annual net sales of approximately $491 million and $671 million, respectively.  For the years ended December 31, 2022 and 2021, the Company had reported a comprehensive income of -$34 million and $7 million, respectively.

**B.      Corporate/Equity Structure and Management**

15.      A simplified organizational chart for the Company, including certain non-Debtor and foreign affiliates, is attached hereto as **Exhibit A**.  Debtor Noble House wholly owns the other

Debtors except Heavy Metal Inc. ("Heavy Metal"). Debtor Heavy Metal owns a 79.3187% interest in Noble House; the remaining interests are held by other non-Debtor members.

16.     In addition, as set forth on **Exhibit A**, the Debtors have other affiliates which are not Debtors in these proceedings that are primarily foreign affiliates. None of these affiliates have commenced bankruptcy or insolvency proceedings.

## C.     Debt Structure

17.     As of the Petition Date, the Debtors' primary long term debt obligations consisted of approximately $73.89 million plus interest, fees and other costs due to Wells Fargo under the Prepetition ABL Agreement (discussed next). As of the Petition Date, the Debtors estimate that they also have approximately $65.3 million of outstanding accounts payable owed to various trade vendors, suppliers and other parties.

### Credit Agreement with Wells Fargo and Defaults

18.     Pursuant to that certain Credit Agreement dated as of December 3, 2021 (as amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition ABL Agreement," and collectively with the Loan Documents (as defined in the Prepetition ABL Agreement) and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, supplemented, waived or otherwise modified from time to time, the "Prepetition ABL Documents"), among (a) certain of the Debtors and their affiliates, (b) Wells Fargo Bank, National Association, as administrative agent (in such capacity, the "Prepetition ABL Agent" or "Wells Fargo"); and (c) the several lenders from time to time party thereto (and including the Prepetition ABL Agent, the "Prepetition ABL Lenders," and collectively with the Prepetition ABL Agent, letter of credit issuers and bank product providers, the "Prepetition ABL Parties"), the Prepetition ABL Lenders provided revolving credit and other

financial accommodations to, and issued letters of credit for the account of, certain of the Debtors pursuant to the Prepetition ABL Documents (the "Prepetition ABL Facility").

19.    The Prepetition ABL Facility provided the Debtors with, among other things, up to $110,000,000 aggregate principal amount of Revolver Commitments (as defined in the Prepetition ABL Agreement), including letters of credit obligations.  As of the Petition Date, the aggregate principal amount outstanding under the Prepetition ABL Facility was approximately $70.4 million in outstanding revolving loans and approximately $3.5 million in issued and outstanding letter of credit obligations.

20.    As more fully set forth in the Prepetition ABL Documents and the DIP Motion (discussed in Part III), prior to the Petition Date, the Debtors granted to the Prepetition ABL Agent, for the benefit of itself and the Prepetition ABL Parties, a first priority security interest in and continuing lien on substantially all assets of the Debtors, including the "Collateral" (as defined in the Prepetition ABL Agreement), and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising, subject only to certain permitted prior liens.

## II.

### EVENTS LEADING TO THE PETITION DATE

**A.    Debtors' Liquidity Issues and Challenging Business Environment**

21.    The COVID-19 pandemic (from March 2020 onward) and its aftermath primarily drove significant effects on the Company and its businesses and operations, posing challenges for the Debtors over the past several years, including supply and distribution chain issues, particularly as the majority of the Debtors' merchandise have been and continue to be made in China.

Challenges included, among other issues, substantially increased inventory costs and long lead times.

22.     Notably, during the pandemic, the Company achieved 48% and 11% net revenue growth in fiscal year (FY) 2020 and FY 2021, respectively.  Based on industry performance overall, customers purchased more furniture and home goods than in prior periods, potentially as a result of being home more often.  However, towards the end of 2021 as the pandemic was subsiding, the Debtors' sales began decreasing relative to prior years and since then, have continued to decline to levels closer to 2018.  Net revenue declined more than 26% from December 2021 to December 2022 and 27% when comparing YTD July 2023 to YTD July 2022.  Further, as a result of reporting on a FIFO (First in – First out) basis, margins continued to be impacted by higher freight costs through May 2023.

23.     Overall, from 2022 onward, easing COVID-19 stay-at-home restrictions and resulting return-to-office dynamics, rising and persistent inflation, and supply chain challenges have put significant downward pressure on the Company's business.  Total net sales decreased from $671 million in 2021 to $491 million in 2022, with 2023 revenue projected to be lower. Reported income in 2021 was $7 million, decreasing to -$34 million in 2022.

24.     During 2023 in particular, the Debtors' liquidity and availability has worsened.  As noted above, the Debtors had defaulted under their financial coverage ratios, and subsequently, availability was further constricted.  In 2023, the Company, among other actions, implemented significant cost reductions, including headcount reductions, further optimization of inventory management, and vacating its Edgewater, New Jersey facility as of mid-May 2023.[2]

---

[2] Prepetition, the landlord for the New Jersey real property had commenced state court actions against the Company for nonpayment of rent and breach of contract.  The Debtors vigorously dispute the allegations in the actions and reserve all their rights relating thereto.

**B.**     **Prepetition Negotiations and Marketing Process**

25.     In light of the foregoing circumstances, the Debtors engaged in negotiations with Wells Fargo regarding a potential consensual resolution of the Prepetition ABL Facility and, in February 2023, the Company retained as its investment banker, Lincoln International LLC ("Lincoln"), to initially run a refinancing process for the Debtors.  Lincoln has worked closely with the Debtors' management to analyze the Debtors' financial position and outlook, prepare marketing and diligence materials (including a Confidential Information Presentation), and populate an electronic data  room (the "Data Room").

26.     With regard to financing, Lincoln began contacting approximately 192 parties in March 2023, and of those, 92 parties signed nondisclosure agreements ("NDAs") and had access to the comprehensive Data Room.  No viable refinancing option resulted from this process.

27.     With regard to a potential sale of the Debtors' business, commencing in July 2023, Lincoln contacted approximately 60 potential buyers.  To date, 23 of these parties have signed non-disclosure agreements.  Three parties submitted preliminary, non-binding Indications of Interest (IOIs).

28.     The foregoing prepetition process culminated in the Asset Purchase Agreement dated as of September 11, 2023 (the "Stalking Horse Purchase Agreement") by and between the Debtors and GigaCloud Technology Inc. (the "Stalking Horse Purchaser"), a third party public company, for the sale of substantially all of the Debtors' assets.  Pursuant to the terms of the Stalking Horse Agreement, the Stalking Purchaser has agreed to buy the purchased assets for $85 million, subject to a working capital adjustment, plus $4.1 million for certain equipment, plus the assumption of certain liabilities.  The Stalking Horse Agreement has an outside closing date of October 31, 2023.  The Debtors anticipate that disclosure of the Stalking Horse Purchase

Agreement and approval of the procedures provided for in the Sale/Procedures Motion (the "Bidding Procedures") will facilitate the continuation of the marketing process, which may lead to the receipt of competing bids and an auction. Whether or not any overbids are received, the Debtors' sale process will enable their estates to achieve a value-maximizing transaction.

29. Thus, the Debtors filed these chapter 11 cases to effectuate a sale of substantially all their assets to a going-concern buyer through a transaction that will preserve the Debtors' business operations, jobs, and vendor relationships, subject to an auction/overbidding process, and maximize the value of the Debtors' estates for the benefit of all stakeholders.

**III.**

**FIRST DAY PLEADINGS**

30. Confronted with the foregoing circumstances, the Debtors determined it to be in their best interests to commence the chapter 11 cases and implement, as appropriate, sales and/or other transactions to maximize value for the Debtors' stakeholders.

31. I am familiar with the contents, including the factual statements, of each of the motions set forth below (the "First Day Pleadings") (including the exhibits and other attachments thereto) and, to the best of my knowledge, after reasonable inquiry, believe the relief sought in each First Day Pleadings: (a) will enable the Debtors to sustain operations while in chapter 11; (b) is critically needed immediately in order to allow the Debtors' ability to maximize the value of their estates and operate their businesses; (c) is, in each case, narrowly-tailored and necessary to achieve the goals identified above; and (d) serves the best interests of the Debtors' estates and creditors and is necessary to avoid irreparable harm to the estates.

## *Procedural/Administrative Motions*

**A.** **Debtors' Emergency Motion for Order Directing Joint Administration of Related Chapter 11 Cases (the "Joint Administration Motion")**

32.     The Debtors request entry of an order directing procedural consolidation and joint administration of these Chapter 11 Cases.

33.     I am informed and understand that the Debtor entities that commenced these Chapter 11 Cases are "affiliates" as that term is defined in section 101(2) of the Bankruptcy Code. Joint administration for procedural purposes only is appropriate in the Debtors' cases. Given the integrated nature of the Debtors' operations, joint administration will provide significant administrative convenience without harming the substantive rights of any party in interest. Many of the motions, hearings, and orders in these Chapter 11 Cases will affect each of the Debtor entities. Joint administration will allow the U.S. Trustee and all parties in interest to monitor these Chapter 11 Cases efficiently and with greater ease, as all filings will be available on one docket rather than across multiple dockets.

**B.** **Emergency Ex Parte Application for Entry of an Order Authorizing the Employment and Retention of Epiq Corporate Restructuring, LLC As Claims, Noticing, and Solicitation Agent ("Claims Agent Motion")**

34.     The Debtors request approval to employ Epiq to serve as Claims and Noticing Agent in their chapter 11 cases to provide the services outlined in the Engagement Letter. The Debtors believe that Epiq's rates are competitive and reasonable, Epiq has the expertise required in a complex chapter 11 case, and Epiq's employment is in the best interest of the estates.

C.    ***Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Redact Certain Personally Identifiable Information, (II) Approving the Form and Manner of Notifying Creditors of the Commencement of the Chapter 11 Cases and Other Information, and (III) Granting Related Relief (the "PII Motion")***

35.    As set forth in the PII Motion, the Debtors believe it appropriate for the Debtors to redact from any paper filed or to be filed with the Court in these Chapter 11 cases, including the consolidated list of creditors and Schedules and Statements, information other than the name of individual creditors including the Debtors' employees, independent contractors, and former employees because such information can be used to perpetrate identity theft and phishing scams or to locate survivors of domestic violence, harassment, or stalking, exposing the Debtors to potential civil liability and significant financial penalties.

36.    Absent the relief requested in the PII Motion, the Debtors (a) would unnecessarily render individuals more susceptible to identity theft and (b) could jeopardize the safety of claimants in these Chapter 11 cases who, unbeknownst to the Debtors, are survivors of domestic violence, harassment, or stalking by publishing their home addresses without any advance notice or opportunity to opt out or take protective measures.

D.    ***Debtors' Emergency Motion for Entry of an Order (I) Restating and Enforcing the Worldwide Automatic Stay, Anti-Discrimination Provisions, and Ipso Facto Protections of the Bankruptcy Code, and (II) Granting Related Relief (the "Stay Motion")***

37.    Pursuant to the Stay Motion, the Debtors seek entry of an order (a) restating and enforcing the worldwide automatic stay, anti-discrimination provisions, and *ipso facto* protections of the Bankruptcy Code, and (b) authorizing, but not directing, the Debtors to translate the Stay Motion and the order thereon, as well as any other filing in the Debtors' chapter 11 cases, into other languages to better inform creditors, governmental units, and interested parties of the relief requested.

38.     The Debtors utilize a broad base of over 50 highly integrated suppliers, sourcing their home furnishings, home décor, and other inventory (the "Inventory") from suppliers in China, Malaysia, Vietnam, and India, in addition to their U.S.-based suppliers.  Moreover, the Debtors' operations are supported by the functions and services of non-Debtor affiliates located overseas, principally in Asia, to support their global supply network and operations.  In this regard, the Debtors, in the ordinary course of business, rely on, and incur obligations to, suppliers of goods and/or services and other creditors that are based outside the United States.  These goods and services are vital to preserving and maximizing the value of the Debtors' businesses.

39.     Without continued support from their non-U.S. suppliers, the Debtors would face severe interruptions and delays to their daily operations.  Importantly, any disruption to the Debtors' supply chain could result in a significant loss of operational efficiency, decreasing the value of their businesses, which could impair stakeholder value at the very outset of these chapter 11 cases.

40.     Many of the Debtors' foreign suppliers lack meaningful, if any, contacts with the United States.  Non-U.S. creditors and contract counterparties operating in non-U.S. jurisdictions may be unfamiliar with the chapter 11 process, the scope of a debtor in possession's authority to operate its business, or the importance and implications of the automatic stay.  Moreover, certain of the Debtors' non-U.S. creditors—and others—may attempt to seize assets located outside of the United States or take other actions violating the automatic stay to the detriment of the Debtors, their estates, and creditors.  By the Stay Motion, the Debtors seek to better inform non-U.S. trade creditors of the automatic stay and other protections of the Bankruptcy Code, thereby further deterring adverse action.

41.     Finally, the Debtors are party to certain executory contracts and other agreements, principally related to the supply of the Debtors' Inventory.  Non-U.S. counterparties thereto could attempt to terminate such leases or contracts upon the commencement of these chapter 11 cases pursuant to *ipso facto* provisions, violating sections 362 and 365 of the Bankruptcy Code.

42.     For the avoidance of doubt, the Debtors do <u>*not*</u> seek to expand or enlarge the rights afforded to them under the Bankruptcy Code with the Stay Motion. Instead, the Debtors seek to affirm those rights and believe that an order from this Court will help protect the Debtors against improper actions taken by, and provide clarity for, non-U.S. parties in interest.

**E.      *Debtors' Emergency Motion for Entry of an Order (I) Extending Time to File (A) Schedules of Assets and Liabilities, (B) Schedules of Current Income and Expenditures, (C) Schedules of Executory Contracts and Unexpired Leases, (D) Statements of Financial Affairs, and (E) Rule 2015.3 Financial Reports, and (II) Granting Related Relief (the "Schedules Extension Motion")***

43.     By the Schedules Extension Motion, the Debtors request an order (a) extending the deadline by which the Debtors must file their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "<u>Schedules and Statements</u>") by 25 days, for a total of 39 days from the Petition Date, through and including October 20, 2023; (b) extending the deadline by which the Debtors must file their initial reports of financial information with respect to entities in which the Debtors hold a controlling or substantial interest as set forth in Federal Rule of Bankruptcy Procedure 2015.3 (the "<u>2015.3 Reports</u>") to and including 39 days after the Petition Date (*i.e.*, October 20, 2023), without prejudice to the Debtors' ability to request additional extensions or to file a motion seeking a modification of such reporting requirements for cause.

44.     The Debtors submit that ample cause exists to grant the requested relief.  To prepare their Schedules and Statements, the Debtors will have to compile information from books, records, and documents relating to thousands of claims, assets, leases, and contracts from each of the six

Debtor entities. Collection of the necessary information will require a significant expenditure of time and effort on the part of the Debtors, their employees, and their advisors at a time when such resources would be best used to stabilize the Debtors' business operations at the outset of these cases. Additionally, because this information is voluminous and located in numerous places throughout the Debtors' organization, including in certain non-Debtor affiliates based in Asia, it may be some time before the Debtors have access to all of the information required to prepare the Schedules and Statements.

45.    Further, certain of the Debtors maintain interests in non-Debtor subsidiaries that may fall under the ambit of Bankruptcy Rule 2015.3 and, as such, the Debtors would be required to file 2015.3 Reports. The Debtors believe that cause exists to extend the deadline for filing the 2015.3 Reports based on (a) the size, complexity, and scope of the Debtors' business and (b) the substantial burdens imposed by compliance with Bankruptcy Rule 2015.3 in the early days of these Chapter 11 Cases.

### *Financing/Operational Motions*

**A.    *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Granting Adequate Protection to Prepetition ABL Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* ("<u>DIP Financing Motion</u>")**

46.    By the DIP Financing Motion, the Debtors seek (i) approval of the proposed senior secured, superpriority postpetition financing on a superpriority basis consisting of a senior secured superpriority revolving credit facility in the aggregate principal amount of up to $12,200,000 in new money advances plus the DIP Roll-Up Obligations (the "<u>DIP Facility</u>") pursuant to the terms and conditions of DIP Agreement with Wells Fargo Bank, N.A. as the DIP Agent and a DIP Lender; (ii) authorization to apply all collections and proceeds of DIP Collateral to reduce, on a

dollar for dollar basis, the Prepetition ABL Obligations (the "Creeping Roll-Up") and, upon entry of the Final Order, converting all remaining outstanding Prepetition ABL Obligations into DIP Obligations (the "DIP Roll-Up Obligations"); (iii) approval of adequate protection to the Prepetition ABL Parties for any diminution in value of their interests in the Prepetition Collateral, including Cash Collateral; and (iv) the granting of related relief set forth in the proposed order on the DIP Financing Motion.

47.     The Debtors require immediate access to the DIP Loans, and continued use of Cash Collateral, to fund operations, capital expenditures, and the administrative costs of these Chapter 11 Cases. As of the Petition Date, the Debtors' cash on hand is insufficient to operate their enterprise and continue paying their obligations as they come due. The Debtors' business is cash-intensive, with significant daily costs required to satisfy obligations to the Debtors' customers, landlords, vendors, and employees.  Access to the DIP Loans and Cash Collateral also will allow the Debtors to consummate a value-maximizing, going concern sale, either with the Stalking Horse Purchaser or an alternative overbidder.

48.     The Debtors rely on the liquidity generated from their operations to, among other things, procure home furnishings to sell to their customers. Because the Debtors operate in a competitive industry, a seamless transition into chapter 11 and the ability to continue uninterrupted operations is imperative to preserve relationships with the Debtors' suppliers and the loyalty and goodwill of their customers, vendors, and employees, and the going-concern value of the Debtors. The Debtors and their advisors have carefully reviewed and analyzed the Debtors' projected cash receipts and disbursements and prepared a budget outlining the Debtors' postpetition cash needs over the course of the Chapter 11 Cases, a copy of which is attached to the proposed Interim Order.

The Debtors determined that they require immediate access to DIP financing to fund the costs of these Chapter 11 Cases and ongoing business operations.

49.     The Debtors believe that the DIP Facility provides the Debtors with sufficient liquidity to maintain their operations, fund the administration of these Chapter 11 Cases, and provide sufficient runway to market and consummate a going-concern sale of substantially all the Debtors' assets. The DIP Facility will allow the Debtors to: (a) continue satisfying obligations to the Debtors' contract counterparties; (b) reassure other stakeholders, including the Debtors' customers and employees, that the Debtors have sufficient funds to continue operating in the ordinary course; (c) fund the Debtors' payroll obligations; (d) fund the administrative costs of these Chapter 11 Cases; and (e) consummate a value-maximizing, going concern sale transaction. Absent funds available from the DIP Loans and access to Cash Collateral, the Debtors could face a value-destructive interruption to their business and lose support from important stakeholders on which the Debtors' business depends. This result, in turn, would hinder the Debtors' ability to maximize the value of their estates, and the Debtors would be forced to curtail their operations significantly, or even cease operations, to the severe detriment of all stakeholders.

50.     Further, I believe the adequate protection provided in the Interim Order (the "Adequate Protection") is fair and reasonable under the circumstances. The Adequate Protection package proposed for the Prepetition Lenders includes the liens and superpriority claims described in the Interim Order. Taken together, the cumulative effect of all of these provisions is to provide reasonable and appropriate adequate protection for the Prepetition ABL Parties.

51.     In evaluating possible financing sources for the Debtors' postpetition financing, the Debtors' advisors determined that no third-party lender is willing to provide DIP financing to the Debtors on terms or timing more favorable than the DIP Facility.  Starting in mid-August 2023,

the Debtors' advisors contacted eighteen potential DIP lenders, of whom thirteen signed non-disclosure agreements. No third-party provided an actionable proposal to lend.

52. The Debtors do not reasonably believe there are strong grounds to support a third-party priming facility under section 364 of the Bankruptcy Code. Additionally, the Debtors believe that the delays, costs, and futility of continuing to shop for such third-party financing from every possible source, as well as the attendant delay in stabilizing the Debtors' operations, more than justify proceeding with the DIP Facility instead.

53. Accordingly, it was clear to the Debtors and their advisors that their best path to financing these Chapter 11 Cases was through financing from the Prepetition ABL Parties. Following extensive arm's-length and good faith negotiations with the Prepetition ABL Parties, the Debtors reached agreement on the proposed DIP Facility, the terms of which are fair and reasonable.

**B.** ***Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Maintenance of Existing Bank Accounts; (II) Authorizing Continuance of Existing Cash Management System; (III) Granting Limited Waiver of Section 345(b) Deposit Requirements; (IV) Authorizing Continued Performance of Intercompany Transactions and Funding; and (V) Granting Related Relief (the "Cash Management Motion")***

54. Pursuant to the Cash Management Motion, the Debtors seek entry of interim and final orders (i) authorizing the Debtors to (a) continue operating the Cash Management System; (b) honor and pay the Fees in the ordinary course, including any prepetition Fees; (c) maintain existing business forms; and (d) continue intercompany transactions and funding consistent with the Debtors' historical practices, subject to the terms described in the Cash Management Motion; (ii) granting a limited waiver of the deposit and investment requirements imposed by section 345(b) of the Bankruptcy Code; and (iii) granting related relief.

55. In the ordinary course of business, the Debtors utilize a centralized cash management system (the "Cash Management System") to collect, manage, and disburse funds used

in their business. The Cash Management System is essential to the stability of the Debtors' assets and business objectives and to maximizing the value of their estates. Importantly, the continuity of the Cash Management System is critical to the Debtors' ability to operate and receive revenue from its customers.

56.     The Cash Management System is tailored to meet the operating needs of the Debtors by enabling them to centrally control and monitor corporate funds, ensure cash availability and liquidity, and reduce administrative burdens by facilitating the movement of funds between and among the Debtors and their non-Debtor affiliates. These controls are critical to the operation of the Debtors' businesses given the significant volume of transactions managed through the Cash Management System. The Debtors' treasury department maintains daily oversight over the Cash Management System and controls the entering, processing, and releasing of funds, including in connection with Intercompany Transactions (discussed below). As the Debtors require prompt access to cash for their daily operations, any disruption of the Cash Management System would have an immediate and devastating adverse effect on the Debtors' operations to the detriment of their estates and stakeholders.

57.     As of the Petition Date, the Debtors maintain ten bank accounts (the "Debtor Bank Accounts" or "Bank Accounts") at three banks (the "Banks").[3] The Debtors' primary Bank is Wells Fargo Bank ("Wells Fargo"), at which the Debtors maintain seven Bank Accounts. The

---

[3]     The Debtors administer and manage certain accounts for non-Debtor affiliates pursuant to operating agreements or other arrangements. Such accounts and the funds therein belong to the applicable non-Debtor affiliate (subject to any applicable agreements) and are not commingled with the accounts (and funds therein) held in the Debtors' names.

Debtors also maintain (a) two Bank Accounts at Pacific Western Bank ("PacWest") and (b) one Bank Account at Chase Bank.[4]

58.     In addition to the Bank Accounts, the Debtors maintain accounts with a number of third party payment services (the "Market Place Services") that allow the Debtors to manage and collect online payments (collectively, the "Market Place Accounts" and together with the Bank Accounts, the "Accounts"). While the Market Place Accounts represent a small portion of the Debtors' revenue, the Debtors believe maintaining the Market Place Accounts is necessary and appropriate given the online nature of the Debtors' business.

59.     Further, in the ordinary course of business, the Company engages in intercompany transactions and transfers of funds among various Bank Accounts ("Intercompany Transactions"). As a result, Intercompany Transactions may exist that reflect intercompany receivables and payables ("Intercompany Claims") made in the ordinary course of business between and among Debtors and their non-Debtor foreign affiliates. These Intercompany Claims may include transfers from the Master Account to fund the operations and expenses of certain of the Debtors' non-Debtor, foreign subsidiaries, which are essential components of the Debtors' complex international operations. The foreign Intercompany Claims generally arise in one of two ways:

60.     *First*, and as discussed in the Wage Motion, the Debtors fund the operating expenses of their non-Debtor subsidiaries in Asia (the "Operating Subsidiaries") that provide various back office services to the Debtors' U.S.-operations. The Operating Subsidiaries are necessary for the operation of the Debtors' business and allow the Debtors to utilize lower cost offshore employees and resources. The expenses of the Operating Subsidiaries include the cost of

---

[4]     Certain of the Debtors' non-Debtor foreign subsidiaries maintain bank accounts at Wells Fargo in their own name. A domestic non-Debtor, Noble House Assurance, LLC ("NH Assurance"), is a single parent captive, which maintains an assurance account at Wells Fargo.

renting and maintaining office space and total approximately $135,000 per month (exclusive of the costs of employee wages and benefits). *Second*, the Debtors historically pay certain costs and expenses of their other foreign subsidiaries in the ordinary course of business and are then reimbursed in the ordinary course of business. As of the Petition Date, there are no amounts owing to any non-Operating Subsidiaries and the Debtors anticipate that any amounts that may need to be funded in the future will be *de minimis*. Further, and as discussed in Utilities Motion, Debtor Le Pouf, LLC, maintains a Bank Account at Chase Bank, which is used to fund all deposits and payments to utility companies across the Debtor entities. During the bankruptcy, the Debtors will record and track the Intercompany Transactions and Intercompany Claims that occur across the corporate structure, as and after they occur, through entries in the general ledger.

61.     By the Cash Management Motion, the Debtors seek to balance their desire to minimize disruptions to their businesses and preserve estate value, on the one hand, and to provide this Court with an appropriate level of supervision and oversight, on the other hand. Thus, the Debtors propose the following approach with respect to each postpetition Intercompany Transaction (each, a "Postpetition Intercompany Transaction"): the Debtors seek authority, but not direction, to continue entering into ordinary course Postpetition Intercompany Transactions (including with respect to any netting and setoff) without further notice or Court approval. The Debtors will maintain current records with respect to all postpetition cash transfers so that all Postpetition Intercompany Transactions may be readily ascertained, traced and properly recorded on any applicable intercompany accounts.

62.     Further, to ensure that no Debtor will fund the operations of a Debtor at the expense of such entity's creditors, the Debtors request, pursuant to Bankruptcy Code sections 503(b)(1) and 364(b), that all Intercompany Claims on account of valid postpetition transfers from a Debtor

to another Debtor or to a non-Debtor subsidiary, including an Operating Subsidiary, be accorded administrative expense status, subject and junior only to the claims, including adequate protection claims, granted in connection with the Debtors' use of cash collateral, and in accordance with any interim and final order, as applicable, approving the use of cash collateral (collectively, the "Cash Collateral Orders").

63.     Allowing the Debtors to engage in postpetition Intercompany Transactions is in the best interests of the Debtors' estates and their creditors, and the Debtors seek authority to enter into such Intercompany Transactions in the ordinary course of business. The Debtors will continue to maintain records of Intercompany Transactions, including records of all current intercompany accounts receivables and payables. If the Intercompany Transactions were to be discontinued, the Cash Management System and related administrative controls would be disrupted to the Debtors' and their estates' detriment. The continued performance of the Intercompany Transactions is in the best interest of the Debtors' estates and their creditors.

64.     The Debtors further seek a waiver of the deposit requirements set forth in section 345 of the Bankruptcy Code.  As discussed in the Cash Management Motion, all of the Bank Accounts are FDIC-insured (up to applicable limits), and most of the Bank Accounts are maintained at Wells Fargo and Chase Bank, both of which have executed a Uniform Depository Agreement ("UDA") with, and are designated as authorized depositories by, the U.S. Trustee, pursuant to the U.S. Trustee Operating Guidelines. The Debtors believe that their other Bank, PacWest, and the Market Place Accounts are reputable and financially stable. Further, all PacWest accounts and Market Place Accounts either (i) are zero balance accounts or (ii) on average, contain relatively small amounts of funds (below the $250,000 FDIC insurance limit) as reflected in

Exhibit 2 (balances) attached to the Cash Management Motion, and are routinely swept to the Master Account.

65.     Further, the Debtors incur certain fees and charges in connection with the ordinary course operation of the Cash Management System (collectively, the "Fees"). The Fees include account maintenance charges, charges relating to ACH and wire transfers, lockbox and depository service charges, and other customary miscellaneous charges. The Debtors do not believe there are any material prepetition Fees outstanding on the Petition Date, but nonetheless seek approval to pay and, for the Bank to deduct, any such Fees in the ordinary course when due.

**C.     *Debtors' Emergency Motion for Entry of an Order Authorizing the Debtors to (I) Pay and/or Honor Prepetition Wages, Salaries, Employee Benefits, and Other Compensation; (II) Remit Withholding Obligations and Deductions; (III) Maintain Employee Compensation and Benefits Programs and Pay Related Administrative Obligations; and (IV) Have Applicable Banks and Other Financial Institutions Receive, Process, Honor, and Pay Certain Checks Presented for Payment and Honor Certain Fund Transfer Requests ("Wage Motion")***

66.     In the ordinary course of business, the Debtors pay wages and compensation and related accrued administrative fees to employees, independent contractors, and related third-party recipients, maintain various Health and Welfare Benefits, and withhold various taxes and other amounts as may be required by law (collectively, the "Compensation and Benefits"). By the Wage Motion, which facts therein are incorporated herein, the Debtors seek authorization to pay all Compensation and Benefits that accrued prepetition and to continue to meet their obligations under the Compensation and Benefits programs.

67.     As of the Petition Date, the Debtors employ approximately 275 employees (the "Employees") (salaried and hourly employees).   The Debtors' workforce also includes approximately 109 independent contractors (the "Independent Contractors"), whom are sourced from various staffing agencies (the "Staffing Agencies") to fulfill certain duties on a short and long-term basis. The Debtors also utilize back-office functions provided by four overseas non-

Debtor affiliates Noble House Home Furnishings Vietnam Company Limited, Noble House Home Furnishings (MY) Sdn.Bhd, Fujian Baimei Electronic Commerce Co., Ltd., and Baimei (Fujian) Network Information Technology Co., Ltd. (the "Operating Subsidiaries") that collectively employ 156 individuals (the "Operating Subsidiaries Employees" and together with the Employees and the Independent Contractors, the "Workforce").[5]

68.    The vast majority of the Workforce relies on compensation and benefits to pay daily living expenses. These individuals will be unfairly harmed if the Debtors are not permitted to continue paying their compensation and providing health and other benefits during these Chapter 11 Cases. The Debtors' Workforce is essential to the Debtors' business, and payment of the Compensation and Benefits at this time is necessary to avoid potential material disruption to the Debtors' ordinary-course operations. Finding, attracting, and training new qualified talent would be extremely difficult, particularly given current labor market conditions. Such recruitment efforts would most likely require, among other things, higher salaries, guaranteed bonuses, and more comprehensive compensation packages than are currently provided to members of the Workforce. Further, delaying payment of Compensation and Benefits risks a needless, value-destructive disruption of the Debtors' businesses.

69.    I believe that the Employees have extensive knowledge of the operation of the Debtors' business and are important components to the successful resolution of the Debtors' cases. Deterioration in the morale and welfare of the Employees at this critical time undoubtedly would adversely impact the Debtors and their ability to sustain their operations. Satisfaction of the

---

[5]    The non-Debtor Operating Subsidiaries employ approximately 263 employees in total around the globe. The Debtors do not directly fund the payroll of any of these employees, but do periodically indirectly fund such payroll as part of the Company's cash management system. The payment, when made, is then accounted for on the Debtors' and Operating Subsidiaries' books as receivables and payables, respectively. Authority to continue this practice is sought in the Cash Management Motion.

Compensation and Benefits, as described in the Wage Motion, is necessary to maintain the Employees' morale during the cases and to ensure continued, efficient operation in order to maximize value for all stakeholders.

**D.  *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Payment of Certain Taxes and Fees and (II) Granting Related Relief (the "Taxes/Fees Motion")***

70.     Pursuant to the Taxes/Fees Motion, the Debtors seek entry of an order authorizing the Debtors in their discretion to remit and pay certain Taxes and Fees, including amounts that may have accrued prepetition, in the ordinary course of business (including, without limitation, using tax credits to offset Taxes and Fees), and granting related relief.

71.     In the ordinary course of business, the Debtors collect, withhold, and incur taxes and fees related to sales and use, property, income, annual reporting fees, audits, and business and regulatory fees (as discussed further below, collectively, the "Taxes and Fees").[6]  The Debtors remit the Taxes and Fees to various governmental authorities on a monthly, quarterly, semi-annual, or annual basis (collectively, the "Authorities"). A schedule identifying the Authorities is attached to the Taxes/Fees Motion.

72.     The Debtors seek authority to make payments where (a) the Taxes and Fees have accrued or were incurred prepetition but (i) were not paid prepetition or (ii) were paid in an amount less than actually owed, (b) the Debtors made payments prepetition that were lost or the Authorities did not receive the prepetition payments in full, which may give rise to interest and other penalties, (c) the Taxes and Fees were incurred for prepetition periods and become due and payable after the Petition Date, (d) the Taxes and Fees accrued or are incurred postpetition, and (e) the Taxes and Fees are for so-called "straddle" periods.

---

[6]     The Debtors do not seek authority to pay prepetition amounts related to employment taxes and payroll withholding taxes under the Taxes/Fees Motion, but rather request such authority in the Wage Motion.

73.     Failure to pay the Taxes and Fees could materially disrupt the Debtors' business operations in various ways, including: (a) the Authorities may initiate audits or other proceedings for the Debtors, which would unnecessarily divert the Debtors' attention from the chapter 11 cases; (b) the Authorities may attempt to suspend the Debtors' operations, file or assert liens, seek to lift the automatic stay, and/or pursue other remedies that will harm the estates; and (c) in certain instances, the Debtors' directors and officers could be subject to claims of personal liability, which would likely distract those key individuals from their duties related to the Debtors' bankruptcy. Unpaid Taxes and Fees may result in fines and penalties, the accrual of interest, or both. Finally, the Debtors collect and hold certain outstanding tax liabilities in trust for the benefit of the applicable Authorities, and these funds may not constitute property of the Debtors' estates.

74.     In sum, the Debtors' ability to pay the Taxes and Fees is critical to their continued and uninterrupted operations, and accordingly, the Taxes/Fees Motion, the facts of which are incorporated herein, is in the best interest of the estates and all stakeholders.

F.     ***Debtors' Emergency Motion for the Entry of an Order (I) Approving the Proposed Adequate Assurance Deposit for Future Utility Services, (II) Prohibiting Utility Providers From Altering, Refusing, or Discontinuing Services, (III) Approving the Proposed Adequate Assurance Procedures for Resolving Adequate Assurance Requests, and (IV) Granting Related Relief (the "Utility Motion")***

75.     Pursuant to the Utility Motion, the Debtors seek entry of an order (a) determining that the Adequate Assurance Deposit provides the Utility Providers with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code, (b) prohibiting the Utility Providers from altering, refusing, or discontinuing services, (c) approving the Adequate Assurance Procedures for resolving any dispute in connection with the Adequate Assurance Deposit, and (d) granting related relief.

76.     In connection with the operation of their businesses, the Debtors obtain and critically need electricity, water, gas, internet, telephone, telecom, waste management, sewer,

recycling, and other similar services (collectively, the "Utility Services"), from a number of utility providers (collectively, the "Utility Providers"). On average, the Debtors spend approximately $112,947 each month in the aggregate, or approximately $28,236 each week on Utility Services, using the historical average of payments made to the Utility Providers. The Debtors intend to satisfy postpetition obligations owed to the Utility Providers in the ordinary course of business and in a timely manner. The Debtors' cash on hand, cash generated in the ordinary course of business, and the availability under Debtors' proposed debtor in possession financing will provide for sufficient liquidity for payments to Utility Providers in accordance with ordinary prepetition practice. As additional assurance of payment, the Debtors propose to deposit $39,751.02 (as adjusted for any existing deposits, the "Adequate Assurance Deposit"), equal to approximately two weeks of the average weekly cost of Utility Services, into a segregated bank account (the "Adequate Assurance Account") maintained by the Debtors.

77. The proposed procedures for the Adequate Assurance Deposits and dealing with the Utility Providers should be approved because they facilitate the Debtors' ability to provide assurance of future payment without prejudicing the rights of Utility Providers.

**G.** ***Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Payment of Shippers and Warehousemen, and (II) Granting Related Relief (the "Shippers/Warehousemen Motion")***

78. Pursuant to the Shippers/Warehousemen Motion, the Debtors seek an order authorizing the Debtors to pay certain shipper and warehouseman claims in the ordinary course of business on a postpetition basis.

79. In the ordinary course of business, the Debtors engage certain vendors (the "Shippers") to transport or deliver its goods and materials (the "Materials") to the Debtors' distribution centers and warehouses and then ultimately to the Debtors' customers. Delivery of the Materials in a timely manner is integral to the Debtors' business. Additionally, the Debtors rely on

certain additional vendors (collectively, the "Warehousemen" and together with the Shippers, the "S&W Claimants") in the ordinary course of business to store Materials when not in transit.

80.     I am informed and understand that if the Debtors were to default on any obligation to the Warehousemen, the Warehousemen may assert a lien, attempt to take possession of the Debtors' property, or bar the Debtors' access to Materials stored at the Warehousemen's yards. In addition, under most state laws, a Shipper or a Warehouseman may have a lien on the goods in its possession, which lien secures the charges or expenses incurred in connection with the transportation or storage of such goods. As a result, certain S&W Claimants may refuse to deliver or release Materials or other property in their possession or control, as applicable, before the prepetition amounts owed to them by the Debtors (collectively, the "S&W Claims"), have been satisfied and their liens redeemed.

81.     In the twelve months preceding the Petition Date, the Debtors paid approximately $160 million in S&W Claims. As of the Petition Date, the Debtors estimate that they have approximately $10 million of prepetition S&W Claims outstanding. To continue using the S&W Claimants transportation and storage services and have access to the Materials held or controlled thereby, the Debtors request authority to pay prepetition S&W Claims as they become due and payable and to continue paying S&W Claims in the ordinary course of business on a postpetition basis, subject to certain conditions and procedures set forth in the Shippers/Warehousemen Motion.

82.     As explained in the Shippers/Warehousemen Motion, the Debtors' revenues and their relationships with their retail partners could be placed in jeopardy absent the relief requested, risking diminution of the Debtors' going concern value at this critical time. Accordingly, the Debtors submit that the payment of the S&W Claims is necessary to protect the Debtors' business

and ensure that the Debtors are able to maximize the value of their estates during these chapter 11 cases.

**H.**    ***Debtors' Emergency Motion Seeking Entry of an Order (I) Authorizing the Debtors to Maintain and Administer Their Existing Customer Programs and Honor Certain Prepetition Obligations Related Thereto, and (II) Granting Related Relief (the "Customer Programs Motion")***

83.    Pursuant to the Customer Programs Motion, the Debtors seek an order (a) authorizing the Debtors to maintain and administer their customer-related programs (the "Customer Programs") in the ordinary course of business consistent with prepetition practices, including allowing for recoupments and offsets of undisputed debts; and pay and honor certain prepetition obligations related thereto; and (b) granting related relief.

84.    The Debtors' customers are generally large e-Commerce partners like Amazon, Walmart, Wayfair, and Home Depot (the "Customers"). To preserve the Debtors' critical relationships with its Customers, the Debtors have historically provided certain credits and discounts discussed below to their Customers. The Customer Programs are beneficial and cost-effective, and they promote the goodwill of the Debtors' business. While the exact terms of the Customer Programs (and relevant rates) vary by individual contract, the Debtors generally have agreed to concessions in favor of their customers at an aggregate rate of 21% of their monthly sales for a total of approximately $7 million per month year to date. This amount varies from week to week based on seasonal and other promotions. In the aggregate, the Debtors believe there is approximately $10.4 million in prepetition obligations outstanding under the Customer Programs as of the Petition Date.

(i)    Freight Allowance. The Debtors provide a freight allowance to certain of their Customers. The freight allowance is based on an agreed-upon percentage of gross sales and constitutes a discount to the total freight costs charged through to the Customer.

(ii)   <u>Returns</u>.  In the ordinary course of business, the ultimate purchaser of the Debtors' products may return those products to the Debtors' Customers.  Pursuant to their contracts with their Customers, the Debtors have either agreed to reimburse their Customers by providing a set percentage discount based on gross sales regardless of the number of returns or to reimburse their Customers based on a value relative to the actual returned products.

(iii)   <u>Spoilage</u>.  In the ordinary course of business, a certain percentage of the Debtors' products get lost or damaged in transit.  Instead of addressing these instances on a case by case basis, the Debtors typically agree to provide certain of their Customers a set percentage discount to compensate for the lost or damaged products.

(iv)   <u>Advertising; Promotion</u>.  The Debtors are contractually obligated to participate in certain advertising and promotional campaigns run by their Customers and are contractually entitled to opt into certain other promotions, *e.g.*, Prime Day on Amazon and other discount programs.  The cost of participating in these campaigns is offset by contract against amounts otherwise due to the Debtors.

85.   The disruption of the Debtors' operations attendant to the failure to maintain the Customer Programs would cause the Debtors' estates to lose revenue, which could negatively impact the Debtors' ability to achieve their chapter 11 objectives.  The potential harm and economic disadvantage that would stem from the failure to honor any of the Debtors' prepetition obligations is grossly disproportionate to the amount of the prepetition claims that may be paid.  Continuing the Customer Programs without interruption during these chapter 11 cases will help preserve the Debtors' valuable Customer relationships and goodwill, which will inure to the benefit of all of the Debtors' creditors and stakeholders.  Continuing the Customer Programs will

also allow the Debtors to operate in the ordinary course of business. If the Debtors are unable to continue their Customer Programs postpetition or to pay amounts or other value due and owing to their Customers under the various Customer Programs, the Debtors risk alienating certain Customer constituencies and suffering corresponding losses in Customer loyalty and goodwill that will harm the Debtors' prospects for a restructuring that maximizes value.

**I.**      ***Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Continue Insurance Coverage Entered into Prepetition and Satisfy Prepetition Obligations Related Thereto, (B) Honor and Renew the Premium Financing Agreement Entered Into Prepetition and Satisfy Obligations Related Thereto, and (C) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies; and (II) Granting Related Relief (the "Insurance Motion")***

86.      By the Insurance Motion, the Debtors seek an order (a) authorizing the Debtors to (i) continue insurance coverage entered into prepetition and satisfy prepetition obligations related thereto in the ordinary course of business, (ii) honor and renew any premium financing agreement entered into prepetition and satisfy obligations related thereto, and enter into new premium financing agreements in the ordinary course of business, and (iii) renew, amend, supplement, extend, or purchase insurance coverage in the ordinary course of business on a postpetition basis; and (b) granting related relief.

87.      In the ordinary course, the Debtors maintain approximately twenty-three (23) insurance policies (collectively, the "Insurance Policies," and the carriers thereof, the "Insurance Carriers"), providing coverage for, among other things, commercial property, flood, tank pollution, cyber, employer practice, and directors' and officers' liability. The Insurance Policies are essential to the preservation of the Debtors' business and assets, and, in many instances, such insurance coverage is required by regulation, law, or contract that governs the Debtors' business. The Debtors are also members of a member-owned group captive insurance pool, Resolute Insurance,

which provides automobile and workers compensation coverage. A comprehensive list of the Insurance Policies is attached to the Insurance Motion.

88.     To preserve the value of the Debtors' business operations, properties, and assets, it is essential that the Debtors be able to continue or renew the Insurance Policies and enter into new insurance policies. In many cases, regulations, laws, and contract provisions that govern the Debtors' commercial activities require the types of coverage provided for under the Insurance Policies, as well as the Bankruptcy Code and the operating guidelines issued by the United States Trustee for Region 7 (the "U.S. Trustee Guidelines"). The relief requested is designed to ensure uninterrupted coverage under the Insurance Policies.

### *Sale Motions*

**J.**     ***Debtors' Emergency Motion for Entry of Orders (A)(I) Authorizing Asset Purchase Agreement for Sale of Substantially All of Debtors' Assets (II) Approving Bidding Procedures for Sale of Debtors' Assets, (III) Approving Bid Protections, (IV) Scheduling Certain Dates With Respect Thereto, (V) Approving the Form and Manner of Notice Thereof, and (VI) Approving Contract Assumption and Assignment Procedures; (B) Approving (I) Sale of Certain Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, and (II) Assumption and Assignment of Certain Contracts and Leases; and (C) Granting Related Relief (the "Sale/Procedures Motion")***

89.     As discussed above, the Debtors filed the chapter 11 cases to effectuate a sale of substantially all their assets to a going-concern buyer through a transaction that will preserve the Debtors' business operations, jobs, and vendor relationships. Before the Petition Date, the Debtors engaged Lincoln as their investment banker in connection with the Debtors' efforts to identify such a going-concern buyer. The Debtors have been engaged in a robust marketing process since July 2023 to assist with the identification of one or more parties interested in consummating a sale transaction with the Debtors contacted parties it believed were most likely to be interested in the Debtors' business and assets.

90.     These discussions culminated in the Stalking Horse Purchase Agreement.  By the Sale/Procedures Motion, the Debtors seek an order (the "Sale Order"), among other things, (a) approving the sale of the Debtors' assets to the Stalking Horse Purchaser or other successful bidder at the Auction free and clear of liens, claims and interests pursuant to Bankruptcy Code section 363(f), (b) approving the Bidding Procedures; (c) approving the assumption and assignment of the Contracts; (d) determining that the Stalking Horse Purchaser or other successful bidder is a good faith purchaser pursuant to Bankruptcy Code section 363(f) and (m), and is entitled to the protections of Bankruptcy Code section 363(m), and (e) granting related relief.

91.     Commencing in July 2023, Lincoln contacted approximately sixty potential buyers. To date, twenty-three of these parties have signed non-disclosure agreements and have received access to the comprehensive Data Room.  Five of those parties held management meetings, and four conducted site visits.  Ultimately, three parties submitted preliminary, non-binding Indications of Interest (IOIs).

92.     On September 11, 2023, the Debtors entered into the Stalking Horse Purchase Agreement with the Stalking Horse Purchaser.  The proposed purchase price for the Purchased Assets[7] is $85,000,000, subject to adjustment or holdback as set forth in the Stalking Horse Purchase Agreement, plus an additional $4,100,000 to be allocated to Banc of America Leasing & Capital, LLC for Non-Automated Equipment, plus the assumption of certain liabilities.

93.     The Debtors are seeking approval of the Bidding Procedures to establish a clear and open process for the solicitation, receipt, and evaluation of overbids on a timeline that allows the Debtors to consummate a Sale of substantially all of the Debtors' Property that the Debtors believe is reasonable and will provide parties with sufficient time and information to submit a competitive

---

[7]     The Purchased Assets are substantially all of the Debtors' assets relating to the operation of their Business (as defined in the Stalking Horse Purchase Agreement).

bid. In formulating the Bidding Procedures and time periods set forth therein, the Debtors balanced the need to provide adequate notice to parties in interest and potential bidders with the need to run a fulsome, expeditious, and efficient marketing process. The Bidding Procedures are designed to generate the highest or otherwise best available recoveries to the Debtors' stakeholders by encouraging prospective bidders to submit competitive, value-maximizing bids. The Bidding Procedures are designed to allow the Debtors sufficient time to conduct a Sale and potentially an Auction while simultaneously ensuring that the Debtors maintain sufficient runway in these chapter 11 cases.

94.     The Debtors also request authority, as set forth in the Bidding Procedures, Bidding Procedures Order, and Stalking Horse Purchase Agreement with the Stalking Horse Purchaser to provide the Breakup Fee ($3.4 million) and Expense Reimbursement (up to $550,000). Such Bid Protections would be an actual and necessary cost of preserving the value of the Debtors' estates.

95.     The Breakup Fee and Expense Reimbursement are a critical component of the proposed transaction. The Stalking Horse Purchaser has expended and will continue to expend time and resources negotiating, drafting, and performing due diligence activities necessitated by the Sale transaction, despite the fact that its bid will be subject not only to Court approval, but also to overbidding by third parties. The Breakup Fee and Expense Reimbursement have been negotiated in good faith and at arm's length and with significant give-and-take with respect to such Breakup Fee and Expense Reimbursement. As a result, by the Breakup Fee and Expense Reimbursement, the Debtors ensure that their estates can realize the benefit of a transaction with the Stalking Horse Purchaser without sacrificing the potential for interested parties to submit overbids at the Auction.

96.     As discussed in the Sale/Procedures Motion, approval of the Bidding Procedures and the other requested relief is in the best interest of the estates will allow the Debtors to implement a reasonable auction/overbidding process for the benefit of all stakeholders.

Executed this 12th day of September 2023 at Chatsworth, California.


*/s/ Gayla Bella*
Gayla Bella

**EXHIBIT A**

## Noble House Home Furnishings and Related Entity Structure

